STATE OF INDIANA       )
                          )    SS:
COUNTY OF VANDERBURGH  )

IN THE VANDERBURGH CIRCUIT COURT

JOHN DOE                    )
           Plaintiff       )
                          )
     v.                  )     CAUSE NO.   **82C01-2109-PL-004615**
                          )
UNIVERSITY OF SOUTHERN INDIANA )
          Defendant    )

## **COMPLAINT**

COMES NOW the Plaintiff, by counsel, and for his Complaint against the Defendant, University of Southern Indiana ("USI"), alleges and states as follows:[1]

1.    Plaintiff, a nineteen-year-old black male, is currently a sophomore student at USI; he receives several scholarships and is studying towards a major in Business Administration.

2.    USI is a state public educational institution located in Evansville, Vanderburgh County, Indiana.

3.    This Court has jurisdiction over the subject matter and persons hereto, and venue is proper herein.

4.    Plaintiff began his freshman year of education at USI during the 2020-2021 academic school year.

5.    During the first semester of his freshman year, Plaintiff met a certain white, female freshman student (hereinafter referred to as "Jane Doe").

---

[1] Plaintiff, as set forth herein, received notice from USI of the sanction suspending him from school less than three (3) days from the imposition of the sanction. As a result of such a short time period, the within pleading is not as organized as the undersigned counsel would want—or could normally present to the Court.

1

EXHIBIT A

6.     Jane Doe lived in a USI residence hall with three other white, female students.

7.     Plaintiff's USI residence hall and Jane Doe's residence hall were located next to each other.

8.     Plaintiff and Jane Doe became friends and spent considerable time together with mutual friends and Jane Doe's roommates.

9.     Plaintiff and Jane Doe also communicated numerous times during any given week in person, by phone or through social media platforms, such as Instagram, Snapchat and TikTok.

10.     On November 13, 2020, Jane Doe, her roommates, and friends began drinking alcohol in her USI residence hall apartment.

11.     Jane Doe drank alcohol heavily and at approximately 2:00 a.m. on November 14, 2020, Jane Doe texted Plaintiff and invited him to their party.

12.     Plaintiff thereafter went to Jane Doe's residence apartment, where she continued to drink heavily.

13.     At one point in the evening Jane Doe began vomiting and then abruptly ran out of her apartment to go to another male friend's USI residence hall apartment.

14.     At some point in the early morning of November 14, 2020, Jane Doe returned to her apartment where the party was continuing, and she continued drinking alcohol until she ended up in the bathroom where she began vomiting again.

15.     Plaintiff and Jane Doe's roommate helped get Jane Doe into her bed.

16.     Jane Doe fell out of bed and thereafter returned to the common area of the apartment where Plaintiff and others were socializing.

17.     At approximately 5:30 a.m. on November 14, 2020, Jane Doe went to the McDonald's at 115 Rosenberger Avenue with her roommates and other friends from the party; the fast-food restaurant is less than three (3) miles from the USI campus.

18.     Plaintiff did not go to McDonalds but instead slept in the common area of Jane Doe's apartment until later in the day, and then he went back to his USI residence hall.

19.     After November 14, 2020, Plaintiff and Jane Doe continued to communicate numerous times each week.

20.     After November 14, 2020, Plaintiff and Jane Doe went to at least one party together off USI's campus, and Jane Doe visited Plaintiff's residence hall apartment on occasion.

21.     After the first semester of 2020 was completed, Plaintiff went to his home for break and Jane Doe went to her home for break.

22.     During break, Plaintiff and Jane Doe continued to communicate through text and social media platforms numerous times a day and week.

23.     Plaintiff returned to USI in January 2021 after the break, but Jane Doe did not immediately return to campus because of COVID issues.

24.     On January 7, 2021, and while home, Jane Doe posted a TikTok video she created, that included her dancing, and contained text for the video saying "I kissed Seth," with a sexually graphic rap song by Kevin Gates called "Me Too" in the background, including the lyrics:

> She say, bae, I'm nasty, I say, me too
>
> I like fucking you in public, she say, me too
>
> She don't like using no rubber, I say, me too
>
> She wanna fuck me 'cause I'm thuggin', I say, me too

25.     When Jane Doe returned to USI, she continued to communicate with Plaintiff regularly by text and social media.

26.     Plaintiff had borrowed less than One Hundred Dollars ($100) from Jane Doe during the 202 First Semester.  During the break and thereafter, Jane Doe sent angry communications to Plaintiff demanding repayment of the money.

27.     On February 11, 2021, Jane Doe got high smoking marijuana, proceeded to have a panic attack and then told her roommates that Plaintiff had "fingered her" without her consent during the early morning of November 14, 2020.

28.     While high on marijuana on February 11, 2021, and after her panic attack, Jane Doe did not tell her roommates that Plaintiff had kissed her or touched her breasts on November 14, 2020.

29.     One of Jane Doe's three white roommates called USI's Public Safety Office during the evening of February 11, 2021, to report that Jane Doe had been sexually assaulted by Plaintiff on November 14, 2020.

30.     On February 11, 2021, at approximately 8:30 p.m., a USI public safety officer ("Officer") and a Vanderburgh County Sheriff's Deputy ("Deputy") interviewed Jane Doe at her apartment.

31.     The Officer and the Deputy each prepared a written report based on the interview with Jane Doe.

32.     Each report stated that Jane Doe "did not tell her roommates about what happened until this week."

33.     Despite the voluminous documented communications between Plaintiff and Jane Doe after November 14, 2020, Jane Doe told the Officer and Deputy that she had no communication with Plaintiff between November 15, 2020, and February 10, 2021.

34.     Jane Doe also told the Officer and Deputy that she was wearing a hoodie and no bra at the time of the alleged sexual assault.

35.     Jane Doe did not tell the Officer or Deputy that she was drinking alcohol on November 14, 2020, or that she was drunk to the point of vomiting multiple times.

36.     Jane Doe also told the Deputy that she did not want to pursue criminal charges against Plaintiff.

37.     Jane Doe has stated that she cannot remember events from November 14, 2020.

38.     On February 25, 2021, Jane Doe submitted a written complaint to USI's Title IX Officer accusing Plaintiff of sexual assault on November 14, 2020, and included certain alleged facts relating thereto (the "Title IX Complaint").

39.     Upon receipt of the Title IX Complaint, USI purportedly began operating under its written sexual assault policy (the "Policy").  A true and correct copy of the Policy is attached hereto as Exhibit 1.

40.     The Policy is intended to comply with the requirements of Title IX (20 U.S.C. § 1681, *et seq.*) and its applicable regulations (the "Regulations").

41.     Once the Title IX Complaint was filed, USI was obligated under the Policy and the Regulations to give Plaintiff notice of the facts then known as to the identity of the accuser, the conduct allegedly constituting sexual harassment, and the date and time of the alleged incident.

42.     USI's written notice to Plaintiff did not include all the facts then known by USI and as outlined in the Title IX Complaint.

43.     When Plaintiff subsequently requested a copy of the Title IX Complaint, USI advised Plaintiff that no written complaint had been filed by Jane Doe.

44.     USI thereafter retained a lawyer from a Kansas City, Missouri, firm to act as the investigator for the Title IX Complaint (the "Investigator").

45.     The Investigator was told by USI that the Title IX Complaint involved accusations that Plaintiff sexually assaulted Jane Doe on November 14, 2020, by kissing her, touching her breasts and digitally penetrating her all without her consent.

46.     Under the Policy and Regulations, USI is obligated to and responsible for gathering the evidence as to the investigation of the Title IX Complaint.

47.     The Investigator interviewed Jane Doe on April 15, 2021, and May 18, 2021, but she did not produce any photos, social media posts or any other evidence relating to communications with Plaintiff on or after November 14, 2020.

48.     Jane Doe stated that she might have something from November 14, 2020, but the Investigator never demanded that she produce any such evidence.

49.     Contrary to what she told the Officer and Deputy on February 11, 2021, Jane Doe told the Investigator that she first told her roommate on November 14, 2020, that Plaintiff allegedly fingered her; but she did not tell them that it was allegedly nonconsensual.

50.     The Investigator interviewed Plaintiff on April 27, 2021, and he produced more than fifty (50) printed pages of communications between Plaintiff and Jane Doe from November 15, 2020, to February 10, 2021.

51.     Plaintiff also produced to the Investigator photos from November 14, 2020, including one showing that Jane Doe was not wearing a hoodie as represented to the Officer and Deputy; but rather, she was wearing a jacket and camisole top.

52.     The Investigator also interviewed two of Jane Doe's roommates who stated that they might have photos from November 14, 2020, but the Investigator did not demand copies of any such evidence.

53.     During the Investigator's interview with one of Jane Doe's roommates, the roommate advised the Investigator that she had filed a sexual assault complaint against Plaintiff with USI after Jane Doe filed the Title IX Complaint.

54.     It was later learned that the roommate's sexual assault complaint was based on Plaintiff allegedly slapping her once on the butt on November 14, 2020.

55.     Under USI's Policy and Regulations, any such alleged sexual assault complaint by the roommate was not relevant to the investigation of the Title IX Complaint.

56.     If, in fact, Jane Doe's roommate had filed a sexual assault complaint against Plaintiff, USI was obligated under the Policy and Regulations to give Plaintiff written notice of the same and allow him to defend himself.

57.     USI has never given Plaintiff notice of a sexual assault complaint filed by Jane Doe's roommate.

58.     If USI received a sexual assault complaint from Jane Doe's roommate against Plaintiff, USI must have summarily dismissed such complaint without advising Plaintiff.

59.     USI provided the Investigator with evidence for the Title IX Complaint investigation but it did not disclose to the Investigator any information relating to Jane Doe's roommate's alleged sexual assault complaint or a dismissal thereof.

60.     The Investigator is required to limit his investigation to relevant information as to the Title IX Complaint.

61.     Under the Policy and Regulations, prior sexual acts of Plaintiff or Jane Doe were not relevant to the investigation of the Title IX Complaint.

62.     Plaintiff advised the Investigator that he denied the accusations of the Title IX Complaint because he never kissed Jane Doe, touched her breasts or fingered her on November 14, 2020.

63.     The Investigator completed his investigation and then submitted his report and evidentiary materials to USI's "decision-makers," who would conduct a hearing on the Title IX Complaint.

64.     Per the Policy and Regulations, the Investigator is not to include or provide evidentiary materials that are not relevant to the Title IX Complaint to the decision-makers.

65.     The Investigator did not redact irrelevant information from the evidentiary materials produced to the decision-makers for the hearing; this included testimony from Jane Doe's roommate that she had filed a sexual assault complaint with USI against Plaintiff.

66.     In April of 2021, Jane Doe contacted the Vanderburgh County Sheriff's Office and stated that she wanted to file criminal charges against Plaintiff relating to the alleged sexual assault on November 14, 2020.

