UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:21-cv-00144-TWP-MPB |
| | ) |
| UNIVERSITY OF SOUTHERN INDIANA, | ) |
| | ) |
| Defendant. | ) |

**ENTRY DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to Federal Rule of Civil Procedure 65 by Plaintiff John Doe ("John") (Filing No. 33). John initiated this lawsuit against Defendant University of Southern Indiana ("USI") after USI imposed a suspension after finding him responsible for a conduct violation through USI's Title IX grievance process. (Filing No. 27.) For the following reasons, the Court **denies** the Motion for injunctive relief.

**I. LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation and quotation marks omitted). Granting a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380. 389 (7th Cir. 1984) (citation and quotation marks omitted).

> To obtain a preliminary injunction, a plaintiff must establish that it has some likelihood of success on the merits; that without relief it will suffer irreparable harm. If the plaintiff fails to meet any of these threshold requirements, the court

> must deny the injunction. However, if the plaintiff passes that threshold, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest.

*Geft Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citations and quotation marks omitted). Courts in the Seventh Circuit employ a sliding scale approach where the greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008).

## II. BACKGROUND

John is a nineteen-year-old male, who is currently a sophomore at USI. (Filing No. 51 at 1-2.) He is majoring in Business Administration and is currently receiving academic and athletic scholarships. *Id.* at 2. During the fall 2020 semester, John met a female, Jane Doe ("Jane"), who was also a freshman student. (Filing No. 58 at 3-4.) The two became "best friends" during their freshmen year, spending significant time together and communicating frequently. John and Jane lived in separate dormitories that were located right next to each other. *Id.* at 4.

The evening of November 13, 2020, and the morning of November 14, 2020, John, Jane, Jane's roommate, two suitemates, and a few other friends were hanging out and drinking. (Filing No. 58 at 4.) Jane was one of the people drinking but John maintains that he did not drink that evening. *Id.* Most of the drinking and socializing took place in Jane's residence hall, specifically the common room she shared with her suitemates. *Id.* On that night, John, Jane, and the others gathered at Jane's on-campus apartment, frequented a Taco Bell located off-campus, and then returned to Jane's residence hall where the socializing and drinking continued. *Id.* John alleges that when the group returned to campus from Taco Bell, he went back to his residence hall alone.

2

*Id.* Around 2:00 a.m. on November 14, 2020, John received a Snapchat message from Jane asking him to come up to her dorm room and he complied. *Id.*

At some point after returning to Jane's apartment, Jane alleges that John joined her in her bed and proceeded to touch her breasts and finger her vagina without her consent. *Id.* John denies that he was ever in Jane's bed with her on November 14, 2020, and he denies any sexual touching on that date. *Id.* at 5. John does not dispute Jane's level of intoxication and that he helped her get into her bed on November 14, 2020. *Id.* But according to John, after helping put Jane to bed, he joined the others in the common room. ([Filing No. 51 at 2](Filing No. 51 at 2).) At some point after that, John reported that Jane woke up, got out of bed, and joined the others in the common room. *Id.* John reported that at approximately 6:30 a.m. on November 14, 2020, Jane went to a nearby McDonald's with some of the other individuals while he stayed and slept in the common room until later in the day. *Id.*

After the alleged incident, John and Jane continued to communicate frequently, attended at least one off-campus party together, and John visited Jane's apartment at least once. *Id.* They also communicated during USI's winter break. *Id.* at 3. After the break, John returned to campus but Jane was delayed due to COVID-19. *Id.* After Jane returned to campus, John and Jane continued to communicate, including Jane demanding that John repay some money that he had previously borrowed from her. *Id.*

On February 11, 2021, Jane had a panic attack and disclosed to her roommates that John had "fingered her" without her consent on the morning of November 14, 2021. *Id.* Jane's roommate called USI's Public Safety Office the same day and reported that Jane had been sexually assaulted by John. *Id.* A USI public safety officer and a deputy from the Vanderburgh County Sheriff's Office interviewed Jane in her apartment and each officer prepared a separate report. *Id.*

3

at 4. On February 25, 2021, Jane submitted a written complaint to USI's Title IX Office alleging that John had sexually assaulted her in her campus dorm room on the morning of November 14, 2020. ([Filing No. 58 at 6](#).)