67.     The Sheriff's Office began an investigation and requested that Jane Doe produce her phone for downloading since she stated that she had photos on her phone that were relevant to the allegations.

68.     Jane Doe told the Sheriff's Office that she would bring her phone in for downloading and a date and time was set.

69.     Jane Doe did not show on the scheduled date and time to allow the Sheriff's Office to download her phone.

70.     Jane Doe thereafter communicated to the Sheriff's Office that she no longer wanted to pursue criminal charges against Plaintiff for the alleged sexual assault, and the Sheriff's Office closed its investigation.

71.     Because of its policy related to sexual assault investigations, the Sheriff's Office would not provide Plaintiff with a copy of its investigation file as to the allegations of Jane Doe against Plaintiff.

72.     Upon information and belief, because of an agreement with USI, the Sheriff's Office did produce its investigation file as to the allegations of Jane Doe against Plaintiff to USI, who in turn produced it to the Investigator.

73.     Upon information and belief, there is an interview of Jane Doe's roommate by the Sheriff's Office that was given to the Investigator but he did not produce a copy of the same to Plaintiff or include it with his investigation file given to the decision-makers.

74.     After the Investigator completed his investigation and report, USI retained three people to act as the decision-makers under the Policy to conduct a hearing on the Title IX Complaint, and reach a determination thereon.

75.     USI retained three white persons, who were physically located throughout the country and all employed by the same California company, to act as decision-makers (the "Decision-Makers").

76.     The Policy states that, "Decision-Makers" means members of the three-person panel of trained faculty, staff, and/or administrative officials who are assigned by the Title IX Coordinator or designee . . . ."

77.     USI did not appoint a panel of USI faculty, staff or administrative officials.

78.     Two of the three Decisions-Makers had no experience with acting as decision-makers in a Title IX proceeding.

79.     One of the Decision-Makers was a "Senior Solution Specialist" who acted as the Hearing Officer under the Policy (the "Hearing Officer").

80.     One of the Decision-Makers had just started working for the company.

81.     Per the Policy and Regulations, the Decision-Makers could only consider relevant evidence as to the Title IX Complaint.

82.     Per the Policy and Regulations, Plaintiff and Jane Doe were allowed to have an advisor assist them during the investigation and hearing.

83.     Per its Policy, USI imposed a "Statement of Rights and Process" for the hearing which expressly prohibited Plaintiff's advisor from raising objections or making statements or arguments during the hearing (defined below).

84.     If the advisor failed to comply with the Policy hearing rules, the advisor would be expelled from the hearing.

85.     Under the Policy and Regulations, only the advisor can cross-examine witnesses at a Title IX hearing.

86.     If Plaintiff's advisor failed to comply with the Policy hearing rules and was expelled, Plaintiff would be alone at the hearing and he could not cross-examine witnesses.

87.     The Regulations and Policy provide that questions and evidence about a Jane Doe's prior sexual behavior are not relevant, unless (i) such questions and evidence are offered to prove that someone other than the accused committed the conduct the Jane Doe alleges, or (ii)

10

if the questions and evidence concern the specific incidents of the Jane Doe's prior sexual

behavior with the accused and are offered to prove consent.

88.     Neither of these exceptions applied to the Title IX Complaint.

89.     On July 26, 2021, USI issued to Plaintiff a Notice of Administrative Hearing

which stated that "[Jane Doe] alleges that . . . [Plaintiff] kissed [Jane Doe], touched her breast,

and digitally penetrated her vagina *without her consent*."

90.     On August 4, 2021, the Decision-Makers conducted a Zoom hearing on the Title

IX Complaint (the "Hearing").

91.     For purposes of the Title IX Complaint, the Policy defines "relevancy" as:

Having some reasonable connection to and having some value or tendency to
prove or disprove a matter of factual significance.  Questions and evidence about
the Complainant's sexual predisposition or prior sexual behavior are not relevant,
unless offered to prove that someone other than the Respondent committed the
conduct alleged by the Complainant, or if the questions and evidence concern
specific incidents of the Complainant's prior sexual behavior with respect to the
Respondent and are offered to prove consent.

92.     At the Hearing, only the Hearing Officer asked questions of witnesses.

93.     The other two Decision-Makers sat silently and never asked a question or had a

discussion of the relevancy of any question or evidence.

94.     The Hearing Officer never addressed the relevancy of any question or evidence.

95.     Within the first hour of testimony at the Hearing, the Decision-Makers allowed

Jane Doe to testify about:

- Alleged sexual assaults by Plaintiff of other female students.
- Rape by Plaintiff of at least two other female students.
- Nonconsensual sexual interactions between Plaintiff and other female students.
- Prior sexual acts between Plaintiff and Jane Doe.

96.     The Decision-Makers allowed Jane Doe to testify about "other girls that

[Plaintiff] had gotten with and stuff," that she then talked to those girls and they allegedly said "I

11

had a similar experience with [Plaintiff], or he did that to me, too," and "oh, [Plaintiff] did this to a girl at a party when she was drunk," and "this is affecting a lot of girls now."

97.     The Decision-Makers never stopped Jane Doe or any witness from offering irrelevant testimony of Plaintiff allegedly sexually assaulting and raping *other* girls.

98.     In fact, the Hearing Officer repeatedly asked questions down this path, such as, but in no way limited to:

- Asking Jane Doe about Plaintiff allegedly sexually assaulting her roommate.
- Asking Jane Doe, "Back in October, [Jane Doe's roommate] told . . . who that [Plaintiff] had sexually assaulted her?"
- Asking Jane Doe if Plaintiff allegedly "Take advantage of girls generally, or take advantage of her friend?"
- Asking Jane Doe, "Did you know about all of these girls" that Plaintiff allegedly sexually assaulted?
- Asking Jane Doe, "Did you know about all of these girls before you told [your roommates]?"
- Asking Jane Doe, "But you personally talked to those girls from the time you told your roommates until the time you made the report?"
- Asking Jane Doe, "But when you talked about these other girls that you heard about, what did they say?"
- In asking Jane Doe how the other girls' stories about Plaintiff were allegedly similar to Jane Doe's claim at issue, she asks "In what way was it similar?"

99.     Those answers included, but were not limited to, Jane Doe testifying that Plaintiff allegedly:

- Sexually assaulted other girls.
- Made-out with her friend when the friend was "black-out drunk."
- Take advantage of girls.
- That Plaintiff "did stuff to other girls when they were really drunk."
- That other girls "had stuff done to them [by Plaintiff] that they did not consent to.
- That Plaintiff "raped" a girl "when she was high."

100.    The Decision-Makers allowed Jane Doe to testify that other girls were "in danger," that Plaintiff was "hurting people" and "that needs to stop."

101.    Despite it being in direct conflict with the Regulations and the Policy, the Hearing Officer asked Jane Doe about her knowledge of Plaintiff allegedly being sexually involved with specifically named persons, to which Jane Doe proceeded to testify that Plaintiff "slept with" one of the girls, "forced [Plaintiff] on" another and proceeded to "rape" one of these girls "while she was high."

102.    Aside from the irrelevance of these questions and answers, they are completely false and defamatory.

103.    The Hearing Officer further asked questions of Plaintiff about his prior sexual activity with Jane Doe despite its prohibition under the Policy and Regulations as to the Title IX Complaint.

104.    As a result of the Policy and USI's Statement of Rights and Process for the Hearing, there was no means for Plaintiff to stop the flow of irrelevant and prejudicial questioning and testimony at the Hearing.

105.    USI never advised Plaintiff that any other student ever accused him or filed a complaint of sexual assault against him.

106.    Upon information and belief, USI never advised the Investigator that any other student ever accused Plaintiff of sexual misconduct or filed a complaint of sexual assault against him.

107.    Upon receipt of the Title IX Complaint and at any time thereafter, USI had the right, under the Policy and Regulations, to remove Plaintiff from its educational program or activity if it believed he posed a threat to the health or safety of any student or USI community member.

108.    From the time of filing of the Title IX Complaint through the Hearing, USI never exercised its right under the Policy or the Regulations to remove Plaintff from USI's campus or prohibit his involvement in USI events.

109.    Plaintiff has never been advised by USI that any person in any location or at any time has accused him of sexual assault other than Jane Doe.

110.    Allowing such irrelevant testimony was contrary to the Policy and Regulations, showed the bias of the Decision-Makers against Plaintiff, and created a tainted proceeding that affected the outcome of the Hearing.

111.    The procedural and evidentiary irregularities of the Decision-Makers at the Hearing were numerous and resulted in a proceeding which was in violation of the requirements of the Policy and Regulations.

112.    Despite stating at the Hearing that certain photos referred to by Jane Doe and her roommate witness were "not in evidence," the Hearing Officer nonetheless proceeded to rely on Jane Doe and her roommate's testimony regarding said photos and used such non-evidence to further ask leading questions regarding the same.

113.    The Hearing Officer never asked for such "non-evidence" to be produced, and none were produced to the Investigator by Jane Doe or her roommates.

114.    The Decision-Makers subsequently used the testimony of the "non-evidence" to create their own timeline set forth in the Decision (defined below) as to when the alleged sexual assault could have occurred.

115.    For example, in her formal, written complaint to USI, dated February 25, 2021, Jane Doe said that the alleged sexual assault occurred between "2-4 in the morning on Saturday, November 14th."

116.    In her interview with the Investigator on April 15, 2021, Jane Doe did not specify a time; but, during her second interview with Investigator on May 18, 2021, she said it was sometime after 3:30-4:00 a.m. but before 4:45 a.m.

117.    The Hearing Officer asked Jane Doe the leading question – "could that have been about 4:30 [am]," to which Jane Doe replied that it occurred "a bit earlier," "maybe like 4-4:15 [a.m.]."  The Hearing Officer proceeds to ask this leading question: "But it could have been later than [4-4:15 am]?"  The Hearing Officer, then states "**I am just trying to create a time line here**," and further leads Jane Doe to the created timeline, asking – "Would that mean the incident that happened with [Plaintiff] occurred between 4:36 and 4:50 [a.m.]?"

118.    Again relying on the non-evidence to establish a timeline, it should come as no surprise that 4:36 – 4:50 a.m. is the exact "window of time" established by the Decision-Makers in the Decision as to the alleged sexual assault which formed the basis for finding that Jane Doe's version was "plausible."

119.    These photos were neither part of the July 15, 2021, Investigative Report, nor were they produced at the Hearing to prove their existence or any other fact.

120.    The Hearing Officer never asked Jane Doe and her roommate to submit the alleged photos as evidence to actually prove they existed or to show those photos provided relevant evidence.

121.    After the Hearing, the Decision-Makers issued their written Title IX Hearing Summary and Decision (the "Decision") on August 4, 2021.