On March 26, 2021, USI sent written notice of the complaint to John. ([Filing No. 51 at 5-6](#).) John alleges that the notice did not include the specific allegations of sexual assault, that USI refused to give him a copy of Jane's complaint, and that USI withheld other facts. *Id.* at 6. USI designated Demetrius Peterson ("Mr. Peterson"), a lawyer from Husch Blackwell, to act as the Title IX Investigator for Jane's complaint. ([Filing No. 58 at 7](#).) As a part of his investigation, Mr. Peterson interviewed both John and Jane, as well as other individuals, and collected documents from each of them. *Id.* Mr. Peterson completed his final Investigation Report on July 15, 2021. ([Filing No. 51 at 7](#).)

On July 26, 2021, USI gave written notice to John that a hearing on Jane's complaint would take place. ([Filing No. 58 at 9](#).) In the notice, USI stated that it would be appointing three people from Grand River Solutions to serve as the hearing panel. *Id.* Grand River Solutions is an independent firm that specializes in Title IX services. *Id.* The three representatives would conduct the panel hearing, render a written responsibility determination and, if applicable, issue a sanction determination. *Id.* By this time, John had retained counsel. On August 2, 2021, USI emailed John and his counsel with a copy of the hearing agenda which outlined the procedural order of events for the upcoming hearing and a copy of USI's Statement of Rights and Process which governed the hearing procedure and rules of decorum. *Id.* at 10. After receiving the letter, John and his counsel met with USI's Interim Title IX Coordinator on August 3, 2021. *Id.* at 11. During the meeting, the parties discussed the procedure for the upcoming panel hearing and answered questions posed by John and his counsel. *Id.*

The hearing was held on August 4, 2021. *Id.* The hearing was conducted via Zoom and lasted approximately five and a half hours excluding breaks. *Id.* The hearing included questioning of Jane, John, and two witnesses, Jane's roommate and one of her suitemates. *Id.* During the hearing, John's counsel was given the opportunity to cross-examine Jane and the two witnesses. *Id.* At the conclusion of the hearing, the decision-makers advised the parties that they would "deliberate in private to determine based on the preponderance of the evidence whether a policy violation has been committed" and would then issue a written determination decision to the parties. *Id.* at 11-12.

On August 25, 2021, USI sent John an email with the panel's written decision attached. (Filing No. 51 at 16.) Using a preponderance of the evidence standard, the panel found John responsible for committing sexual assault. (Filing No. 58 at 16.) The panel indicated that it reached its decision by relying on the final Investigative Report and appendices, the statements provided by Jane and John during the panel hearing, and the statements provided by witnesses who appeared at the panel hearing. *Id.* The decision also included sanctioning John to the following: (1) suspension, effective fall semester 2021 and eligible to return spring semester 2023; and (2) Title IX Sexual Harassment education following return from suspension. (Filing No. 51 at 17.)

On September 1, 2021, John submitted a written appeal of the decision to USI. *Id.* at 21. USI appointed Christopher Bayh ("Mr. Bayh"), an Indianapolis attorney from Barnes & Thornburg, to serve as the appellate officer. *Id.* After reviewing the appeal, Mr. Bayh issued his decision on September 22, 2021, denying John's appeal and affirming the panel's decision. *Id.*

On September 24, 2021, John filed his original Complaint in state court. (Filing No. 1-1.) The original Complaint alleged several claims against USI: (1) violation of Title IX, erroneous outcome; (2) violation of Title IX, deliberate indifference; (3) violation of due process under the

Fourteenth Amendment; (4) violation of equal protection under the Fourteenth Amendment; (5) specific performance under contact; (6) judicial review of USI's appeal decision; (7) preliminary and permanent injunction; and (8) temporary restraining order. *Id.* USI removed the case to federal court on September 29, 2021. (Filing No. 1.) The Court entered an order extending temporary restraining order issued by the state court, until it rules on the Motion for preliminary injunction. (Filing No. 13). On October 18, 2021, John filed an Amended Complaint which reduced his claims to three: (1) violation of Title IX; (2) preliminary and permanent injunction; and (3) attorneys' fees. (Filing No. 27.) The Court heard oral argument on December 17, 2021. (Filing No. 105.)