122.    The Decision first stated:

**Hearing Overview: Allegations of Title IX Sexual Harassment**

This hearing was conducted to determine whether [Plaintiff], ("Respondent") engaged in prohibited conduct in violation of the University of Southern Indiana's

15

Sexual Harassment Policy by committing Sexual Assault, defined as a forcible sex offense, that occurred on November 14, 2020 on the University's campus in . . . Specifically, [Jane Doe] alleged that while in her residence hall room, Respondent kissed her, touched her breast, and digitally penetrated her vagina without her consent.

123.    The Decision concluded:

Considering the totality of the evidence in the record, the Decision-makers find that [Jane Doe's] account is more credible than Respondent's. Because Jane Doe's account is more credible than Respondent's, the Decision-makers further find that it is more likely than not that in the early morning hours of November 14, 2020, Respondent touched Jane Doe's breasts and vagina, and digitally penetrated her, without her consent.

Because it is more likely than not that he engaged in these actions, the Decision-Makers find that Respondent violated University policy against Sexual Harassment, specifically Rape and Forcible Fondling.

124.    The Decision then imposed a "Sanction" as follows:

- Suspension, effective fall semester 2021 and eligible to return spring semester 2023
- Title IX Sexual Harassment education following return from suspension

125.    The Decision-Makers' procedural irregularities and bias are further evidenced in the Decision where they rely upon the photos admittedly "not in evidence" to create their own timeline, and then note that the lack of evidence did not allow for "a reliable chronology of events."

126.    Nonetheless, the Decision then concludes that Jane Doe's account was plausible because of the 4:36 – 4:50 a.m. timeline "created" by the Hearing Officer.

127.    Thus, the Decision-Makers relied upon photos "not in evidence" to admittedly create their own timeline which they then admitted was unreliable, but this timeline formed as the basis for the Decision.

128.    The Decision-Makers' bias, procedural irregularity and deficiency is further evidenced in the Decision, where they state:

> [Jane Doe's] account is specific and detailed and has been consistent over time. [Jane Doe] has consistently maintained that Respondent helped her into bed, *kissed* her, touched her bare breast under her clothing despite her telling him that she did not want to engage in that activity . . .

129.    Jane Doe's account has been anything but consistent over time, as she told the Investigator that she was too intoxicated to give consent.

130.    Despite filing the Title IX Complaint, in part, based on sexual assault from Plaintiff allegedly kissing her without her consent on November 14, 2020, less than twenty minutes into her testimony at the Hearing, Jane Doe testified that the alleged sexual assault as to "kissing" was "consensual."

131.    This is evidence of a false report made by Jane Doe in violation of USI's Student Rights and Responsibilities, Section 5.10A.

132.    Under the Policy, the Decision-Makers are required to include in their written determination "A statement of, and rationale for, the result as to each allegation, including any finding of responsibility and sanctions or remedies."

133.    The Title IX Complaint included a specific allegation of sexual assault as to Plaintiff kissing Jane Doe on November 14, 2020.

134.    The Decision, however, failed to give a decision as to Plaintiff's responsibility as to this kissing allegation.

135.    By ignoring its obligation under the Policy as to the kissing allegation, the Decision-Makers were able to advance the clearly false conclusion that Jane Doe's story was consistent over time.

136.    At the Hearing and in the Decision, the Decision-Makers simply ignored this inconsistency and Jane Doe's admission of filing a false sexual assault claim as to kissing under her totally false and fabricated theory of events on November 14, 2020.

137.    The Decision-Makers' bias, procedural irregularity and deficiency is further evidenced by their conclusion in the Decision that Jane Doe's account is "corroborated" by testimony of Jane Doe's roommate.

138.    Jane Doe's roommates each testified that they did not see Plaintiff engage in any conduct to support the sexual assault allegations.

139.    "Corroboration" means to confirm with other evidence, and here, at the Hearing, the roommate witness merely repeated what Jane Doe told her which is nothing more than the roommate regurgitating the false story that Jane Doe told her when Jane Doe was high on marijuana and after having experienced a panic attack on February 11, 2021.

140.    Another critical example of the Decision-Makers' bias and procedural irregularity involved the standard applied to determine "credibility."

141.    The Decision states that the determination of credibility was based, in part, on the factor that Plaintiff "has a motivation to falsify information" because he "will likely face a sanction if found responsible."

142.    The Regulations expressly prohibit such assessment, stating that "credibility determinations may not be based on a person's status as a respondent."

143.    The Decision-Makers applied a prohibited standard in assessing factors which directly resulted in and affected the outcome.

144.    In USI's communication of August 25, 2021, giving notice of the Decision, USI advised Plaintiff that he would face "disciplinary action up to and including dismissal from the University," if he copied or distributed the Decision to anyone other than his advisor.

145.    Such restriction is not authorized under the Policy or the Regulations, and has the effect of preventing Plaintiff from providing the same to his parents or others to assist him with the irregularities, violations and deficiencies outlined, in part, herein, to help him protect his right and reputation, and to help him deal with the stress and emotional trauma of the false allegations and process deficiencies.

146.    USI's threat of discipline further impacted Plaintiff's ability to protect his rights, prevent injustice and equitably present an appeal of the Decision fully establishing the irregularities and bias affecting the outcome.

147.    Plaintiff was prepared to submit the Decision and related documents to an outside Title IX expert, who preliminarily opined that if certain scenarios occurred in a Title IX hearing or decision, the same would violate the Regulations.

148.    If Plaintiff had been able to share the Decision and related documents to the Title IX expert, it is believed that he would have issued an opinion, based on the actual events relating to the Title IX Complaint, that the Hearing and Decision was tainted with bias, prejudicial and contrary to the Regulations and the Policy, and that numerous substantive and procedural irregularities affected the outcome.

149.    On September 1, 2021, Plaintiff submitted a written appeal of the Decision to USI in accordance with the Policy and Regulations which outlined numerous procedural irregularities in the investigation and Hearing, and the bias of the Decision-Makers.

150.    USI appointed an Indianapolis lawyer as the appellate officer ("Appeal Officer").

151.    Jane Doe had the opportunity to submit a written response to Plaintiff's appeal but she did not.

152.    On September 22, 2021, the Appeal Officer issued his appeal decision denying Plaintiff's appeal and affirming the Decision-Makers' Sanctions (the "Appeal Decision").

153.    In the Appeal Decision, the Appeal Officer, in response to issues relating to the Decision-Makers, stated:

> USI certified that these individuals received the proper training in accordance with the law. *See* § 106.45(b)(10)(i)(D); https://www.usi.edu/sexual-assault-prevention-and-response.

154.    The USI link leads to a page where it lists persons who apparently provided training to USI on Title IX issues.

155.    This link not only includes the Hearing Officer, the other two Decision-Makers and the company they work for as providing Title IX training to USI, it also identifies the Appeal Officer as having provided training to USI.

156.    USI never disclosed to Plaintiff that the Hearing Officer, and all Decision-Makers through the same company, had a clear conflict of interest in sitting as Decision-Makers.

157.    If USI's duties under the Policy and Regulations and in advancing the Title IX Complaint were deficient, the Decision-Makers had no incentive to point those out or correct such deficiencies because the same could lead to claims against the Hearing Officer and her company for negligent training of USI.

158.    Had USI disclosed such conflict of interest of the Decision-Makers, Plaintiff would have objected to such Decision-Makers.

159.    Such undisclosed conflict of interest is a further violation of the Policy and Regulations.

160.     In addition, the Appeal Officer has a clear conflict of interest in assessing the appeal on the Title IX Complaint.

161.     If USI's duties under the Policy and Regulations and in advancing the Title IX Complaint were deficient, the Investigator's and/or the Decision-Makers' actions were deficient and/or contrary to the Policy and Regulations, the Appeal Officer had an incentive to avoid an objective review of any deficiencies because the same could lead to a claim against the Hearing Officer and/or his law firm for negligent training of USI.

162.     USI did not disclose the Appeal Officer's conflict of interest to Plaintiff.

163.     Had USI disclosed such conflict of interest of the Appeal Officer, Plaintiff would have objected to such Appeal Officer.

164.     Such undisclosed conflict of interest is further inconsistent with the Policy and Regulations.

165.     The Appeal Decision is also deficient and is contrary to the Policy and Regulations.

166.     The Appeal Decision repeats the threat that the Appeal Decision cannot be shared with anyone but Plaintiff or his advisor.

167.     Plaintiff is facing a life altering "rape" determination, and USI prevents him from sharing the Title IX Complaint related decisions and documents to address the emotional trauma he is experiencing and to protect his rights.

168.     The Appeal Decision finds no error at the Hearing in allowing the testimony of other alleged rape and sexual assaults by Plaintiff because:

> Here, at the hearing, [Jane Doe's] testimony about prior acts between the parties was clearly focused on consent—their consensual acts on prior occasions, how similar consensual acts began on November 14, and how things then advanced abruptly and were no longer consensual.

169.    This completely ignores the fact that the Title IX Complaint was based on Jane Doe's assertion that the kissing, touching and penetrating was **not consensual**.

170.    While asserting that USI's withholding of Jane Doe's written complaint was not wrongful, the Appeal Decision states, [Plaintiff] and his advisor consistently understood exactly what [Jane Doe] alleged."

171.    As the Appeal Decision refers to consensual acts occurring on November 14, 2020, the Appeal Officer clearly did not understand what Jane Doe alleged in the Title IX Complaint.

172.    Plaintiff did not raise the issue of consent because he denied that the alleged kissing, touching and penetrating ever occurred on November 14, 2020.

173.    The Appeal Decision's rationale is contrary to the Policy and Regulations.

174.    The Appeal Decision also denies the appeal on the basis that Plaintiff and his advisor did not object to any question or other matter at the Hearing.

175.    This basis directly conflicts with the Policy and USI's Statement of Rights and Process" for the Hearing which expressly prohibits such objections

176.    The Appeal Decision advances a required course of action that would have resulted in the removal of Plaintiff's advisor from the Hearing and further prejudiced Plaintiff.

177.    The Appeal Decision's rationale is further contrary to the Policy and Regulations.

178.    The Appeal Decision does not address the Decision's deficient and clearly erroneous reliance on Jane Doe's roommates alleged "corroboration."

179.    Such omission acknowledges this clear irregularity and procedural defect which was part of the rational for the outcome holding Plaintiff responsible.

22

180.    The Appeal Decision further ignores the Policy's obligation imposed on USI by the Policy to gather relevant evidence, and seeks to improperly impose that burden on Plaintiff by holding that Plaintiff should have somehow gathered evidence in the possession of Jane Doe and her roommates, and thus, attempts to deflect USI's deficient gathering and disclosure.

181.    The Appeal Decision refers to Plaintiff as changing his story at the Hearing as to "his and Jane Doe's sexual past."

182.    Not only was Plaintiff not asked about the same during the investigation as to create any change in story, but he was never asked in the Hearing about any change in story.