### III.  DISCUSSION

John seeks a preliminary injunction on his Title IX claim to enjoin USI from enforcing a three-semester suspension resulting from a fundamentally unfair disciplinary process. The Court will first address the parties' preliminary motions before addressing the motion for injunctive relief.

**A.  Preliminary Motions**

Following oral argument on the Motion, John filed two motions to supplement the evidence provided in support of the preliminary injunction. (Filing No. 117; Filing No. 127.)[1] The first motion included social media posts from Jane indicating that she was transferring to the University of Kansas. (Filing No. 117.) The second was to provide an interrogatory answered by USI indicating that Jane was not currently enrolled at USI for any classes during the Spring 2022 semester. (Filing No. 127.) John argues that both pieces of evidence are material to the Court's forthcoming ruling on his Motion for Preliminary Injunction (Filing No. 33), specifically to the

---

[1] USI filed its own motion to supplement evidence (Filing No. 128), and John filed a third motion to supplement evidence as well (Filing No. 130). Both motions have already been granted by the Court. (Filing No. 129; Filing No. 132.)

balance of harms and public interest elements. The Court has reviewed all of the parties supplemental materials and since it has allowed prior supplements, will grant the pending motions.

**B.     Motion for Preliminary Injunction**

As previously stated, to obtain a preliminary injunction, John must establish the following factors: (1) that he is likely to succeed on the merits; (2) that he has no adequate remedy at law; (3) that he is likely to suffer irreparable harm in the absence of preliminary relief; (4) that the balance of equities tip in his favor; and (5) issuing the injunction is in the public interest. *Geft*, 922 F.3d at 364. The first two factors are threshold determinations. "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). The Court first considers whether Doe has demonstrated a likelihood of success on the merits regarding his Title IX claim.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). To support a Title IX claim, a plaintiff must show (1) that the educational institution intentionally discriminated against the plaintiff based on the plaintiff's sex, and (2) that "gender was a motivating factor in the decision to impose the discipline." *Doe v. Indiana Univ.-Bloomington*, 2019 WL 341760, at *8 (S.D. Ind. Jan. 28, 2019) (quoting *King v. DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind. Aug 22, 2014)). The formative question the Court must answer is "do the alleged facts,

if true, raise a plausible interference that [USI] discriminated against [John] on the basis of sex?" *Doe v. Purdue Univ.*, 928 F.3d 652, 667-668 (7th Cir. 2019).

One category of Title IX claims attacking a university's disciplinary proceeding is the "erroneous outcome" claim, where "the plaintiff was innocent and wrongly found to have committed an offense." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). "A plaintiff alleging an 'erroneous outcome' claim under Title IX must first 'allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the proceedings' and then also 'allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *Doe v. Purdue Univ.*, 281 F. Supp. 3d 754, 774 (N.D. Ind. 2017) (quoting Yusuf, 35 F.3d at 715).

John argues that he is likely to succeed on the merits of his claim because of the numerous violations of 34 C.F.R. § 106.45. John points out that when the Department of Education was adopting this rule, it determined that these policies were needed to " avoid . . . injection of sex-based biases and stereotypes in Title IX proceedings." (Filing No. 51 at 28 (citing 85 Fed. Reg. at 30,054).) The Department of Education also stated that failing to comply with this new rule would "constitute[] a violation of [the rule] and potentially, discrimination under Title IX." *Id.* (citing 85 Fed. Reg. at 30,047). In his briefing, John alleges twelve different violations of procedure that support his Title IX claim, which the Court will discuss in turn.