183.    The Appeal Decision acknowledges that there is "traction" to Plaintiff's appeal assertion that the Decision-Makers violated the Regulations by using an improper standard to determine credibility.

184.    In finding no procedural irregularity, the Appeal Decision states that the "Preamble" to the Regulations "confronts and resolves the ambiguity."

185.    In its analysis, the Appeal Decision relies on the last sentence in the section of the Preamble but wholly ignores the actual content preceding that sentence which expressly rejects the interpretation in the Appeal Decision:

> The Department agrees with commenters who noted the inappropriateness of investigators and decisionmakers drawing conclusions about credibility based on a party's status as a complainant or respondent. While the Department appreciates the concerns by commenters advocating that the final regulations should permit status-based inferences as to a person's credibility, the Department believes that to do so would invite bias and partiality. To that end, we disagree with commenters who opposed categorical bars on the factors that investigators or decision-makers may consider, and who want to partially judge a person's credibility based on the person's status as a complainant, respondent, or witness. A process that permitted credibility inferences or conclusions to be based on party status would inevitably prejudge the facts at issue rather than determine facts based on the objective evaluation of evidence, and this would decrease the likelihood that the outcome reached would be accurate. The Department disagrees that § 106.45(b)(1)(ii) conflicts with the presumption of non-responsibility; in fact, § 106.45(b)(1)(ii)

helps to ensure that the presumption is not improperly applied by recipients. Section 106.45(b)(1)(iv) affords respondents a presumption of non-responsibility until the conclusion of the Determinations of credibility, including of the respondent, must be based on objective evaluation of relevant evidence—not on inferences based on party status. Both the presumption of non-responsibility and this provision are designed to promote a fair process by which an impartial fact-finder determines whether the respondent is responsible for perpetrating sexual harassment. Every determination regarding responsibility must be based on evidence, not assumptions about respondents or complainants. The Department disagrees that disregarding party status poses problems for investigators or adjudicators or directs them to ignore central factors in reaching credibility determinations.

186.    The Preamble expressly rejects the Appeal Decision's rationale attempting to salvage the Decision-Makers' reliance on an improper and clearly rejected credibility standard.

187.    The Appeal Decision notice states:

You are suspended effective 12:00 PM Central Time September 25, 2021, through January 1, 2023. During this time, you are not allowed on University property

188.    USI's handling of the Title IX Complaint was contrary to the Policy and Regulations.

189.    USI's investigation of the Title IX Complaint, its conduct of Hearing and its appeal process, including the Decision and Appeal Decision, were contrary to and in violation of the Policy and Regulations, were arbitrary and capricious, were clear error, and were intentionally in disregard of Plaintiff's rights and due process.

**COUNT I:**
**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**ERRONEOUS OUTCOME**

190.    Plaintiff repeats and realleges paragraphs 1-189 of this Complaint as if fully asserted herein.

191.    Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be deprived the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

192.    USI receives federal financial assistance and is therefore subject to Title IX.

193.    As an institution covered by Title IX, USI must comply with all of its requirements and the requirements of its applicable regulations.

194.    The facts alleged in this Complaint demonstrate that USI failed to comply with Title IX and its accompanying regulations in multiple respects.

195.    USI has created a campus environment in which Plaintiff, an accused black male student, will be denied the benefits of an education at USI and discriminated against because of his sex.

196.    USI's investigation, hearing, decisions, appeal, appeal decision and the entire disciplinary process was conducted in a manner that was permeated by bias against Plaintiff, and causing Plaintiff to be unjustly deprived of educational opportunities on the basis of his sex.

197.    As a direct result of USI's discriminatory practices, Plaintiff was denied a fundamentally fair investigation, hearing, decision, appeal and appeal decision, and USI reached an erroneous outcome in finding against Plaintiff.

198.    USI violated Plaintiff's Title IX right to be free from discrimination by sanctioning, tolerating, and endorsing procedures and policies which deprived Plaintiff, a male student, rights and privileges provided to female students.

**COUNT II:**
**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**DELIBERATE INDIFFERENCE**

199.  Plaintiff repeats and realleges paragraphs 1-198 of this Complaint as if fully asserted herein.

200.  USI had actual notice of the irresponsible, improper, and sexually biased manner in which the allegations against Plaintiff were investigated and adjudicated.

201.  Despite notice of the failures of its investigative and adjudicative processes, USI, its employees and agents failed to correct the deficiencies in the investigation and process and were deliberately indifferent to the known failings of its employees and agents responsible for those processes.

202.  USI's deliberate indifference was motivated by Plaintiff's gender, and likely his race.

203.  USI sanctioned, tolerated, and endorsed procedures and policies which deprived Plaintiff, a black male student, of the rights and privileges provided to female students.

**COUNT III:**
**42 U.S.C. § 1983: VIOLATION OF RIGHTS SECURED BY THE DUE PROCESS**
**CLAUSE OF THE FOURTEENTH AMENDMENT**

204.  Plaintiff repeats and realleges paragraphs 1-203 of this Complaint as if fully asserted herein.

205.  Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

206.    The Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of life, liberty, or property, without due process of law."

207.    It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

208.    A person who has been admitted to a public university has a protected liberty interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process of law.

209.    USI and its employees and agents are state actors subject to the Fourteenth Amendment.

210.    The Due Process Clause of the United States Constitution is implicated by USI's investigation, hearing, appeals, and disciplinary process.

211.    USI and its employees and agents have a duty to provide USI's students due process of law by and through any and all policies and procedures set forth by USI.

212.    Plaintiff has a protected liberty interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

213.    Plaintiff has a constitutional right to be free from arbitrary suspension, dismissal, or restrictions on his ability to enter the USI campus.

214.    Plaintiff's constitutionally protected liberty interest in his right to continued enrollment at USI also arises from the policies, courses of conduct, practices, and understandings established by USI.

215.    As a direct and proximate result of USI's investigation, hearing, decision appeals, appeal decision and disciplinary process detailed above, USI under color of law deprived Plaintiff of the minimal requirements of procedural fairness.

216.    Accordingly, USI violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment enforceable by 42 U.S.C. § 1983.

**COUNT IV:**
**42 U.S.C. § 1983: VIOLATION OF RIGHTS SECURED BY THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT**

217.    Plaintiff repeats and realleges paragraphs 1-216 of this Complaint as if fully asserted herein.

218.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits states from denying "to any person . . . the equal protection of the laws."

219.    It is well established that the Equal Protection Clause prohibits discrimination against individuals on the basis of sex.

220.    As detailed above, USI, acting under color of law, violated Plaintiff's clearly established right not to be discriminated against on the basis of sex, in violation of the Fourteenth Amendment.

**COUNT V:**
**BREACH OF CONTRACT – SPECIFIC PERFORMANCE**

221.    Plaintiff repeats and realleges paragraphs 1-220 of this Complaint as if fully asserted herein.

222.    Indiana law imposes an implied contract on the relationship between students and universities.

223.    USI's written sexual assault policy is intended to comply with the requirements of Title IX and its applicable regulations, and gives students accused of sexual misconduct certain

rights and outlines the procedures USI must follow in the investigation, hearing, and appeal process of sexual misconduct allegations.

224.    Plaintiff reviewed and relied on USI's promises in USI's Policy and in doing so, Plaintiff understood he needed to comply with his obligations detailed in the Policy.

225.    Plaintiff obeyed all institutional rules set forth in the Policy.

226.    Nevertheless, USI breached its contract with Plaintiff when it failed to follow its own policies and procedures and in suspending Plaintiff from USI, as set out in detail above.

227.    USI acted illegally, arbitrarily, capriciously, and in bad faith when it condoned and supported the discriminatory investigation, hearing procedures, and ultimate decision, and by affirming the decision on appeal.

228.    Damages are inadequate to compensate Plaintiff for USI's wrongful conduct.

229.    Unless specific performance of the Policy is granted, USI's material breaches will irreparably injure Plaintiff.

230.    USI's breaches contributed and will continue to contribute to the ongoing violations of Plaintiff's constitutional rights.

231.    As a result of USI's breaches, Plaintiff will be denied the benefits of education at his chosen school, he will suffer permanent damage to his reputation and the loss of future educational and employment opportunities.

232.    Accordingly, Plaintiff seeks specific performance of USI's Policy.

## COUNT VI:
## JUDICIAL REVIEW

233.    Plaintiff repeats and realleges paragraphs 1-232 of this Complaint as if fully asserted herein.

29

234. The Appeal Decision was a final agency action specifically directed to the Plaintiff, making it ripe for judicial review by this Court.

235. As evidenced by the final sentence of the Appeal Decision which states, "[p]lease be advised that this is the final decision regarding this incident and no further appeals will be considered," Plaintiff has exhausted his administrative remedies.

236. Plaintiff is entitled to judicial review of USI's action as it was:

- arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
- contrary to constitutional right, power, privilege, or immunity;
- in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
- without observance of procedure required by law; and
- unsupported by substantial evidence.

237. Plaintiff submits this request for judicial review within thirty (30) days of USI's issuance of the Appeal Decision. Accordingly, Plaintiff's request is timely.

238. Plaintiff will provide the Court with the agency record for review within thirty (30) days of the date of this filing.

**COUNT VII:**
**PRELIMINARY AND PERMANENT INJUNCTION**

239. Plaintiff repeats and realleges paragraphs 1-238 of this Complaint as if fully asserted herein.

240. USI, through its investigation, hearing, appeals, and disciplinary process detailed above, violated Title IX and the United States Constitution and materially breached its contract with Plaintiff.

241. Plaintiff has no adequate remedy at law and will suffer irreparable harm unless and until USI is enjoined from sanctioning Plaintiff with a year and one-half suspension from USI.

242.    Accordingly, Plaintiff seeks a preliminary and permanent injunction enjoining USI from enforcing sanctions imposed upon Plaintiff by its Decision.

**COUNT VIII:**
**<u>TEMPORARY RESTRAINING ORDER</u>**

243.    Plaintiff repeats and realleges paragraphs 1-242 of this Complaint as if fully asserted herein.

244.    Plaintiff incorporates herein by reference the relief requested in his Verified Application for T.R. 65(B) Temporary Restraining Order, which is filed contemporaneously herewith.

245.    Plaintiff will suffer immediate and irreparable injury, loss, or damage before USI can be heard in opposition to Plaintiff's said application.

246.    As set forth fully in Plaintiff's said application and the separately filed Attorney's Affidavit, Plaintiff and his attorney have met all of the procedural requirements set forth in T.R. 65(B).

247.    Plaintiff thus seeks a temporary restraining order restraining USI from enforcing sanctions imposed upon Plaintiff.