First, during the process of investigating Jane's claim, USI changed its definition for rape from "nonconsensual sexual intercourse" to a term that would include Jane's allegations against John. *Id.* at 28-29. The previous definition aligned with the Federal Bureau of Investigation's definition and, according to John, "the Interim Coordinator, Investigator, Decision Makers, and Appeal Officer knew that 'rape' was nonconsensual intercourse." *Id.* at 29.

Second, 34 C.F.R. 106.45(b)(6)(i) states that decision makers cannot rely on statements by persons who were not subject to cross-examination. *Id.* Despite knowing this, John alleges that the panel "relied on multiple purported statements by female witnesses that Plaintiff sexually assaulted and/or raped them." *Id.*

Third, John contends that USI knew of the six requirements for a written decision under 34 C.F.R § 106.45(b)(7)(ii)(A)-(F), which require the identification of the allegations of sexual harassment as defined in 34 C.F.R. § 106.30 and a determination as to each allegation. *Id.* John asserts that the Title IX personnel ignored this mandate in its definition of "rape" and in failing to render a determination of Jane's allegation of sexual assault for non-consensual kissing. *Id.*

Fourth, USI repeatedly threatened John with expulsion if he shared information relating to allegations or the process outside of his advisor/council. *Id.* at 30. John contends that Title IX personnel have been trained that this type of threat is prohibited and that a party has the right to share information for purposes of the process and personal support. *Id.*

Fifth, USI implemented a new Title IX policy during the process of investigating Jane's claim to alter the appeal grounds mandated in 34 C.F.R. § 106.45(b)(8)(i). *Id.* According to John, USI restricted appeals to those with "procedural irregularities" involving the "investigation." John argues that this is a clear violation of the Regulations. *Id.*

Sixth, 34 C.F.R. § 106.45(b)(6) restricts evidence of prior sexual relations between Jane and John where consent was not an issue. *Id.* Because John denied that any conduct of a sexual nature alleged by Jane occurred on November 14, 2020, the issue of consent was not relevant to the complaint. *Id.* John asserts that the Title IX personnel ignored their training and addressed prior sexual relations at all stages of the process. *Id.*

Seventh, John argues that the Title IX personnel were trained in the prohibition in 34 C.F.R. § 106.45(b)(1)(ii) that "credibility determinations may not be based on a person's status as a … respondent." *Id.* at 30. John contends that the panel ignored this mandate when it made a determination of credibility, in part, based on his status as a respondent because he "has a motivation to falsify information" as he "will likely face a sanction if found responsible." *Id.* at 31.

Eighth, USI did not provide him with written notice of Jane's allegations until after the investigation was complete and just prior to the hearing. *Id.* at 31. Additionally, USI misrepresented the existence of Jane's written complaint and the information it contained. *Id.* John contends that 34 C.F.R. § 106.45(b)(2)(B) requires prompt disclosure of information known by USI and the specifics of Jane's allegations of sexual assault. *Id.*

Ninth, under 34 C.F.R. § 106.45(b)(5)(i), (vi)-(vii), the burden of proof and the burden of gathering evidence was on USI not John, the investigator was to provide access to all information directly related to the allegations to John, and the investigator was to create a report that summarizes the relevant evidence. *Id.* at 31-32. John contends that the investigator did not obtain relevant evidence from Jane or her roommates, did not provide him with access to the Sheriff's Office's interview with Jane's roommate, and he did not redact irrelevant information nor include relevant videos in the report that was submitted to the panel. *Id.* Additionally, contrary to the regulations, John asserts that the Appeal officer imposed the burden of gathering evidence and proof on John and his counsel. *Id.*

Tenth, Title IX personnel were required to make an "objective evaluation of all relevant evidence" pursuant to 34 C.F.R. § 106.45(b)(1)(ii). *Id.* at 32. John, however, contends that both the panel and the appeal officer ignored this regulation when reaching both of their decisions. *Id.* For the panel, John argues that the hearing officer used leading and suggestive questioning to get