**WHEREFORE,** Plaintiff John Doe respectfully requests that this Court:

(a)  Enter a Temporary Restraining Order that immediately and without notice enjoins the USI from enforcing the sanctions issued against Plaintiff on September 22, 2021;

(b)  Set a hearing for a preliminary injunction;

(c)  For an order compelling performance of the USI's written sexual assault Policy;

(d)  Vacate and set aside the Decision and Appeal Decision and the resulting sanctions and remand the matter to USI to conduct proceedings that adhere to the Policy, Regulations and Plaintiff's constitutional rights;

(e)  For actual and consequential damages in an amount to be determined at trial;

(f)   For an award of Plaintiff's reasonable attorneys' fees and costs incurred in prosecuting this action to enforce 42 U.S.C. § 1983 (*see,* 42 U.S.C. § 1988);

(g)   Ultimately, reinstate Plaintiff John Doe at USI immediately and expunge his suspension from his record; and

(h)   All other just and appropriate relief.

Respectfully submitted,

ZIEMER, STAYMAN, WEITZEL & SHOULDERS, LLP

BY: */s/ Keith W. Vonderahe*
         Robert L. Burkart, 16664-82
         Keith W. Vonderahe, 21908-82
         Matthew S. Koressel, 35276-49
         20 NW First Street, Ninth Floor
         P. O. Box 916
         Evansville, Indiana   47706-0916
         Phone: (812) 424-7575
         Fax: (812) 421-5089
         rburkart@zsws.com
         kvonderahe@zsws.com
         mkoressel@zsws.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of September, 2021, the foregoing pleading or paper was electronically filed using the Indiana E-filing System (IEFS).

*/s/ Keith W. Vonderahe*
Keith W. Vonderahe



# Sexual Harassment Policy

Date
2/21

Item
F.1

# I. INTRODUCTION

The University of Southern Indiana ("University" or "USI") embraces and celebrates the many differences that exist among the members of a dynamic, intellectual, and inclusive community, and strives to maintain an environment that respects differences and provides a sense of belonging and inclusion for everyone. In accordance with Title IX of the Educational Amendments Act of 1972 and its implementing regulations, the University prohibits discrimination on the basis of sex, including Sexual Harassment (as defined below), in its education programs or activities. This prohibition on sex discrimination includes, but is not limited to, admission and employment.

# II. SCOPE

The focus of this policy is the protection of educational and employment opportunity regardless of sex for students, faculty, administrators, and support staff at the University. For students, compliance with this policy is a term and condition of enrollment at the University. For faculty, administrators and support staff, compliance with this policy is a term and condition of employment with the University.

# III. JURISDICTION

This policy applies to all USI faculty, staff, students, and visitors. This policy applies in connection with any USI education program or activity, whether on or off campus, including academic, educational, extra-curricular, athletic, residential, employment (including work-study), and other College programs and activities. The Title IX Coordinator is responsible for determining whether matters fall under the jurisdiction of this policy and may consult with others, as appropriate, in making this determination. Alleged conduct that does not fall within the definition of Sexual Harassment set forth in this policy may be addressed under other applicable policies.

# IV. Title IX Coordinator

The Title IX Coordinator oversees the University's compliance with Title IX and other applicable federal and state laws, including review, investigation, and resolution of reports of violations of this policy, as well as the coordination of primary and ongoing training programs and education regarding the definition of Sexual Harassment, the scope of the University's education program or activity, how to conduct an investigation and grievance process, including hearings, appeals, and informal resolution processes, and how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. The Title IX Coordinator may designate other University personnel or external consultants to assist and support compliance efforts or to act as a designee in cases of conflict of interest or in other situations where a designee is deemed necessary to maintain the University's compliance under this policy and applicable state and federal laws.

USI has designated Carrie Lynn to serve as its Title IX Coordinator. Her contact information is:

Ms. Carrie Lynn
Title IX Coordinator
Wright Administration Building, Forum Wing, Room FA171

8600 University Boulevard
Evansville, Indiana 47712
812-464-1703
cnlynn@usi.edu

Dameion Doss is USI's full-time Deputy Civil Rights & Title IX Coordinator. His contact information is:

Mr. Dameion Doss
Deputy Civil Rights & Title IX Coordinator
Wright Administration Building, Forum Wing, Room 171
8600 University Boulevard
Evansville, Indiana 47712
812-464-1835
ddoss@usi.edu

USI has designated Dr. Shelly Blunt and Laurie Berry to serve as its Deputy Title IX Coordinators. Their contact information is:

Dr. Shelly Blunt
Associate Provost for Academic Affairs
Wright Administration Building, Room 103A
8600 University Boulevard
Evansville, Indiana 47712
812-465-1617
sblunt@usi.edu

Ms. Laurie Berry
Assistant Dean of Students
University Center East, Room 1229
8600 University Boulevard
Evansville, Indiana 47712
812-464-1862
lberry@usi.edu

# V. Definitions

Capitalized terms used in this policy have the following meanings:

"*Actual Knowledge*" means notice of Sexual Harassment or allegations of Sexual Harassment to USI's Title IX Coordinator or any USI official who has authority to institute corrective measures on behalf of the University. This standard is not met when the only official of the recipient with actual knowledge is the Respondent.

"*Advisor*" means a person selected by the Complainant or Respondent, or appointed by USI, who may be present during the Formal Complaint Resolution Process and related meetings. An Advisor may be an attorney.

"*Appellate Officer*" means the individual designated by the University to decide Appeals in accordance with Section VI, below. The Appellate Officer is the Vice President for Finance and Administration or designee.

"*Business Days*"means Monday through Fridays when the University's administrative offices are operational for business.

"*Complainant*" means an individual who is alleged to be the victim of conduct that could constitute Sexual Harassment.

"*Consent*" means a clear, knowing, and voluntary agreement to participate in a given activity. To give consent, individuals must be awake, of legal age, and have the capacity to reasonably understand the nature of their actions. Individuals who are Incapacitated cannot give consent. Consent can be given by words, conduct, or

**EXHIBIT 1**

actions, as long as those words, conduct, or actions create mutually understandable, clear permission regarding willingness to engage in (and the conditions of) sexual activity. Individuals may not use Force or Coercion as a method of obtaining consent. Consent may be withdrawn by either person at any time, and once withdrawal of consent is expressed, the sexual activity must stop. Consent to any one form of sexual activity does not automatically imply consent to engage in any other forms of sexual activity. Previous relationships or prior consent to engage in sexual activity with any individual does not automatically imply consent to engage in future sexual acts with the same or other individuals.

"*Incapacitated*" means a state in which one cannot make rational or reasonable decisions because one lacks the capacity to give knowing and voluntary consent (i.e., to understand the "who, what, when, where, why, or how" of one's sexual interaction). Sexual activity with someone whom one should know to be, or based on the circumstances, should reasonably have known to be, Incapacitated (e.g., by alcohol or other drug use, by a state of unconsciousness or by an apparent or known mental or cognitive disability) constitutes a violation of this policy.

"*Force*" means physical violence and or physically imposing one's self on another to gain sexual access. Force also includes threats or implied threats, or other forms of intimidation that overcome resistance or produce consent.

"*Coercion*" means unreasonable and continued pressure for sexual activity. Coercive behavior differs from seductive behavior based on the type of pressure one uses to get consent from another. Pressure that continues beyond the following points can be considered coercive: (i) when one makes it clear to another that one does not want sexual activity, (ii) when one makes it clear to another that one wishes to stop sexual behavior that already has begun, (iii) when one makes it clear to another that one does not want to go past a certain point of sexual interaction.

"*Cross Examination*" means a party's advisor asking the other party and any witnesses relevant questions and follow-up questions, including those challenging credibility, at the Live Hearing, directly, verbally, and in real time, and never by a party personally.

"*Concurrent Student Conduct Charges*" means student conduct charges that do not involve sex discrimination or Sexual Harassment, but arise out of the same facts or circumstances as a report or compliant of sex discrimination, or a report or Formal Complaint of Sexual Harassment.

"*Decision-Makers*" means members of the three-person panel of trained faculty, staff, and/or administrative officials who are assigned by the Title IX Coordinator or designee and who hear and reach a determination regarding a Formal Complaint alleging Sexual Harassment in accordance with the procedures outlined in Section VI, below. One of the three Decision-Makers in any hearing shall be the Hearing Officer.

"*Deliberate Indifference*" means when a response to Sexual Harassment is clearly unreasonable in light of the known circumstances.

"*Emergency Removal*" means removal of the Respondent from the University's education program or activity on an emergency basis following the University's individualized assessment and determination that an immediate threat to the physical health or safety of a student or individual arising from the allegations of Sexual Harassment justifies removal.

"*Employee Who Can Take Corrective Action*" means the Title IX Coordinator, Deputy Title IX Coordinator, Dean of Students, Executive Director of Human Resources, Director of Public Safety, and Assistant Director of Public Safety

"*Formal Complaint*" means a document filed by a Complainant or signed by the Title IX Coordinator alleging Sexual Harassment against a Respondent and requesting investigation of the allegations.

"*Formal Notice*" means the written notice the University provides to the parties who are known following receipt of a Formal Complaint.

"*Formal Complaint Resolution Process*" is the process outlined in Section VI, below.

3                                    **EXHIBIT 1**                          Last Updated 02/25/2021

"*Hearing Officer*" means the individual designated by USI who is responsible for managing the conduct of a hearing on a Formal Complaint of Sexual Harassment in accordance with the procedures outlined in Section VI, below. The Hearing Officer is also a Decision-Maker.

"*Informal Resolution*" means the process outlined herein for resolving a Formal Complaint with the voluntary written consent of both the Complainant and Respondent and consistent with the other conditions and procedures set out in Section VI, below.

"*Investigative Report*" is a written report prepared by the Investigator that summarizes relevant evidence gathered in an investigation and relating to a Formal Complaint.

"*Investigator*" means the trained individual designated by USI to gather information in response to a Formal Complaint.

"*Live Hearing*" means the live hearing before the Decision-Makers, one of which is the Hearing Officer, where each party's advisor may ask – directly, verbally, and in real time – the other party and any witnesses relevant questions and follow-up questions, including those challenging credibility. A Live Hearing may be conducted with all parties physically present in the same location or, at the University's discretion, with all parties, witnesses, and other participants appearing virtually, with technology enabling them simultaneously to see and hear each other.

"*Parties*" means the Complainant(s) and Respondent(s).

"*Preponderance of the Evidence*" means more likely than not.

"*Presumption of Not Responsible*" means that the Respondent is presumed not responsible for the alleged Sexual Harassment until a determination of responsibility is made at the conclusion of the grievance process.

"*Program or Activity*" means locations, events, or circumstances over which the University exercised substantial control over both the Respondent and the context in which the Sexual Harassment allegedly occurs, and also includes any building owned or controlled by a student organization that is officially recognized by the University.

"*Relevancy*" means having some reasonable connection to and having some value or tendency to prove or disprove a matter of factual significance. Questions and evidence about the Complainant's sexual predisposition or prior sexual behavior are not relevant, unless offered to prove that someone other than the Respondent committed the conduct alleged by the Complainant, or if the questions and evidence concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to prove consent.