John to agree to a timeline that the panel manufactured. *Id.* John alleges that the panel ignored their training on authenticity and relied on photographs "not in evidence" to manufacture their timeline. *Id.* Additionally, John alleges that the decision makers ignored Jane's admission that her allegation of sexual assault for kissing was false when finding that the remainder of her testimony was credible. *Id.*

Eleventh, USI was experiencing substantial criticism for its alleged inaction on Title IX complaints. *Id.* at 33. John argues that because of this criticism, USI shut down comments on the Men's Athletic Instagram page, blocked certain persons from posting comments, and issued a social media post asserting that it takes allegations of sexual misconduct seriously. John alleges that this criticism is what led USI to decide against him.

Finally, John asserts that all the individuals involved in the Title IX process "ignored their training, the applicable policy, and the Title IX requirements." *Id.* John, by restating the various violations previously mentioned, asserts that this resulted in various violations of 34 C.F.R. 106.45. *Id.* Without citing any additional information, John concludes that "[t]hese numerous substantive and procedural irregularities evidence a process motivated by gender bias against Plaintiff and in favor of Jane doe." *Id.* at 36.

In response, USI first points out that John was an invitee under a license pursuant to the implied contract of enrollment between USI and John. (Filing No. 58 at 20.) USI contends that it has statutory authority under Indiana law to regulate John's conduct as a USI student. *Id.* (citing Ind. Code § 21-39-2-3). This statutory authority authorizes USI "to construct [its] own disciplinary procedures," and as a USI student, John contractually agreed to USI's procedures for deciding Jane's allegation, including USI's appeal process. *Id.* USI argues that its appeal process was John's final remedy for his grievances regarding the due process that USI promised to John. *Id.* at 21.

11

The appeal decision was the final, non-appealable procedural event. *Id.* USI contends that John does not and cannot argue that he contracted for a stay of a disciplinary suspension, pending the arguments that he is presenting to the Court. *Id.*

Next, USI points out that John's Amended Complaint, which is now limited to a Title IX claim, requires that he show that "sex was a motivating factor in [the] university's decision to discipline a student." *Id.* (quoting *Doe v. Purdue Univ.*, 928 F.3d at 667-68). USI argues that John appears to allege "bias" from the Title IX personnel on four grounds: (1) procedural irregularities, (2) relevance of evidence received, (3) choice of words and solicitude to witnesses, and (4) evaluation of impeachment evidence. *Id.* USI contends that none of these arguments show bias based on John's gender. *Id.*

USI next contends that any events prior to the August 4, 2021 hearing are immaterial to the criteria for preliminary injunctive relief. *Id.* at 22. If John perceived any imminent or prospective harm from anything that happened prior to August 4, 2021, he would have filed his lawsuit much sooner. *Id.* "A preliminary injunction does not rewind the clock to address the events that occurred months ago. A preliminary injunction ordinarily only exists to preserve the status quo." *Id.* (citing *Long v. Brown*, No. 2:14-cv-00381-JMS-WGH, 2015 WL 4162809, at *2 (S.D. Ind. July 9, 2015)). USI argues that the panel has made their decision, and the suspension is imminent. *Id.* at 22-23. The administrative process has been completed and USI argues that John has failed to allege any rule authorizing a stay of implementation of the final, non-appealable outcome. *Id.* at 23. According to USI, John cannot now invoke Title IX as a shield against "prompt corrective measures" that should commence no later than completion of Title IX's "Grievance process for formal complaints of sexual harassment." *Id*. at 23-24.

USI argues that alleged errors of administrative due process, without more, is not probative of discriminatory intent. *Id.* at 24. For his theory of relief, USI contends that John needs to show the alleged procedural flaws were not errors at all, but rather were intentional steps in an anti-male scheme. *Id.* at 25. USI contends that John offers no evidence for such a scheme and that, in fact, the evidence is compelling in favor of USI's "good-faith and diligent commitment to truth-finding and evenhandedness." *Id.* USI notes that John and his legal team participated in identifying the issues for the hearing, finalizing the investigation record for the panel, and confirming the procedures and rules for the hearing. *Id.* John, and likely his legal team, sent a response to the investigative report that included the following:

- The Written Response does not allege any anti-male bias on the part of the investigator or anyone else associated with USI's process.