"*Remedies*" means measures designed to restore or preserve equal access to the University's education program or activity. Remedies may include supportive measures; however, Remedies need not be non-disciplinary or non-punitive and need not avoid burdening the Respondent.

"*Respondent*" means an individual who has been alleged to be the perpetrator of conduct that could constitute Sexual Harassment.

"*Responsible Employees*" means all faculty, all administrators, and certain designated support staff and student workers, including Resident Assistants, Public Safety Staff (specifically, Public Safety Officers, Sergeants, Staff Sergeants, Dispatchers, Senior Administrative Assistants, Graduate Assistants, and Student Workers), and Dean of Student's Office (specifically, Senior Administrative Assistants, Administrative Assistants, Graduate Assistants, and Case Workers). Responsible Employees who witness or otherwise know, directly or indirectly, of any incidents of alleged Sexual Harassment must report it to the Title IX Coordinator.

"*Sexual Harassment*" is conduct on the basis of sex that satisfies one or more of the following:

1. An employee of the University conditioning the provision of an aid, benefit, or service of the University on an individual's participation in unwelcome sexual conduct;

**EXHIBIT 1**

2. Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education programs or activities;
3. Sexual assault, meaning an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation (https://ucr.fbi.gov/nibrs/2012/resources/nibrs-offense-definitions);
4. Dating violence, meaning violence committed by a person: (A) who is or has been in a social relationship of a romantic or intimate nature with the victim; and (B) where the existence of such a relationship shall be determined based on (i) the length of the relationship; (ii) the type of relationship; and (iii) the frequency of interaction between the persons involved in the relationship;
5. Domestic violence, meaning felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the State of Indiana, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the State of Indiana; or
6. Stalking, meaning engaging in a course of conduct directed at a specific person that would cause a reasonable person to (A) fear for their safety or the safety of others; or (B) suffer substantial emotional distress.

"*Standard of Evidence*" means the standard of evidence used to determine responsibility. The standard of evidence USI applies to resolve all Formal Complaints of Sexual Harassment, whether against students or employees, is preponderance of evidence.

"*Supportive Measures*" means non-disciplinary, non-punitive, individualized services designed to restore or preserve equal access to USI's educational programs or activities. Supportive Measures may be offered to a Complainant or Respondent before or after the filing of a Formal Complaint or where no Formal Complaint has been filed. Supportive Measures may include, but are not limited to:

- Counseling
- Coursework adjustments
- Modifications of schedules
- Campus escort services
- Mutual restrictions on contact
- Changes in work or housing locations
- Leaves of absence
- Increased security or monitoring

Supportive Measures provided to a Complainant or Respondent will be kept confidential to the extent feasible. Options for Supportive Measures will be provided to the parties in writing.

"*Title IX Coordinator*" means the individual identified in Section I, above.

# VI. Reporting

## A. Reporting to the University

### 1. Confidential Reporting

Individuals who believe that they have experienced behaviors that violate this policy may report confidentially to a University employee acting in an official capacity as a professional mental health counselor (and those acting in that role under the supervision of a professional mental health counselor), a University Health Center employee or a pastoral counselor. Subject to certain limited exceptions under applicable law designed to protect a student or others from harm, these individuals are statutorily required not to report the information to University officers.

**EXHIBIT 1**

## 2. Non-Confidential Reporting

In the interest of maintaining a safe and inclusive environment for all members of the University community, the University encourages all faculty, administrators, support staff, and students to promptly report known or suspected violations of this policy to the Title IX Coordinator, Deputy Title IX Coordinator, Affirmative Action Officer, or Public Safety. Reports also may be made to University Responsible Employees.

Affirmative Action Officer and Title IX Coordinator
Ms. Carrie Lynn
Wright Administration Building, Forum Wing, Room FA171
8600 University Boulevard
Evansville, Indiana 47712
812-464-1703
cnlynn@usi.edu

Deputy Civil Rights & Title IX Coordinator
Mr. Dameion Doss
Wright Administration Building, Forum Wing, Room 171
8600 University Boulevard
Evansville, Indiana 47712
812-464-1835
ddoss@usi.edu

Deputy Title IX Coordinator
Dr. Shelly Blunt
Associate Provost for Academic Affairs
Wright Administration Building, Room 103A
8600 University Boulevard
Evansville, Indiana 47712
812-465-1617
sblunt@usi.edu

Deputy Title IX Coordinator
Ms. Laurie Berry
Assistant Dean of Students
University Center East, Room 1229
8600 University Boulevard
Evansville, Indiana 47712
812-464-1862
lberry@usi.edu

Public Safety
From your cell phone or outside line: 812-492-7777
From campus phones: ext. 7777
(Available for Emergency or After Hours Reporting)

An individual is not required to report alleged violations of this policy to the person who is engaging in the alleged behavior. Anyone may report Sexual Harassment, regardless of whether the person making the report is the person alleged to be the victim of alleged Sexual Harassment. Reports may be made in person, by mail, by telephone, by email, or online at https://cm.maxient.com/reportingform.php?UnivofSouthernIndiana&layout_id=1. Reports may be made at any time.

Any report made to the Deputy Title IX Coordinator, Affirmative Action Officer, Public Safety, or a Responsible Employee must be shared with the Title IX Coordinator. Upon receipt of a report, the Title IX Coordinator or designee will contact the Complainant to discuss the availability of Supportive Measures (with or without the filing of a Formal Complaint), consider the Complainant's wishes with respect to Supportive Measures, and explain the process for filing a Formal Complaint.

**EXHIBIT 1**

If the Complainant chooses not to file a Formal Complaint, the Title IX Coordinator may choose to do so. The Title IX Coordinator also may advise the Complainant about other available procedures and Supportive Measures.

If the Complainant or the Title IX Coordinator chooses to file a Formal Complaint, such Formal Complaint will be handled in accordance with the Formal Complaint Resolution Process described below.

Additionally, individuals who believe they have experienced Sexual Harassment in violation of this policy may report confidentially to a University employee acting in an official capacity as a professional mental health counselor (and those acting in that role under the supervision of a professional mental health counselor), a University Health Center employee, or pastoral counselor. Subject to certain limited exceptions under applicable law designated to protect a student or others from harm, these individuals are statutorily required not to report the information to others, including the Title IX Coordinator.

## B. Reporting to Law Enforcement

Individuals are also encouraged to report criminal misconduct to law enforcement. Please note that reporting options are not mutually exclusive; both internal (University) and external (Law Enforcement) reporting options may be pursued at the same time. The local law enforcement office with jurisdiction over the University's geographic location is the Vanderburgh County Sheriff's Office. Allegations of criminal misconduct occurring within the Evansville city limits can be reported to the Evansville Police Department. Additionally, the Indiana State Police (ISP) has state-wide jurisdiction.

Vanderburgh County Sheriff's Office Operation Center
5607 Highway 41 North
Evansville, IN 47711
Non-emergency telephone: 812-421-6201
Emergency telephone: 911

Evansville Police Department
15 Northwest Martin Luther King Jr. Boulevard Evansville, IN 47708
Non-emergency telephone: 812- 436-7896
Emergency telephone: 911

Indiana State Police (ISP) District 35 Police Post
19411 Highway 41 North
Evansville, IN 47725
Telephone: 812-867-2079 or 800-852-3970

While not required, the University strongly encourages anyone who becomes aware of behavior that may constitute a crime to report the incident to local law enforcement. The University can provide support, resources, and assistance to those who do so. Regarding the involvement of law enforcement in matters involving Sexual Harassment, the Complainant has several options, including to: (1) notify law enforcement authorities; (2) be assisted by campus authorities in notifying law enforcement authorities if the Complainant chooses; or (3) decline to notify such authorities. The University will comply with the Complainant's request for assistance in notifying law enforcement in these matters to the extent legally permitted. The Complainant's choice to report to law enforcement will not impact the implementation of supportive measures if applicable.

Regardless of whether a Complainant chooses to notify law enforcement, it is important for a Complainant who has experienced sexual assault, dating violence, or domestic violence to seek medical attention and to preserve evidence potentially by obtaining a forensic medical exam. Preserving evidence may assist in proving that an alleged criminal offense occurred or may be helpful in obtaining a protective order. The University will provide written information on where to obtain forensic examinations. Obtaining a forensic examination does not require the Complainant to file a police report, but a forensic examination can help preserve evidence in cases where the Complainant decides to file a police report at a later date.

In certain instances, the University may need to report potential criminal misconduct to law enforcement authorities even when the Complainant has decided not to do so. Such circumstances include those in which

**EXHIBIT 1**

there is clear and imminent danger or risk to the Complainant and/or the University community, in which a weapon was involved with the incident, child abuse, or in which the allegations involve sexual misconduct and the Complainant is under the age of consent. The necessity to report an incident to law enforcement will be shared with the Complainant.

The University's Formal Complaint Resolution Process and the legal system work independently from one another, and the University will proceed with its process as applicable, regardless of action or inaction taken by outside authorities. If a law enforcement investigation is initiated, the University may pause its procedures briefly at the request of law enforcement to facilitate their initial evidence gathering. Decisions made or sanctions imposed through the Formal Complaint Resolution Process are not subject to change if criminal or civil charges arising from the same misconduct are dismissed, reduced, or rejected in favor of or against the Respondent.

# VII. Amnesty

Reporting suspected Sexual Harassment is important. The University recognizes that an individual who reports Sexual Harassment may be engaged in under-age drinking or drug use or other prohibited conduct at or near the time of the incident reported. To encourage reporting under these circumstances, the University will not take disciplinary action against a student reporter, student witness, student Complainant, or student Respondent for their personal use of alcohol or drugs or for other prohibited conduct at or near the time of the incident reported if such violations do not or did not subject other people to harm. Depending on the circumstances, similar consideration may be given to employee reporters, employee witnesses, employee Complainants, and employee Respondents.

# VIII. Emergency Removal

During and before the investigation, emergency measures may be taken to protect the safety or well-being of members of the University community. The University may remove a Respondent from its education program or activity on an emergency basis. No Respondent will be removed until the University has undertaken an individual safety and risk analysis and determined that an immediate threat to the physical health or safety of any student or other individual arising from the allegations of Sexual Harassment justifies removal. Any Respondent who is removed will be provided notice and an opportunity to challenge the decision immediately following removal.

A non-student employee Respondent may be placed on administrative leave during the pendency of the resolution process described by this Policy.

# IX. Formal Complaint Resolution Process

The University's response to a Formal Complaint of Sexual Harassment will treat Complainants and Respondents equitably and provide a process in which the Title IX Coordinator, Investigator, Decision-Makers, Hearing Officer, Appellate Officer, and any facilitator of an Informal Resolution are free from conflicts of interest or bias against the Complainant or Respondent (or against complainants and respondents generally).