- The Written Response opens the door to a new impeachment theory: "[Jane] may have been pressured by [Jane's roommate] to make the false report against me because [Jane's roommate] has made numerous online posts falsely accusing me of assaulting other USI women and demanding I be removed as a member of the USI Men's Soccer Team. There is absolutely no basis for such defamatory statements, and no USI student or other woman has made any assault accusation against me—because none have ever occurred."

- The Written Response is silent on the investigation report's quotation of John's statement that his history of touching Jane was limited to cuddling and kissing.

- The Written Response does not contend that Jane was confusing the night in question with a prior occasion on which John fingered Jane's vagina.

*Id.* at 25-26. In addition, neither John nor his legal team raised any issues during their meeting with the Interim Title IX Coordinator the day before the hearing. *Id.* at 26. Both John and his legal team also expressly affirmed on the record that the hearing process was understood and accepted. *Id.* According to USI, at no point during or after the hearing did John or his counsel express any objection or concern about the hearing or investigative process. *Id.*

13

Finally, USI contends that John supplied no evidence of anti-male bias in the panel's weighing of the evidence or the appellate officer's determination of John's appeal. *Id.* USI argues that John cannot prove anti-male bias by pointing out issues with the text of rules or procedures, nor can he show that the text of any University policy or procedure had an anti-male effect. *Id.* Based on John's written response to the investigative report, his original strategy was to attribute defamatory motives to Jane and her friends. *Id.* at 27. John maintained that he never joined Jane in her bed on November 14, 2020, did not touch Jane's breasts, and did not touch Jane's vagina that same morning. *Id.* However, at the hearing John pivoted to "a more conciliatory strategy." *Id.* At the hearing John admitted for the first time that he did, in fact, touch Jane in the ways she alleged, but only with her consent and only on a different occasion when she was sober. *Id.* Further, John testified that he believed that Jane's allegation was not intentionally false, but rather she was just confused, which Jane later denied. *Id.* USI argues that John's allegation of anti-male bias did not occur until after he received the panel ruling and "learned how badly his 'confusion' argument had impeached his credibility." *Id.* USI asserts that John has pointed to no gender bias on the part of the Title IX personnel or in their decision. *Id.* at 28-29. It asserts that the panel heard John change his story during the hearing, as well as heard from other witnesses that they observed John laying in Jane's bed despite his denying it. *Id.* This was enough, USI contends, for the panel to reach its decision and none of the alleged procedural irregularities demonstrate anti-male bias. *Id.*

At oral argument, John referenced a USI school newspaper article that accused USI of not taking allegations of sexual misconduct seriously and "allowing a rapist to run on campus." (Filing No. 109 at 18.) He argued that because of "public pressure", USI made him the sacrificial male lamb and intentionally withheld exculpatory evidence concerning credibility. *Id*. at 34. But John

has produced no evidence to support his assertion that USI's erroneous decision was based on male gender bias. As noted in *Doe v. Columbia College Chicago*, 299 F.Supp 939, 954 (N.D.I.L. 2017), several courts have similarly rejected erroneous outcome claims based upon allegations of general anti-male bias resulting from public and government pressure. *See, e.g.*, *Doe v. Cummins*, 662 Fed.Appx. 437, 452 (6th Cir. 2016) (rejecting plaintiff's claim that university adopted male-biased sexual assault investigation procedures to appease federal government); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F.Supp.3d 448, 474–75 (S.D.N.Y. 2015), (rejecting plaintiff's claim because he did not provide statements by university officials showing discriminatory intent or statistical evidence that "males invariably lose" when charged with sexual misconduct and thus did not "provide any evidence suggesting that the outcome was born out of gender bias"); *Doe v. Univ. of Colo.*, 255 F.Supp.3d 1064, 1077 (D. Colo. 2017) ("pressure from the [ ] government to investigate sexual assault allegations more aggressively—either general pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the University, or both—says nothing about the University's alleged desire to find men responsible because they are men.").