These individuals will receive training on the definition of Sexual Harassment, the scope of Title IX, and how to serve impartially including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. These individuals will also receive training regarding their specific roles in the process.

The University will strive to complete the Formal Complaint Resolution Process within 60 days of the filing of a Formal Complaint. The University will conduct the Formal Complaint Resolution Process on a confidential basis, consistent with the requirements of this Policy and applicable law. The Title IX Coordinator may allow for the temporary delay of all or part of the Formal Complaint Resolution Process for good cause and will provide written notice to the Complainant and Respondent of the delay and the reasons therefor.

**EXHIBIT 1**

## A. Presumption

A Respondent in a Formal Complaint is presumed not responsible for the alleged conduct until a determination is made regarding responsibility at the conclusion of the Formal Complaint Resolution Process.

## B. Written Notice

Within a reasonable period following receipt of a Formal Complaint, the University will provide Formal Notice to known parties of:

- The Formal Complaint Resolution Process and Informal Resolution Process
- The allegations potentially constituting Sexual Harassment, including details then-known regarding the:
  - Identities of the parties involved in the incident
  - Conduct allegedly constituting Sexual Harassment
  - Date and location of the alleged incident(s)
- The presumption that the Respondent is not responsible and that a finding of responsibility is made at the conclusion of the Formal Complaint Resolution Process
- The right to an Advisor who may, but is not required to, be an attorney (with agreed upon notice)
- The ability to inspect and review evidence in connection with the Formal Complaint
- The obligation to promptly notify the Title IX Coordinator if they believe the Title IX Coordinator, Investigator, Hearing Officer, facilitator of any Informal Resolution, Decision-Maker, or Appellate Officer has a conflict of interest or bias

If, during the course of an investigation, the University decides to investigate allegations about the Complainant or Respondent that were not included in a previous Formal Notice, it will provide notice of the additional allegations to known parties.

## C. Grounds for Dismissal

The University will dismiss a Formal Complaint for Title IX purposes if it determines at any time after its filing that the conduct alleged (1) would not constitute Sexual Harassment even if proved, (2) did not occur in the University's education program or activity, or (3) did not occur against a person in the United States. Such a dismissal does not preclude disciplinary action under other provisions of the University's policies, nor does it preclude the University from using the Formal Complaint Resolution Process outlined in this policy to resolve such allegations.

The University may dismiss all or part of a Formal Complaint any time after its filing if: (1) Complainant notifies the Title IX Coordinator that they wish to withdraw the Formal Complaint or any allegations in it; (2) the Respondent is no longer enrolled or employed; or (3) specific circumstances prevent the University from gathering evidence sufficient to reach a determination.

If the University dismisses all or part of a Formal Complaint under this section, it will promptly notify the Complainant and Respondent in writing.

## D. Informal Resolution

A Formal Complaint that does not involve allegations of an employee engaging in Sexual Harassment of a student may be resolved by Informal Resolution. Informal Resolution may occur any time between the filing of a Formal Complaint and a determination of responsibility. The Title IX Coordinator or designee will determine whether to offer Informal Resolution.

Informal Resolution is intended to create an opportunity for individuals to resolve complaints quickly, efficiently, and to the mutual satisfaction of all parties involved in a safe, non-threatening, and non-confrontational environment. It is an entirely voluntary process intended to allow the parties involved in an

**EXHIBIT 1**

alleged violation of this policy to discuss their respective understandings of the incident with each other through the assistance of a facilitator. Informal Resolution is designed to encourage each person to be honest and direct with the other and to accept personal responsibility where appropriate.

Before any Informal Resolution, both the Complainant and Respondent will be given written notice of: (1) the allegations; (2) the circumstances under which Informal Resolution precludes them from resuming the Formal Complaint Resolution Process, such as voluntarily agreeing to resolution of the Formal Complaint through Informal Resolution; (3) their right to withdraw from the Informal Resolution process and resume the Formal Complaint Resolution Process at any time before agreeing to a resolution; and (4) that Informal Resolution could result in an agreed-upon sanction, which may appear in certain records pertaining to that individual.

The University will facilitate an Informal Resolution only after the Complainant and Respondent have received such written notice and provided voluntary, written consent to participate in Informal Resolution.

Upon the voluntary, written consent of all parties to the Formal Complaint, the Title IX Coordinator or designee will identify an appropriate University official or external professional who may be engaged by the University for purposes of facilitating a session or series of sessions between the parties. Any resolution developed through Informal Resolution must be mutually agreed upon by all parties to the Formal Complaint, and any such resolution will be documented as deemed appropriate to the circumstances. All parties to the Formal Complaint will be asked to provide signatures signifying their understanding of an agreement to abide by any such resolution. If an agreement has not been reached within 10 days, a Formal Complaint will automatically move to the Formal Complaint Resolution Process.

## E. Investigation

Following the filing of a Formal Complaint, the Title IX Coordinator shall designate an Investigator to conduct a prompt, thorough, fair, and impartial investigation and prepare a written Investigative Report. The Investigator will typically meet individually with the Complainant and Respondent at least once during an investigation. The Complainant and Respondent will receive written notice of the date, time, location, and individuals who will be present for any investigative interview or meeting and will be given sufficient time to prepare. The Complainant and Respondent may be accompanied by one Advisor at any investigative interview or meeting.

The Complainant and Respondent may advise the Investigator of any witnesses they believe should be interviewed and any inculpatory or exculpatory evidence including, for example, e-mails, text messages, photographs, video surveillance, and/or other physical, documentary or other evidence.

The burden of gathering evidence sufficient to reach a determination regarding responsibility rests on the University. After the Investigator has gathered evidence, both the Complainant and Respondent (and any Advisor) will be given the opportunity to inspect and review evidence obtained as part of the investigation that is directly related to the allegations raised in the Formal Complaint. Within 10 days, the Complainant and Respondent may submit a written response to such evidence. Any written responses will be considered by the Investigator before completing the Investigative Report.

## F. Investigative Report

The Investigative Report will summarize the relevant evidence. If a Formal Complaint proceeds to a hearing, the Investigative Report will be sent to both the Complainant and Respondent (and any Advisor) at least 10 days before the hearing. The Complainant and Respondent will be permitted to review the Investigative Report and provide a written response to the Investigator within 5 days of the date of the Investigative Report.

## G. Live Hearing

The Decision-Makers, one of whom is the Hearing Officer, hears a Formal Complaint that proceeds to a hearing. The purpose of the hearing is for the Decision-Makers to evaluate relevant evidence to determine

**EXHIBIT 1**

whether or not the Respondent is responsible for engaging in Sexual Harassment. If the Decision-Makers determine that the Respondent is responsible for Sexual Harassment, they also will determine appropriate sanctions. The Title IX Coordinator cannot serve as a Decision-Maker.

# 1. Preparation for the Hearing

The Title IX Coordinator or a designee will arrange the administrative details for the hearing, including: (1) selecting the Decision-Makers; (2) arranging a time and place for the hearing; (3) making the Investigative Report and evidence directly related to the allegations in the Formal Complaint available at the hearing so that both Complainant and Respondent will have equal opportunity to refer to such evidence during the hearing; and (4) arranging for a Complainant or Respondent who does not have an Advisor to be appointed an Advisor to conduct cross-examination on behalf of that party at the hearing.

At the request of either Complainant or Respondent, the hearing will occur with the Complainant and the Respondent located in separate rooms with technology enabling the Decision-Makers, Complainant, Respondent, Advisors, and any witness(es) to simultaneously see and hear any party or witness answering questions.

# 2. Conduct of the Hearing

The Hearing Officer is responsible for managing the conduct of the hearing and ensuring that procedures are followed. The Hearing Officer facilitates all phases of the hearing and resolves all questions that arise during the hearing, including but not limited to procedural issues and issues regarding the propriety or relevance of specific questions, arguments, and information presented. The Hearing Officer also will seek to ensure an orderly and fair exchange of information during the hearing, and in the Hearing Officer's or other Decision-Makers' discretion, may ask questions of any party or witness. If anyone attending the hearing acts without appropriate respect or decorum, including failure to comply with the Hearing Officer's instructions, the Hearing Officer may take appropriate action, including requiring that person to leave the hearing.

At the hearing, both Complainant's Advisor and Respondent's Advisor will have the opportunity to ask the other party and any witnesses relevant questions and follow-up questions. Only relevant cross-examination and other questions may be asked of a party or witness. Before a Complainant, Respondent, or witness answers a question, the Hearing Officer will determine whether the question is relevant. If the Hearing Officer excludes a question as not relevant, they verbally will explain their decision.

Questions that intrude upon a legally recognized privilege will not be permitted unless the privilege has been affirmatively waived. Questions and evidence about a Complainant's sexual predisposition or prior sexual behavior are not relevant unless: (1) they are offered to prove that someone other than the Respondent committed the conduct alleged by the Complainant; or (2) they concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to prove consent.

If a Complainant, Respondent, or witness does not submit to cross-examination at the hearing, the Decision-Makers will not rely on any statement of that party or witness in reaching a determination regarding responsibility, nor will the Decision-Makers draw an inference about the determination regarding responsibility based solely on a party's or witness's absence from the hearing or refusal to answer cross-examination or other questions.

An audio recording, audiovisual recording, or a transcript of the hearing will be made and provided to the Complainant and Respondent for review subsequent to the conclusion of the hearing.

# H. Determination Sanctions, and Remedies

Following the presentation of information at the hearing, the Decision-Makers will determine whether the Respondent is responsible for Sexual Harassment. The Decision-Makers will deliberate privately. In deciding,

**EXHIBIT 1**

the Decision-Makers will apply a preponderance of the evidence standard and conclude that Respondent is responsible for Sexual Harassment if it is "more likely than not." The Decision-Makers will reach a decision by majority vote.

If the Decision-Makers determine that Respondent is responsible for Sexual Harassment, they will deliberate further to determine appropriate sanctions. The University may implement any of the Supportive Measures outlined above at any time before or after any finding of responsibility. However, disciplinary sanctions and remedies may only be implemented after a finding of responsibility. Such sanctions and remedies may range from verbal warnings or mandatory trainings to employment termination for faculty, administrators, and support staff, and from verbal warnings or mandatory trainings to expulsion for students. The Title IX Coordinator is responsible for effective implementation of any remedies.

## I. Written Determination

The Decision-Makers will issue a written determination regarding responsibility. The written determination will include:

- The allegations potentially constituting Sexual Harassment
- The procedural steps from receipt of the Formal Complaint through the written determination
- Findings of fact supporting the determination
- Conclusions regarding the application of the policy to the facts
- A statement of, and rationale for, the result as to each allegation, including any finding of responsibility and sanctions or remedies
- The procedures and permissible grounds for appeal

The written determination will be provided to the parties simultaneously.