John also argues the totality of the evidence supports a plausible inference of gender bias, but even if John is correct regarding the numerous policy violations made by USI, he has failed to demonstrate that the cause of any of these irregularities originated from an individual's animosity towards his male sex. Instead, most of John's arguments appear to show his disagreement with the weighing of evidence and credibility determinations made by the panel and appellate hearing officer. No evidence of statements or conduct demonstrating gender bias or discrimination have been presented. John's numerous complaints about USI's Title IX grievance process, at most, amount to a claim that USI favors complainants over respondents. Most courts, however, that

have addressed the issue of whether anti-male bias can be reasonably inferred from evidence of a school's anti-respondent bias "have concluded that evidence of a school's anti-respondent bias does not create a reasonable inference of anti-male bias." *Doe v. University of Denver*, 952 F.3d 1182, 1196 (10th Cir. 2020) (collecting cases); *see also Doe v. Trustees of Indiana Univ.*, No. 1:21-cv-00973-JRS-MPB, 2021 WL 2982186, at *5 (S.D. Ind. July 15, 2021). Based upon the Court's review and analysis of the evidence and arguments, the Court concludes that John does not have a reasonable likelihood of success on the merits of his Title IX claim.

### C. Irreparable Harm

Having found that John's Title IX claims show no likelihood of succeeding on the merits, the will only briefly analyze his irreparable harm claim; after all, IU has successfully demonstrated that John cannot satisfy the requirements for receiving preliminary injunctive relief. The irreparable harm alleged by John is "the loss of his education and educational related activities at USI from present to Spring Semester 2023, the continuing and permanent harm from a gap in his educational records, [and] his branding as a rapist and the finding of guilt as to sexual assault." (Filing No. 27 at 69). During oral argument, USI asserted that transcripts do not display disciplinary status. And s USI argued, John has only been suspended for three-semesters, not expelled. When the suspension runs its course and John complies with the conditions of re-enrollment, USI asserts that he will have the same educational opportunity at USI that he has presently.

The Court agrees, the harms alleged are not actual or likely. John tenders no evidence that there is "disciplinary mark" on his "USI transcript" (Filing No. 51 at 47) nor any evidence that he has attempted to transfer to any institution. A plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries. *E. St. Louis Laborers' Local 100 v. Bellon Wrecking*

*& Salvage Co.*, 414 F.3d 700, 705-06 (7th Cir. 2005). The threatened injury must be "more than mere speculation." *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011). On the record before the Court, John's alleged harms are not irreparable.

## IV.  **CONCLUSION**

John Doe has failed to satisfy either of the threshold requirements for injunctive relief, therefore the Court need not balance the hardship between the parties or determine the public interest. For the foregoing reasons, John Doe's Supplemental Motion to Supplement Preliminary Injunction Evidentiary Submission (Filing No. 117) and Second Motion to Supplement Preliminary Injunction Evidentiary Submission (Filing No. 127) are **GRANTED** but his Motion for Preliminary Injunction (Filing No. 33) is **DENIED**.

**SO ORDERED.**

Date: 5/10/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Robert L. Burkart
ZIEMER STAYMAN WEITZEL & SHOULDERS
rburkart@zsws.com

Kristen Hahn
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
khahn@zsws.com

Joseph Heavrin Harrison, III
STUART & BRANIGIN
jhh@stuartlaw.com

William P. Kealey
STUART & BRANIGIN
wpk@stuartlaw.com

Matthew Stephen Koressel
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
mkoressel@zsws.com

Keith W. Vonderahe
ZIEMER STAYMAN WEITZEL & SHOULDERS
kvonderahe@zsws.com