## J. Appeals

A Complainant, Respondent, or Title IX Coordinator may appeal: (1) a determination regarding responsibility; or (2) any dismissal of all or part of a Formal Complaint. Appeals are limited to the following grounds:

- Procedural irregularity that affected the outcome
- New evidence that could affect the outcome but was not reasonably available at the time the determination or dismissal was made
- The Title IX Coordinator, Investigator, or Decision-Maker(s) had a conflict of interest or bias for or against complainants or respondents generally or the individual Complainant or Respondent and that conflict of interest or bias affected the outcome

Appeals must be submitted in writing to the Title IX Coordinator or designee within 5 business days of receipt of the written determination or dismissal. When an appeal is filed by a party, the University will provide notice to the other party and an opportunity to respond to the appeal in writing within 5 days.

The Appellate Officer will issue a written decision describing the result of the appeal and the rationale for it, which will be provided to both parties simultaneously. If the appeal is denied, the matter will be closed, and the findings will become final and not subject to further appeal. If the appeal is granted, the Appellate Officer may (1) affirm the written determination (which is final and not subject to further appeal) or (2) remand the case for a new and/or additional investigation and hearing (the results of which will be final and not subject to further appeal).

The Appellate Officer shall not be the same person as the Decision-Maker(s) that reached the determination regarding responsibility or dismissal, the Investigator, or the Title IX Coordinator.

**EXHIBIT 1**

# X. Retaliation Prohibited

The University prohibits retaliation against any individual who makes a report, testifies, assists, participates, or refuses to participate in any manner in an investigation, proceeding, or hearing under this policy. Those found to have violated this policy's prohibition on retaliation will be subject to disciplinary action, up to and including termination of employment for employees and expulsion for students. Any person who believes that someone has been subjected to retaliation should promptly contact the Title IX Coordinator.

# XI. Care and Support Resources

The University is committed to treating all members of the University community with dignity, care, and respect. Any individual who experiences or is affected by discrimination or harassment, whether as a Complainant or a Respondent, may benefit from access to care and support resources through the University and the local community.

The University encourages all individuals to seek the support of and use all available internal and external resources, regardless of when or where any alleged incident occurred. The following is a non-exhaustive list of such resources available to the members of the University community.

Resources Specifically for USI Students

- USI Counseling Center
  Orr Center 1051
  Telephone: 812-464-1867
- USI Religious Life Residence Life Resource Center
  Telephone: 812-464-1871
- USI Housing & Residence Life
  Your Resident Assistant or Area Coordinator
  Telephone: 812-468-2000
- USI Dean of Students
  Office University Center East 1229
  Telephone: 812-464-1862

Resources Specifically for Benefits-Eligible Faculty and Staff

- Deaconess Concern Employee Assistance Program
  445 Cross Pointe Boulevard, Suite 330
  Evansville, IN 47715
  Telephone: 812-471-4611 or 800-874-7104

Resources for all Members of the University Community

- USI Health Center
  Health Professions 0091
  Telephone: 812-465-1250
- Albion Fellows Bacon Center
  P.O. Box 3164
  Evansville, IN 47731
  Telephone for Domestic Violence: 812-422-5622
  Telephone for Sexual Assault: 812-424-7273
  Toll-free: 800-339-7752
- YWCA Evansville
  118 Vine Street
  Evansville, IN 47708
  Telephone: 812-422-1191 or 866-367-9922

**EXHIBIT 1**

- Holly's House
  750 North Park Drive
  Evansville, IN 47710
  Telephone: 812-437-7233
- Lampion Center
  655 South Hebron Avenue
  Evansville, IN 47714
  Telephone: 812-471-1776
- Southwestern (Behavioral Health)
  415 Mulberry Street
  Evansville, IN 47713
  Telephone: 812-423-7791
  24 Hour Suicide Hotline: 812-422-1100

# I. Miscellaneous

This policy is not a contract. The University reserves the right to modify the application of these procedures consistent with applicable law to provide, in its discretion, equitable treatment of Complainant and Respondent.

Inquiries about the application of Title IX and its implementing regulations may be referred to USI's Title IX Coordinator and/or the Assistant Secretary for the Department of Education's Office of Civil Rights.

**EXHIBIT 1**

| | | |
|---|---|---|
| STATE OF INDIANA | ) | VANDERBURGH CIRCUIT COURT |
| | ) SS: | Vanderburgh Circuit Court |
| VANDERBURGH COUNTY | ) | CAUSE NO. |

**JOHN DOE**

            Plaintiff           **SUMMONS**          **82C01-2109-PL-004615**

   v.

**UNIVERSITY OF SOUTHERN INDIANA**

            Defendant

**TO ABOVE NAMED DEFENDANT OR DEFENDANTS:**

You have been sued by the person(s) named "plaintiff" in the court stated above.

The nature of the suit against you is stated in the complaint which is attached to this document.  It also states the demand which the plaintiff has made and wants from you.  You must answer the complaint in writing, by you or your attorney, within twenty (20) days, commencing the day after you receive this summons, or judgment may be entered against you for what the plaintiff has demanded.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

The following manner of service of summons is hereby designated:  **Personal Service**

If not so designated, the clerk shall cause service to be made by mail.

Date:  September 24, 2021

ZIEMER, STAYMAN, WEITZEL & SHOULDERS, LLP     CARLA J. HAYDEN, CLERK

Attorney for Plaintiff

20 NW First Street, Ninth Floor

P. O. Box 916                              BY:_____Deputy

Evansville, IN  47706-0916                       (S E A L)

Phone: 812-424-7575

VC (seal impression: VANDERBURGH COUNTY COURTS — SEAL — INDIANA)

**CERTIFICATE OF MAILING**

I hereby certify that on the _____ day of _____, 2021, I mailed a copy of this summons and a copy of the complaint to each of the defendant(s) by (registered or certified) mail, requesting a return receipt signed by the addressee only, addressed to each of said defendant(s), at the addresses furnished by the plaintiff.

Dated _____, 2021.          CARLA J. HAYDEN, CLERK

                                    BY:_____Deputy

**RETURN ON SERVICE OF SUMMONS BY MAIL**

I hereby certify that service of summons with return receipt requested was mailed on the _____ day of _____, 2021, and that a copy of the return receipt was received on the _____ day of _____, 2021, which copy is attached herewith.

Dated _____, 2021.          CARLA J. HAYDEN, CLERK

                                      BY:_____Deputy

**RETURN ON SERVICE OF SUMMONS BY SHERIFF**

I hereby certify that I have served the within summons:

    1.    By delivering personally on the _____ day of _____, 2021, a copy of the summons and a copy of the complaint to each of the within-named defendant(s).

    2.    By leaving on the _____ day of _____, 2021, for each of the within-named defendant(s) a copy of the summons and a copy of the complaint at the respective dwelling place of abode with some person of suitable age and discretion whose duties or activities include prompt communication of such information to the person being served.

    3.    By leaving on the _____ day of _____, 2021, for each of the within-named defendant(s) a copy of the summons and a copy of the complaint at the respective or usual place of business or employment with some person of suitable age and discretion whose usual duties or activities include prompt communication of such information to the person being served.

Whenever service is made on part 2. or 3., there shall be added:

    That on the _____ day of _____, 2021, I sent by first-class mail a copy of the summons without the complaint to each of the within-named defendant(s).

                              Sheriff of Vanderburgh County, Indiana

**Name and Address:**               By_____, Deputy

**Dr. Ronald S. Rochon, President**

**University of Southern Indiana**

**Byron C. Wright Administration Building 101**

**8600 University Boulevard**

**Evansville, Indiana   47712**

| | | |
|---|---|---|
| STATE OF INDIANA | ) | VANDERBURGH CIRCUIT COURT |
| | ) SS: | |
| VANDERBURGH COUNTY | ) | CAUSE NO. |

**JOHN DOE**

          Plaintiff                **SUMMONS**

    v.                                                 **82C01-2109-PL-004615**

**UNIVERSITY OF SOUTHERN INDIANA**

          Defendant

**TO ABOVE NAMED DEFENDANT OR DEFENDANTS:**

You have been sued by the person(s) named "plaintiff" in the court stated above.

The nature of the suit against you is stated in the complaint which is attached to this document.  It also states the demand which the plaintiff has made and wants from you.  You must answer the complaint in writing, by you or your attorney, within twenty (20) days, commencing the day after you receive this summons, or judgment may be entered against you for what the plaintiff has demanded.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer. The following manner of service of summons is hereby designated:  **Personal Service**

If not so designated, the clerk shall cause service to be made by mail.

Date:  September 24, 2021

ZIEMER, STAYMAN, WEITZEL & SHOULDERS, LLP        CARLA J. HAYDEN, CLERK

Attorney for Plaintiff

20 NW First Street, Ninth Floor

P. O. Box 916                                     BY:_____VC_____Deputy

Evansville, IN   47706-0916                           (S E A L)

Phone: 812-424-7575

<strong>CERTIFICATE OF MAILING</strong>

I hereby certify that on the _____ day of _____, 2021, I mailed a copy of this summons and a copy of the complaint to each of the defendant(s) by (registered or certified) mail, requesting a return receipt signed by the addressee only, addressed to each of said defendant(s), at the addresses furnished by the plaintiff.

Dated _____, 2021.               CARLA J. HAYDEN, CLERK

                                            BY:_____Deputy

<strong>RETURN ON SERVICE OF SUMMONS BY MAIL</strong>

I hereby certify that service of summons with return receipt requested was mailed on the _____ day of _____, 2021, and that a copy of the return receipt was received on the _____ day of _____, 2021, which copy is attached herewith.

Dated _____, 2021.               CARLA J. HAYDEN, CLERK

                                            BY:_____Deputy

<strong>RETURN ON SERVICE OF SUMMONS BY SHERIFF</strong>

I hereby certify that I have served the within summons:

       1.       By delivering personally on the _____ day of _____, 2021, a copy of the summons and a copy of the complaint to each of the within-named defendant(s).

       2.       By leaving on the _____ day of _____, 2021, for each of the within-named defendant(s) a copy of the summons and a copy of the complaint at the respective dwelling place of abode with some person of suitable age and discretion whose duties or activities include prompt communication of such information to the person being served.

       3.       By leaving on the _____ day of _____, 2021, for each of the within-named defendant(s) a copy of the summons and a copy of the complaint at the respective or usual place of business or employment with some person of suitable age and discretion whose usual duties or activities include prompt communication of such information to the person being served.

Whenever service is made on part 2. or 3., there shall be added:

       That on the _____ day of _____, 2021, I sent by first-class mail a copy of the summons without the complaint to each of the within-named defendant(s).

                                           Sheriff of Vanderburgh County, Indiana

**Name and Address:**                              By_____, Deputy

**Aaron C. Trump, Chief Government**
  **And Legal Affairs Officer**
**University of Southern Indiana**
**8600 University Boulevard**
**Evansville, Indiana   47712**