UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CASE NO.  3:21-cv-00144-TWP-CSW |
| | ) | |
| UNIVERSITY OF SOUTHERN INDIANA, *et al*., | ) | |
| Defendants. | ) | |

**PLAINTIFF'S SUBSTITUTED CONSOLIDATED SUMMARY JUDGMENT BRIEF**

Plaintiff John Doe ("John") submits his Substituted Consolidated Brief (i) in Oppositions to Defendants' Motions for Summary Judgment, and (ii) in Support of his Cross-Motion for Summary Judgment per the Court's order of December 21, 2022 [Dkt. 338].

**Statement of the Issues**

1.      Whether John is entitled to judgment as a matter of law as to liability on Counts I, II, and II of his Second Amended Complaint?

2.      Whether Defendants' respective motions for summary judgment should be denied because John is entitled to judgment as a matter of law on the Second Amended Complaint, or alternatively whether there are genuine issues of material fact precluding judgment for Defendants on their respective motions for summary judgment?

TABLE OF CONTENTS

<u>Page</u>

Statement of Issues ………………………………………………………… 1

Table of Contents…………………………………………………………… 1

Table of Authorities………………………………………………………… 3

Introduction………………………………………………………………… 5

1

Standard of Review…………………………………………………………… 5

**The 7th Circuit's Opinion is not law of the case**…………………… **6**

Statement of Material Facts in Dispute as to D.Stafford's Statement of
Material Facts Not in Dispute………………………………………… 7

Statement of Material Facts in Dispute as to USI, Doss and Devonshire's Statement
of Material Facts Not in Dispute…………………………………… 7

**Defendants' incorporation of another's statement of facts
is ineffective**……………………………………………………… **9**

**Grand River and Nutter's reliance on a "Procedural History" as a
"Statement of Undisputed Material Facts" under Local Rule
56-1 is improper**……………………………………………… **9**

John's Statement of Material Facts Not in Dispute………………………… 10

**Jane Doe reports sexual assault and the Title IX Process begins**… **10**

**John is labeled a rapist online and on social media**………………… **12**

**Multiple Maxient reports accusing John of sexual assault are filed** **14**

**USI issues the Notice of Allegations to John**………………………… **16**

**The Investigation**……………………………………………………… **17**

**Devonshire becomes Interim Title IX Coordinator**………………… **18**

**A.**      **Sexual Harassment**…………………………………………………… **20**

**Preparation of the Hearing Notice and Events Leading up to the Hearing** **20**

**USI's Policy Updates**……………………………………………… **25**

**The Hearing, Deliberations, and the Decision**……………………… **27**

**John Appeals the Decision**……………………………………… **29**

**The Effects of the Title IX Process and Finding on John**…………… **30**

Argument……………………………………………………………… 32

**I.**      **Count I - Title IX claim against USI**……………………………… **32**

**A.**      **There is no dispute as to the seriousness of a Title IX grievance
process**……………………………………………………… **34**

**B.**      **USI, Doss, and Devonshire withheld material evidence during the
Title IX process**……………………………………………… **35**

**C.**      **USI instructs Jane not to disclose the other alleged incidents and
reports, and USI misrepresents the nonexistence of other reports
to John**……………………………………………………… **37**

**D.**      **USI knew the covert gender bias resulted in the Decision, and that
disclosure of the same would have led to a different result**………… **38**

**E.**      **USI has no explanation why the concealed evidence was not
disclosed during the process, and no Defendant designates evidence
that the process was thorough, fair, and impartial**………………… **40**

**F.**      **USI, Doss, Devonshire, and Nutter failed to disclose Nutter's conflicts
of interest, and the new allegations**………………………………… **41**

**G.**      **USI and Devonshire now claim that Policy amendments were**

implemented immediately prior to the Hearing and contrary to
Title IX and USI policy………………………………………… 43
H.   USI viewed females as the only victims of sexual harassment……… 45
I.   USI knew that John did not advance a "new claim." ……………… 46
J.   USI's argument that John lacks Title IX standing for injunctive
relief is baseless……………………………………………… 47
II.   Count II - 42 U.S.C. § 1983 claims against Doss, Devonshire, and Nutter.
A.  Doss and Devonshire's arguments in support of their Motion for
Summary Judgment are waived………………………………… 48
B.  The undisputed facts entitle John to judgment as to liability on
Count II and preclude Defendants motions…………………………… 50
1.   John suffered deprivations of his protected interests……………… 50
(i)   Property Interest…………………………………… 50
(ii)   Liberty Interest…………………………………… 53
2.   John was denied due process throughout the Title IX Process…… 55
(i)   Doss and Devonshire………………………………… 56
(ii)   Nutter………………………………………………… 56

III.   Count III – IIED claims against Defendants……………………………… 57
A.  The IIED elements……………………………………………… 57
B.  Judgment as a matter of law is appropriate in John's favor on the
IIED claims…………………………………………………… 59
C.  The undisputed facts entitle John to judgment as to liability on
Count III and preclude Defendants' motions………………………… 59
1.   USI, Doss, and Devonshire…………………………………… 60
2.   Grand River and Nutter……………………………………… 61
(i)  Punitive damages can be assessed against Grand River……… 61
(ii) Nutter was employed in a managerial capacity and was acting
within the scope of her employment…………………………… 62
(iii)  Grand River authorized Nutter's actions and ratified them… 62
3.   D.Stafford………………………………………………… 63

CONCLUSION………………………………………………………… 64

## TABLE OF AUTHORITIES

<u>Case</u>                                                                                      <u>Page</u>

*American Family Mut. Ins. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016) …………… 6
*Arizanovska v. Wal-Mart Stores, Inc.*, No. 1:09-CV-1404-RLY-DML, 2011
WL 4402561, at *7 (S.D. Ind. Sept. 22, 2011), *aff'd on other grounds*,
682 F.3d 698 (7th Cir. 2012) …………………………………………… 58
*Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 550 (Ind. Ct. App. 2015)
Ind. Ct. App. 2016) citing Restatement (Second) of Torts Section 46 (1965)…… 58
*Baines v. Walgreen Co.*, 863 F.3d 656, 661–62 (7th Cir. 2017) …………………… 6
*Bast v. Ford Motor Credit Corp.*, 631 F.2d 508, 509 (7th Cir. 1980)………………… 58
*Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999) ………………………… 60

*Chivers v. Central Noble Comm. Schools,* 423 F.Supp.2d 835, 857 (N.D. Ind. 2006)...... 58

*Conwell v. Beatty,* 667 N.E.2d 768, 777 (Ind. Ct. App. 1996) .................................... 57

*DeSilva v. DiLeonardi,* 181 F.3d 865, 866 (7th Cir.1999)........................................ 9, 49, 60, 61, 63

*Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019)............................. 32

*Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016).................................... 48

*Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019).................................... 48, 50, 51, 53, 54, 55

*Doe v. Univ. of S. Indiana,* 43 F.4th 784, 793 (7th Cir. 2022)............................... 6, 7, 39, 40

*Downing v. SMC Corp. of Am.*, 649 F. Supp. 3d 725, 727–28 (S.D. Ind. 2023)......... 6

*Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011).................................... 49, 61

*Erie Ins. Co. v. Hickman by Smith,* 622 N.E.2d 515, 520 (Ind.1993).................... 63

*Ernie G. v. Kijakazi*, No. 1:20-CV-3288-MJD-RLY, 2022 WL 168348, at *1 (S.D. Ind. Jan. 18, 2022)................................................................ 49, 60, 61

*In Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238 (Ind. Ct. App. 2013)................. 61, 62

*Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007)..................................... 48

*Gordon v. United Airlines, Inc.*, 246 F.3d 878, 891–92 (7th Cir. 2001) (same) ......... 6, 50

*Hall v. Shaw*, 147 N.E.3d 394, 408–09 (Ind. Ct. App. 2020) *trans. denied* 160 N.E.3d 517.......................................................................... 58

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.*, 991 F.2d 1249, 1258 (7th Cir. 1993).................... 6

*Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utilities*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019)....................................................................... 49

*McCarthy v. Fuller*, No. 1:08-CV-994-WTL-DML, 2014 WL 4672394, at *3-4 (S.D. Ind. Sept. 18, 2014), *rev'd and remanded*, 810 F.3d 456 (7th Cir. 2015) 9, 49, 60, 61, 63

*Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013) .................................. 6

*Pogorzelska v. VanderCook Coll. of Music*, No. 19-CV-05683, 2023 WL 3819025, at *7 (N.D. Ill. June 5, 2023) ...................................................... 40

*Public Finance Corp. v. Davis*, 360 N.E.2d 765 (1976) ................................. 58

*Samford University*, 29 F.4th at 697–98 (Jordan, J., concurring) (collecting cases) 6

*Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) ................................ 48

*State v. Alvarez by next friend Alvarez,* 150 N.E.3d 206, 218–19 (Ind. Ct. App. 2020) 57, 58, 60

*Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009).................................. 6

*Tedrow v. Franklin Twp. Cmty. Sch. Corp.*, No. 1:21-CV-453 RLM-MG, 2023 WL 3602712, at *9 (S.D. Ind. May 23, 2023)........................................... 49, 60, 61, 63

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).................................. 6

*Westminster Presbyterian Church of Muncie v. Cheng*, 992 N.E.2d 859, 870 (Ind. Ct. App. 2013), *trans. denied*.................................................. 57

**Introduction**

USI claims there is no evidence that its "sound Title IX practice" "camouflaged anti-male bias." Discovery, however, exposed Defendants' camouflage and disclosed the covert, discriminatory anti-male bias throughout the grievance process, including:

- Concealment of exculpatory evidence favoring John of:
  - USI's Case File report on the alleged incident;
  - USI's memoranda of meetings with Jane Doe about the alleged incident;
  - USI's reports by Jane Doe of other alleged misconduct by John;
  - USI's memoranda of meetings with John;
- USI's directive to Jane Doe not to disclose exculpatory evidence favoring John;
- Intentional and covert misconduct by Defendants.

Title IX litigation is unlike the final two minutes of a Law & Order episode where a person suddenly admits, "I did it." There is no recorded case of a university admitting Title IX sex discrimination. Yet, legal mandates and remedies exist to prohibit and address university discrimination. As the 7th Circuit held, circumstantial evidence is sufficient to prove sex discrimination, because "the devil is in the details."

Defendants avoid discussion of the "details" by placing blame on a nineteen-year old student who believed USI's representation that it would provide a fair, thorough, and impartial process. Defendants' intentional misconduct violated John's rights and caused severe emotional distress. The frequency and ongoing nature of Defendants' outrageous misconduct, the egregious nature of the misconduct, and the dire consequences from their misconduct are contrary to cultural norms and values in a civilized society. Based on the undisputed material facts, the Court should enter judgment as to liability in John's favor on the Second Amended Complaint and deny Defendants' summary judgment motions.

**Standard of Review**

When parties file cross-motions for summary judgment, the Court takes the motions "one at a time," and "views and recites the evidence and draws all reasonable inferences in favor of

the non-moving party." *Downing v. SMC Corp. of Am.*, 649 F. Supp. 3d 725, 727–28 (S.D. Ind. 2023) quoting *American Family Mut. Ins. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016).

> To put the point in arguably circular terms, procedural irregularities may support a finding of sex bias under Title IX if, in light of all the circumstances, a fact-finder is convinced that the defendant deviated from proper procedures not because of human error but by design, to achieve covertly what it could not do openly: discriminate against the plaintiff on the basis of his sex. "[A]s the number of irregularities increases, or the irregularities become more serious," it begins to look less likely that the errors were due to benign reasons. *Samford University*, 29 F.4th at 697–98 (Jordan, J., concurring) (collecting cases). We have often made essentially this point about departures from regular procedure in employment discrimination cases. E.g., *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017) (reversing summary judgment); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 891–92 (7th Cir. 2001) (same). The same reasoning can apply under Title IX.
> The devil is in the details, though.

*Doe v. Univ. of S. Indiana*, 43 F.4th 784, 793 (7th Cir. 2022).

> Direct evidence, such as an admission by the employer of unlawful animus, is sufficient but rare. A plaintiff may "also supply the causal link through circumstantial evidence from which a jury may infer intentional discrimination." *Id.*, citing *Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009). "If [a] plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013). . . The absence of such a direct admission of unlawful intent does not mean the plaintiff cannot meet her burden with circumstantial evidence.

*Baines v. Walgreen Co.*, 863 F.3d 656, 661–62 (7th Cir. 2017).

**The 7th Circuit's Opinion is not law of the case.**

Defendants recite the 7th Circuit's Opinion affirming this Court's denial of John's motion for preliminary injunction as if it is law of the case. It is well-settled that a ruling on a preliminary judgment is not law of the case or binding at trial. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.*, 991 F.2d 1249, 1258 (7th Cir. 1993).

In noting the different burdens between a preliminary injunction and a motion for

summary judgment, the 7th Circuit stated:

> In reviewing the district court's decision on a preliminary injunction, we approach the record from a neutral and objective viewpoint, assessing the merits as we think they are likely to be decided after more complete discovery and litigation.

*Id*. at 792. While the Opinion was based "on the record before us," the current record is

significantly different given the more complete discovery, depositions, and retention of

unopposed expert testimony. *Doe*, 43 F.4th at 801.

## STATEMENT OF MATERIAL FACTS IN DISPUTE
### AS TO D.STAFFORD'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

1. Devonshire testified that plaintiff and his advisor were advised as to the changes to USI's Sexual Harassment Policy, which were made to USI's Sexual Harassment policy when she was interim Title IX coordinator. [Dkt. 319-1, p. 4].

The cite does not support the statement. Beth Devonshire was referring to the USI Spreadsheet as to changes and updates, and USI's 30(b)(6) designee testified that USI has no knowledge of the approval or implementation of the purported policy amendments on the Spreadsheet. [Ex. 2 at 33:6-25 (Exhibit 58 thereto)]. Beth Devonshire said that Aaron Trump approved changes to policy [Ex. 4 at 80:13-18], and Aaron Trump testified that he did not approve any changes to the policy. [Ex. 1 at 73:11-25; 12:1-6; Ex. 2 at 34:22-24].

2. There is no evidence in the record which indicates that they contemporaneously objected to the definitional changes. [Dkt. 319-1, p. 4].

There is no evidentiary cite as to this statement as required, and it is argument.

## STATEMENT OF MATERIAL FACTS IN DISPUTE
### AS TO USI, DOSS, AND DEVONSHIRE'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1. USI's headings are not factual statements supported by evidentiary and are argumentative.

2. Lynn's letter gave John the required written notice of the allegations of sexual harassment asserted against him. [Dkt. 315, p. 4].

---

[1] John does not concede any fact asserted by any Defendant for a purpose other than summary judgment, including trial, and none are otherwise intended to be binding.

This includes a legal assertion. USI did not include the facts known at the time as contained in documents concealed, the Case File, and other reports, and USI did not provide the specific allegations of sexual assault by Jane as require by 34 CFR § 106.45(b)(2)(B).

3.  In her written response Jane said that she was not making a non-consensual kissing allegation against John. [Dkt. 315, p. 9].

The cite does not support the statement. USI gave notice to John in the Hearing Notice that an allegation of sexual assault of nonconsensual kissing was one of the allegations for hearing, and the Decision stated that one of the allegations provided by USI for the Hearing was an allegation of nonconsensual kissing.

4.  John agreed that through Jane's written response he was aware at this point in the investigation (and before the panel hearing) that Jane was **_not_** contending to the investigator that there was nonconsensual kissing. [Dkt. 315, p. 9].

The assertion is misleading as John testified as cited that he was aware of other statements stating differently, *e.g*., the Hearing Notice and Decision.

5.  John deployed sexual history evidence as an affirmative defense. [Dkt. 315, p. 12].

There is no evidentiary cite for this statement, and it is argument. Moreover, answering questions asked of him is not an affirmative defense.

6.  At the hearing, after months of denying any history of touching Jane's vagina, John changed his story. [Dkt. 315, p. 14].

The statement is contrary to the evidence because John did not "change his story." John told USI at a meeting in February 2021, that he had fingered Jane on a prior occasion at her request and with her consent. [Ex. 11 at 242:12-25; 243-244; 245:1-25; Ex. 14 at 13-14; Ex. 12 at 47-50; Dkt. 33-16, ¶ 51-64; Ex. 53 at ¶ 5]. He told his mother the same thing in texts on March 21, 2021. [Ex. 11 at 242:12-25; 243-244; 245:1-25; Ex. 12 at 47-50; Ex. 14 at 13-14]. John also told his Title IX advisor at their first meeting on April 5, 2021. [Dkt. 33-16, ¶ 51; Ex. 52 at ¶ 6]. Thus, there was no change in his story because he had disclosed to USI, his mother, and his advisor before the Investigation interview and the Hearing of the prior fingering of Jane at her request and consent.

7.  When John volunteered an assertion that Jane may have been confused and the Hearing Officer asked John what Jane may have been confused about, John made the new claim that Jane's allegation of fingering related to a different, earlier, consensual encounter. [Dkt. 315, p. 14].

The statement is contrary to the evidence as there was no "new claim." See explanation in prior Paragraph 6. The cite does not support the statement. John did not volunteer an assertion. He answered a question from the Hearing Officer as to whether he had on other occasions touched Jane's breasts or fingered her. No such question was asked by the Investigator.

8. That testimony directly contradicted his prior insistence to Peterson during the investigation that, prior to November 14, 2020, he and Jane "would always just really kiss and we'd cuddle, but that was, that was it." [Dkt. 315, p. 15].

This is an argumentative assertion and characterization and is contrary to the evidence. [Dkt. 33-16, ¶ 51-64]. See also the explanation in prior Paragraph 6.

9. USI has protected the confidentiality of the investigation and decision of Jane's allegation against John. [Dkt. 315, p. 14].

There is no evidentiary cite as to this statement as required.

### Defendants' incorporation of another's statement of facts is ineffective.

Defendants Grand River Solutions (Grand River"), Karen Nutter ("Nutter"), and D.Stafford & Associates ("D.Stafford") incorporate USI's "Statement of Material Facts Not in Dispute" without specifying any fact as material in their respective brief. [Dkt. 317-1, p. 4; Dkt. 319-1, p. 5]. This is an improper attempt to "a self-help increase in the length" of their brief. *McCarthy v. Fuller*, No. 1:08-CV-994-WTL-DML, 2014 WL 4672394, at *3-4 (S.D. Ind. Sept. 18, 2014), *rev'd and remanded*, 810 F.3d 456 (7th Cir. 2015) citing *DeSilva v. DiLeonardi,* 181 F.3d 865, 866–67 (7th Cir.1999). They further fail to comply with Local Rule 56-1(a), and they are therefore limited to the designated facts in their respective brief. *See* Local Rule 56-1(h) (Court has "no duty to search or consider any part of the record not specifically cited in the manner described in [Local Rule 56-1(e)"]).

### Grand River and Nutter's reliance on a "Procedural History" as a "Statement of Undisputed Material Facts" under Local Rule 56-1 is improper.

Grand River and Nutter's "Statement of Material Facts" includes a "Procedural History." A procedural history is not a statement of determinative facts under Local Rule 56-1(a), and therefore John is not required to respond to the same.

**JOHN'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

**Jane Doe reports sexual assault, and the Title IX Process begins.**

On February 11, 2021, Jane Doe ("Jane") got high smoking marijuana, proceeded to have a panic attack, and then told her roommates that John had "fingered her" without her consent during the early morning of November 14, 2020. [Dkt. 42-1 at 84:24-85:8, 97:3-9, 167:18-168:6]. Jane's roommate reported the alleged incident and a USI public safety officer and a Vanderburgh County Sheriff's Deputy interviewed Jane and prepared separate reports. [Dkt. 35-1 at 123-29, 188-193].

On February 12, 2021, John received a letter from USI which stated that he was to have no contact with Jane. [Ex. 11 at 30:19-31]. On February 16, 2021, USI Deputy Title IX Coordinator Dameion Doss ("Doss") and USI's then Title IX coordinator, Carrie Lynn ("Lynn"), met with Jane regarding the alleged sexual assault by John on November 14, 2020. [Ex. 48]. A written "Memo of Conversation" was created by USI regarding the conversation with Jane on February 16, 2021, and contained statements by Jane as to the alleged sexual assault by John on November 14, 2020 (the "February 16 Memo"). [Ex. 48].

As Deputy Title IX Coordinator, Doss's responsibilities included educating students and staff on Title IX requirements, and assisting with varying aspects of the process once a student filed a Title IX Complaint.[Ex. 5 at 9:13-11:25]. On February 18, 2021, Doss and Lynn met with John. [Ex. 49]. USI did not advise John at the meeting of any specific behaviors of sexual assault being made by Jane against him. [Ex. 49]. USI told John at the meeting that there were several other USI female students who had reported that his behavior made them feel uncomfortable. [Ex. 5 at 151:7-19 and Exhibit 22 thereto, USI 01387]. USI has no document as to other USI

female students being uncomfortable. [Ex. 36 at ¶¶ 286-287; Ex. 5 at 153:4-22].[2] A written

"Memo of Conversation" was created by USI regarding the meeting with John on February 18,

2021 (the "February 18 Memo"). [Ex. 49]. John disclosed to Doss and Lynn at the February 18,

2021, meeting that on a prior occasion, John had fingered Jane's vagina at her initiation and with

her consent. [Ex. 10 at 242:12-25; 243-244; 245:1-25; and Ex. 14 at 13-14 ; Ex. 12 at 47-50; Dkt.

33-16, ¶ 51-64; Ex. 53 at ¶ 5].

On February 25, 2021, Jane sent an email to USI's Title IX Officer accusing John of

sexual assault on November 14, 2020 (the "Formal Complaint"). [Ex. 43]. USI opened a Title IX

"Case File" for the Formal Complaint and identified it as "Case# 2021-43." [Ex. 47 and Ex. 5 at

69:3-21.] Doss and USI Deputy Title IX Coordinator, Dr. Shelly Blunt ("Blunt"), met with Jane

on February 25, 2021, regarding the alleged sexual assault by John on November 14, 2020. [Ex.

50]. A written "Memo of Conversation" was created by USI as a result of the meeting (the

"February 25 Memo"). [Ex. 50]. The February 25 Memo contained statements by Jane as to the

alleged sexual assault by John on November 14, 2020. [Ex. 50].

The focus of USI's Sexual Harassment Policy as of February 25, 2021 (the "Policy") was

"the protection of educational and employment opportunity regardless of sex for students,

faculty, administrators, and support staff" at USI. [Ex. 27 at 1]. Section II of the Policy states that

compliance with the Policy is a term and condition of enrollment at USI. [Ex. 27 at 1]. The

Policy defined "Sexual Harassment" as including "sexual assault"  which it defined as:

---

[2] In responses to RFP Request Nos. 286-287, USI made objections but did not assert that any
responsive document had been withheld per FRCP 34(b)(2)(C). [Ex. 36 at ¶¶ 286-287] Thus,
USI's response is a representation that no responsive document exists as to the RFP responses.
*3D Sys. Corp. v. Miller*, No. 117CV03252RLYMJD, 2018 WL 7350943, at *1 (S.D. Ind. Jan. 31,
2018); *Todero v. Blackwell*, No. 117CV01698TWPMJD, 2018 WL 10601816, at *1 (S.D. Ind.
Apr. 6, 2018).

1.      Sexual assault, meaning an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation (https://ucr.fbi.gov/nibrs/2012/resources/nibrs-offense-definitions).

[Ex. 27 at 4-5]. FBI NIBRS definition of forcible rape was "the  carnal knowledge of a person, forcibly and/or against that person's will or not-forcibly or against the person's will in instances where the victim is incapable of giving consent because of his/her temporary or permanent mental or physical incapacity." [Dkt. 33-5 at 5-6]. The Policy stated anyone may report sexual harassment by, among other ways, following a link to "…cm.maxient.com…" and completing a reporting form. [Ex. 27 at 6].

On March 23, 2021, Doss and Lynn met with Jane regarding the Formal Complaint, allegations, and process, and Jane acknowledged the harassing and slanderous accusations being made against John. [Ex. 40 at 13-14]. A written "Memo of Conversation" was created by USI as a result of the meeting with Jane on March 23, 2021 (the "March 23 Memo"). [Ex. 40 at 13-14]. At this meeting, Doss and Lynn instructed Jane not to disclose the other incidents and reports she made against John during the Title IX process. [42-1 at 96:7-21; Ex. 40 at 42].

**John is labeled a rapist online and on social media.**

On March 25, 2021, USI's student publication, The Shield, published an article titled "Student Reports Sexual Assault, Says Officials Aren't Serious," (the "Article") where an anonymous female USI student, *i.e*, Jane, accused USI of not taking seriously a report she made on February 11, 2021, alleging that she was sexually assaulted by a male USI student in November 2020. [Dkt. 33-26; Ex. 10 at 277:25; 278:1-13]. The Article included a quote from Jane, the anonymous female student, stating that she wanted the male removed from USI's campus, because "[she didn't] want it to happen to any more girls." [Dkt. 33-26 at 3; Ex. 10 at 277:25; 278:1-13]. The Article also included a comment that a female student posted to USI's

social media post, which read "USI will be held accountable for this," and "You're supporting rape culture and discouraging women from going to college and speaking up for themselves." [Dkt.. 33-26 at 3].

In March of 2021, USI knew that a female USI student had created an online petition accusing John of sexually assaulting seven different USI female students which states, "The University of Southern Indiana is allowing a predator to have free range of their college campus," and it requested others to sign her petition for USI to take action (the "Online Petition"). [Dkt. 33-4; Ex. 40]. Comments to the Online Petition included: 1) "Women support women;" 2) "This is a disgrace to women;" 3) "MEN SHOULD BE HELD FOR THEIR OWN ACTIONS…STOP IGNORING VICTIMS;" 4) "…they should kick someone out who actually poses a threat to women." [Dkt. 33-4 at 2-5]. On March 25, 2021, USI circulated the Online Petition to various USI employees. [Ex. 45]. The Online Petition violated USI's Student Conduct Policy. [Dkt. 33-4; Ex. 40 at 64-66]. The Online Petition and Jane's roommate's social media posts constituted sexual harassment as defined under the Policy as unwelcome conduct and stalking, and a violation of Sections 2.5.4 and 2.6 under USI's Student Conduct Policy for social media harassment and cyber-bullying.  [Dkt. 35-1 at 20-21; Ex. 40 at 64-66].

After Jane's accusation against John, Jane's roommate, M.B., began social media posts accusing John of sexual assault. [Dkt. 33-2; Dkt. 42-1 at 206:22-208:3]. The social media posts by M.B. also violated the Policy and USI's Student Conduct Policy. [Dkt. 33-2; Ex. 40 at 66]. In March of 2021, USI knew of social media posts by other females accusing John of sexual assault and accusing USI of taking no action against John.  [Dkt. 33-3; 33-16 at ¶¶ 23-26; Ex. 40 at 13-14; Ex. 10 at 37:2-38:5, 42:19-44:13, 85:17-86:19; Dkt 33-4]. A TikTok video was posted with a picture of John and accusing him of sexual assault.[Ex. 46].

On March 26, 2021, John and his parents met with Doss and Lynn and discussed that Jane's roommates and other USI female students were making false, harassing, and threatening social media posts targeting him. [Ex. 10 at 37:2-38:5, 42:19-44:13, 85:17-86:19; Ex. 40 at 15-16; Ex. 41; Dkt. 33-4]. A written "Memo of Conversation" was created by USI as a result of the meeting with John and his parents on March 26, 2021 (the "March 26 Memo"). [Ex. 40 at 15-16]. John advised that USI students had disclosed his USI dorm room on social media posts, made false accusations of alleged multiple rapes of USI female students, and made threats of harm against him. [Ex. 10 at 37:2-38:5, 42:19-44:13, 85:17-86:19]. In March of 2021, USI knew that John was subject to verbal harassment at a USI athletic event in which he was participating. [Ex. 40 at 15-16; Ex. 40 at 49]. In March of 2021, USI knew of comments on USI's athletic Instagram page falsely accusing John of sexual assault. [Dkt. 33-3; 33-16 at ¶ 23-25]. USI deleted negative social media comments and blocked certain persons from making comments on USI's athletic team Instagram page. [Dkt. 33-3; 33-16 at ¶ 25]. USI made a social media post stating: "[a]t USI, we take all allegations of sexual misconduct seriously and strongly encourage anyone with information to reach out to USI Public Safety and/or our Title IX office . . . ."  [Dkt. 33-2 at 7].

**Multiple Maxient reports accusing John of sexual assault are filed.**

On March 19, 2021, a USI resident assistant, on behalf of Jane, submitted a Title IX report through USI's Maxient system regarding an alleged sexual assault of Jane by John occurring at 3:00 a.m. on November 13, 2020 (the "March 19 Report"). [Ex. 40 at 17-21]. The March 19 Report was sent to Doss, Blunt, then Executive Director of Human Resources Andrew Lenhardt ("Lenhardt"), Lynn, and Deputy Title IX Coordinator Laurie Berry ("Berry"). [Ex. 40 at 18-19]. The March 19 Complaint related to the same alleged incident as referenced in the

Formal Complaint and contained statements by Jane as to the alleged sexual assault by John on November 14, 2020. [Ex. 40 at 18-19].

On March 20, 2021, Jane's suitemate, H.W. submitted a Title IX report through USI's Maxient system against John, accusing him of sexual assault for allegedly slapping her butt on November 14, 2020 (the "H.W. Incident Report"). [Ex. 22 at 1-4]. H.W. met with Doss and Lynn , and H.W. requested and received academic accommodations, and her professors were advised that she had filed a report of sexual assault. [Ex. 22 at 5-9].

On March 21, 2021, Jane submitted a Title IX report against John through USI's Maxient system asserting an alleged sexual assault by John occurring on October 4, 2020, the first night she met John (the "October Incident Report"). [Ex. 40 at 31-35]. The October Incident Report included statements by Jane as to John's alleged sexual assault occurring on October 4, 2020. [Ex. 40 at 31-32]. The October Incident Report was sent to Doss, Blunt, Lenhardt, Lynn, and Berry.  [Ex. 40 at 32].

On March 21, 2021, Jane submitted a Title IX report against John through USI's Maxient system regarding alleged misconduct by John occurring on November 8, 2020, as to sexually explicit photos of Jane on her phone (the "November 8 Report"). [Ex. 40 at 26-30]. The November 8 Report was sent to Doss, Blunt, Lenhardt, Lynn, and Berry. [Ex. 40 at 27].

On March 21, 2021, John texted with his mother and told her that he had kissed and cuddled with Jane and that on one occasion Jane had asked him to finger her vagina and he did so with her consent. [Ex. 11 at 242:12-25; 243-244; 245:1-25; Ex. 14 at 13-14; Ex. 12 at 47-50; Dkt. 33-16, ¶ 51-64; Ex. 53 at ¶ 5]. In March 2021, USI maintained a website which included a webpage for USI's Title IX Department and a link for which USI students, faculty, and staff and

the public could access USI policies including the Policy. [Ex. 1 at 9:24-25; 10:1-8; Ex. 58 at 42:2-12; Ex. 5 at 51:2-17].

**USI issues the Notice of Allegations to John.**

At the meeting on March 26, 2021, USI gave John a letter notifying him that a formal complaint of sexual harassment had been filed against him by Jane (the "Notice of Allegations"). [Dkt. 38-1]. The Notice of Allegations stated:

> The following is a summary of the allegations of sexual harassment contained in the Complaint:
>
> The Complaint, [Jane], states in her Complaint that the Respondent, [John] violated the University of Southern Indiana's Sexual Harassment Policy by committing Sexual Assault, defined as a forcible sex offense, that occurred on November 14, 2020, on the University's campus in [] Hall, Room [].

[Dkt. 38-1].

The Notice of Allegations did not disclose the specific behaviors constituting sexual assault that Jane was alleging. [Dkt. 38-1; Ex. 12 at 25:5-25; 26:1-3]. At the meeting on March 26, 2021, with Doss and Lynn, USI was asked whether any other report of misconduct had been made against John other than the one by Jane as to November 14, 2021, and USI responded that there had been no other report. [Ex. 12 at 25:2-25, 26-27, 28:8-13; Dkt. 33-16 at ¶¶ 31, 36]. The Notice of Allegations referenced USI's Sexual Harassment Policy, which as of March 26, 2021, was the Policy. [Dkt. 38-1; Ex. 35 at ¶ 116; Ex. 27] USI began a Title IX investigation under the Policy for the Formal Complaint. [Dkt. 38-1].

Attorney Keith Vonderahe agreed to act as John's advisor under the Policy for purposes of the Title IX process (the "Advisor"), and John first met with Advisor on April 5, 2021. [Ex. 52 at ¶ 6]. At this first meeting with Advisor, John communicated his interactions with Jane, including that on an occasion prior to November 14, 2020, John had fingered Jane's vagina with her consent. [Dkt. 33-16 at ¶ 51; Ex. 52 at ¶ 6].

16

The Notice of Allegations omitted information contained within the Formal Complaint, as well as  information known by USI in the public safety reports, the March 19 Report, and the February 16 Memo, and the February 25 Memo. [Dkt. 38-1]. When requested, USI refused to provide Advisor with a copy of the Formal Complaint. [Dkt. 38-1].

### The Investigation

USI designated attorney Demetrius Peterson of the Husch Blackwell law firm in Kansas City, Missouri, to act as the Title IX investigator on USI's behalf (the "Investigator") as to the Formal Complaint (the "Investigation"). [Dkt. 35-1 at 1]. The Investigator acted on USI's behalf in the Investigation of the Formal Complaint. [Ex. 6 at 26:2-11; 40:23-41:3]. USI directed the Investigator to investigate the Formal Complaint in accordance with the Policy. [Ex. 6 at 14:11-12]. The Investigator was located in Kansas City, Missouri, and he did not have access to USI files, and he relied on USI to provide him with documents it possessed. [Ex. 6 at 26:2-5; Ex. 5 at 76:17-24].

Hereinafter, the February 16 Memo, the February 18 Memo, the February 25 Memo, the March 23 Memo, the March 26 Memo, the March 19 Report, the October Incident Report, the November 8 Report, and the H.W. Incident Report are individually and collectively referred to as the "Concealed Documents."

USI sent certain documents to the Investigator for purposes of the Investigation, including the Policy and the Formal Complaint. [Ex. 6 at 25:7-19] USI did not disclose or produce the Concealed Documents to the Investigator during the Investigation. [Ex. 6 at 24:25; 25:1-6; 32:6-9; 39:20-24 and Exhibit 76 thereto; Ex. 29 at ¶¶ 2,9]. USI did not disclose or produce the Concealed Documents to John during the Title IX process. [Ex. 29 at ¶¶ 7, 14; Ex. 52 at ¶ 3]. Prior to and during the Investigation, including his interviews with the Investigator,

17

USI did not disclose to John the specific behaviors of sexual assault being made by Jane as to the November 14, 2020, alleged incident. [Dkt. 38-1].

On May 10, 2021, USI received communication from Jane's mother asserting that John had harassed, assaulted, and raped 7 or 8 girls. [Ex. 32 at 2]. USI knew that it possessed no information or documentation that John had raped 7 or 8 girls, but USI did not relay this to her when responding. [Ex. 5 at 152:22-153:9; Ex. 32 at 1; Ex. 36 at ¶¶ 286-287].

### Devonshire becomes USI's Title IX Coordinator

Lynn ceased employment as USI's Title IX Coordinator on July 2, 2021, to pursue other employment. [Doss Dep. 6:16-18; Dkt. 315-1 at 9]. On June 17, 2021, USI entered into a contract with D. Stafford & Associates, Inc. ("D. Stafford"), whereby D. Stafford would provide an individual to act as USI's Title IX coordinator. [Ex. 15]. D. Stafford is a consulting firm that has expertise in Title IX and its regulations. [Dkt. 320-1 at 8:4-9:4; 18:18-19:8]. Pursuant to its contract with USI, Stafford placed Beth Devonshire ("Devonshire") at USI to act as the university's Title IX Coordinator. [Ex. 15; Dkt. 33-6].

On July 8, 2021, USI issued a written public statement that was emailed to USI students that Devonshire was named as USI's interim Title IX Coordinator effective July 5, 2021. [Dkt. 33-6]. In that written public statement, USI stated that Devonshire "is employed by D. Stafford & Associates," and that she would be responsible for upholding "federal gender-equity law" by overseeing the reporting, investigation and adjudication of sexual assault complaints." [Dkt. 33-6]. Devonshire was acting in the course and scope of her contractual arrangement with D. Stafford in performance of her interim Title IX Coordinator duties at USI. [Dkt. 294 at ¶ 1].

As of July 8, 2021, D. Stafford represented to colleges and universities that Devonshire was a Title IX expert. [Dkt. 295 at ¶ 3]. Prior to July 8, 2021, Devonshire, on behalf of D.

18

Stafford, had trained college and university personnel on compliance with the 2020 Title IX regulations. [Dkt. 294 at ¶ 7]. Prior to July 8, 2021, Devonshire, on behalf of D. Stafford, had trained college and university personnel on best practices and industry standards for compliance with the 2020 Title IX regulations. [Dkt. 294 at ¶¶ 8-9]. Devonshire was also acting as USI's agent in performing her interim Title IX Coordinator duties at USI. [Ex. 29 at ¶ 22]. Devonshire described her duties as Interim Title IX Coordinator at USI as typical of any Title IX Coordinator, *i.e.* overseeing the Title IX process, including intake, "shepherding of the process" policy development, outreach, training, and establishing a reputation for the office.[Ex. 4 at 10:15-24].

At the time Lynn ceased USI employment and Devonshire commenced her position as Title IX Coordinator, the Investigation was not complete and the Investigator had not issued the final Investigation Report. [Dkt. 35-1]. Doss gave Devonshire notice on July 9, 2021, of Case # 2021-43 that included some Concealed Documents, and which was prior to the issuance of the Investigation Report on July 15, 2021. [Ex. 47; Ex. 6 (Exhibit 76 thereto); Ex. 40 at 1-35]. Devonshire reviewed and read the documents within "Case# 2021-43." [Ex. 4 at 32:20-22, 52:23-53:1, 158:9-16].

The Investigator prepared an Investigation Report dated July 15, 2021, and he included an Appendices of documents (the "Investigation Report"). [Dkt. 35-1]. USI received a copy of the Investigation Report. [Peterson Dep. 18:10-19]. The "Index to Appendices" of the Investigation Report stated, "Appendix A Pertinent University Policies." [Dkt. 35-1 at 15]. Appendix A to the Investigation Report only included the Policy. [Dkt. 35-1 at 16-30]. The Investigation Report did not include the Concealed Documents. [Dkt. 35-1; Ex. 29 at ¶¶ 2,9].

The "Memorandum" of the Investigation Report advised John and Jane that the Formal

Complaint was investigated as prescribed by the Policy, and further stated:

> The following sections of USI's Policy implicated by the complaint are identified below.
>
> **A. Sexual Harassment**
>
> USI's Policy defines sexual harassment as conduct on the basis of sex in pertinent part, as follows: "Sexual assault, meaning an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation (https://ucr.fbi.gov/nibrs/2012/resources/nibrs-offense-definitions)."
>
> Importantly, the Federal Bureau of Investigation defines a Sex Offense, Forcible as "any sexual act directed against another person, without the consent of the victim including instances where the victim is incapable of giving consent." This includes "Sexual Assault With An Object – To use an object or instrument to unlawfully penetrate, however slightly, the genital or anal opening of the body of another person, forcibly and/or against that person's will or not forcibly or against the person's will in instances where the victim is incapable of giving consent because of his/her youth or because of his/her temporary or permanent mental or physical incapacity." This also includes "Forcible Fondling – The touching of the private body parts of another person for the purpose of sexual gratification, forcibly and/or against that person's will or not forcibly or against the person's will in instances where the victim is incapable of giving consent because of his/her youth or because of his/her temporary or permanent mental or physical incapacity."

[Dkt. 35-1 at 1, 3].

The "Memorandum" of the Investigation Report only identified "Sexual Assault With an

Object" and "Forcible Fondling" under the Policy "as implicated by the complaint." It did not

identify "rape" as "implicated by the complaint." [Dkt. 35-1 at 3]. USI told the Investigator to

investigate "Sexual Assault With an Object" and "Forcible Fondling" under the Policy. [Ex. 6 at

26:16-23].

### Preparation of the Hearing Notice and Events Leading up to the Hearing

USI entered into a written contract with Grand River to provide three decision-makers,

with one of those being a hearing officer for the Title IX hearing (the "Hearing"). [Ex. 20].

Grand River is a consulting firm, that in July of 2021, had expertise in Title IX and the

Regulations. [Dkt. 303 at ¶¶ 31-35, 39]. Karen Nutter was designated by Grand River as the

hearing officer for the Hearing. [Dkt. 303 at ¶ 35]. Nutter was a Title IX expert who provided

Title IX training and had experience as a Title IX investigator and hearing officer. [Nutter Dep.

6:19-7:6; 8:25-9:4]. Nutter was not retained to review USI's Policy or to determine allegations

for the Hearing. [Ex. 13 at 16:1-10]. Nutter did not seek legal advice from USI or Trump during

the Title Process. [Ex. 13 at 25:22-24, 38:16-18].

On July 22, 2021, Devonshire sent Nutter templates for the Title IX hearing notice on the

Formal Complaint, and Devonshire added question and answer language for the Title IX hearing.

[Ex. 33 at 1-3]. On July 22, 2021, Devonshire sent Nutter a draft hearing notice which stated in

part,

> The formal complaint specifically alleged the following: HOW HAS THIS BEEN
> SUMMARIZED IN THE PAST DOCS On November 14-15, 2020, in [Jane's] residence
> hall, [John] kissed [Jane], touched her breasts and digitally penetrated [Jane's] vagina
> without her consent.

[Ex. 33 at 2]. Nutter stated that she would review the draft letter and see if she had any

suggestions. [Ex. 33 at 1]. On July 23, 2021, Devonshire sent an email to Doss regarding the

draft hearing notice letter and stated, "there are things that I could not confirm and/or send and

wanted to review with you." [Ex. 33 at 4].

On July 26, 2021, Devonshire sent Doss an email only containing the following:

> The following:

> The Complainant, [Jane], states in her Complaint that the Respondent, [John],
> violated the University of Southern Indiana's Sexual Harassment Policy by
> committing Sexual Assault, defined as a forcible sex offense, that occurred on
> November 14, 2020 on the University campus in [], Room []. Specifically, [Jane]
> alleges that while in her residence hall room, [John] kissed [Jane], touched her
> breasts, and digitally penetrated [Jane's] vagina without her consent.

21

[Ex. 33 at 9]. Devonshire did not communicate with Jane about her allegations of sexual assault against John prior to Devonshire's email to Doss on July 26, 2021. [Ex. 4 at 95:15-20]. On July 26, 2021, Devonshire, Aaron Trump, USI's chief government and legal affairs officer ("Trump"), Lenhardt, Doss, and/or Nutter were involved in eleven (11) emails, claimed as privilege, relating to the hearing notice to be given to John and Jane. [Ex. 30 at 4-5].

On July 26, 2021, Doss sent an email to Nutter, and copied Devonshire, and attached the Notice of Allegations and stated, "Please see the attached old notice of allegations and investigations that Beth asked me to send to you." [Ex. 33 at 12]. The "old notice of allegations," referred to the allegations in the Notice of Allegations. [Ex. 33 at 12-14]. As of July 26, 2021, Jane had not accused John of forcible or nonconsensual sexual intercourse. [Ex. 5 at 120:21-23]. As of July 26, 2021, Jane had not accused John of "rape" as defined under the FBI NIBRS List. [Ex. 5 at 120:4-23]. The Investigation Report did not reference any allegation by Jane of forcible or nonconsensual sexual intercourse by John. [Dkt. 35-1].

Devonshire trained others and received training herself that that "sexual assault" under Title IX was classified as a forcible or nonforcible sex offense under the FBI NIBRS List. [Ex. 4 (Ex. 72 thereto at 13-15]. Prior to July 1, 2021, Nutter knew from Grand River Solutions Title IX training materials that:

> What (Mis)Conduct is Covered by the New Regulations' Processes?
> • Sexual Assault*
> * Using 106.30 definitions
>
> What are the § 106.30 Definitions?
> Definition of Sexual Harassment
> Sexual harassment means conduct on the basis of sex that satisfies one or more of the following: . . .
> (3) "'Sexual assault" as defined in 20 U.S.C. 1092(f)(6)(A)(v) . . . ."
>
> Sexual Assault Definitions
> • 20 U.S.C. 1092(f)(6)(A)(v) – Federal Definitions

22

• Sex Offenses Forcible and Non-Forcible
• Forcible:
• Rape, Sodomy, Sexual Assault with an Object, Non-Consensual Fondling
• Non-Forcible: Incest, Statutory Rape

[Dkt. 33-13 at 7, 9-10, 16].

On August 2, 2021, Devonshire sent Nutter an email stating:

Hi,

thoughts on this language in the follow-up to narrow the scope. Even if we left with the kick to NIBERS it would still be all the forceable and non-forcible so trying to limit

Similarly, as a follow-up to the letter from the 26th, please note that the specific violations in which the hearing will focus upon are the following:

2.9.2 A: Rape (or attempts to commit same)

The penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.

2.9.2 D Fondling (or attempts to commit same)

The touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental incapacity.

[Ex. 33 at 26]. The description of fondling in Devonshire's email to Nutter on August 2, 2021, was not the same as the FBI NIBRS in the Policy. [Ex. 33 at 26; Dkt. 33-5 at 5-6].

On July 26, 2021, USI sent John a letter notifying him that a hearing on the Formal Complaint was scheduled for August 4, 2021, by Zoom (the "Hearing Notice"). [Dkt. 40-1]. USI did not disclose to John in the Hearing Notice that there were new allegations for the Hearing. [Dkt. 40-1]. USI did not disclose any Policy amendments in the Hearing Notice. [Dkt. 40-1]

USI's "Statement of Rights and Process" for the Hearing advised that Advisor's role at the hearing was limited to cross-examination. [Dkt. 33-11 at 2]. On August 2, 2021, Devonshire sent an email to John and his advisor, copying Doss, and stated,

23

Similarly, as a follow-up to the letter from the 26th, please note that the specific violations in which the hearing will focus upon are the following:

• Rape (or attempts to commit same)
The penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.

• Fondling (or attempts to commit same)
The touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental incapacity

[(the "August 2 Email") Ex. 33 at 28]. The violations and definitions set forth in the August 2

Email were not definitions in the Policy and were not definitions used by the Investigator. [Dkt.

41-1; 35-1 at 20-21; 33-5 at 5-6; Ex. 6 at 29:15-30:6]. Nutter testified that a university cannot

change Title IX policy definitions during the period between the investigation and the hearing.

[Ex. 13 at 30:15-15; 31:1-18].

Devonshire had a Zoom communication with John and Advisor on August 3, 2021, and

Devonshire did **not** disclose:

- That USI was withholding the Concealed Documents;
- That Nutter was involved in determining the allegations and definitions for the Hearing;
- That USI had made any amendment to the Policy;
- That USI had instructed Jane not to disclose the reports or other alleged incidents against John;
- That H.W. had filed a Maxient Report of sexual assault and was receiving academic accommodations;
- That Nutter, Trump, Doss, and/or Devonshire had determined new allegations for the Hearing.

[Dkt. 60 at 2; Ex. 52 at ¶¶ 3, 4, 10].

Nutter was trained on and knew that conflict of interests or bias needed to be disclosed.

[Ex. 13 at33:19-20]. Nutter knew that the Regulations required a determination on each Title IX

allegation advanced to a hearing. [Ex. 13 at 27:24-28:2]. Nutter had communications with

Devonshire and Trump regarding the allegations to be included in the Hearing Notice for the Hearing. [Ex. 30 at 4-5].

Neither USI nor Nutter disclosed to John that Nutter was involved in communications with USI regarding the allegations to be included in the Hearing Notice. [Ex. 13 at 90:13-22]. Neither USI nor Nutter disclosed to John that Nutter was involved in communications to determine the violations or definitions for the Hearing. [Ex. 4 at 115:4-7]. Nutter did not disclose to John that she was involved in discussions with Devonshire about allegations for the Hearing or purported Policy definition amendments for the Hearing. [Ex. 13 at 90:13-23]. USI represented to John in the Hearing Notice that Nutter was retained solely to be a decision-maker for the Hearing. [Dkt. 40-1 at 1-2].

### USI's Policy Updates

During July-August 2021, USI tasked a group of department leaders, organized and led by Devonshire, with updating USI's sexual harassment policy. [Ex. 42]. This USI working group was discussing policy updates which led to a new Sexual Harassment Policy that was approved on August 23, 2021. [Ex. 42 at 45; Ex. 2 at 67:10-24]. Working Group member Berry testified that there was no approval of any Title IX amendment as of August 20, 2021. [Ex. 8 at 60:11-17].

USI did not communicate any Policy amendment to students or faculty during the period from July 26, 2021, to August 23, 2021. [Ex. 2 at  42:2-6, 44:18-25; Ex. 37 at ¶¶ 298-300; Ex. 38 at ¶ 343]. USI requires a USI Vice-President to approve any USI policy change or amendment. [Ex. 1 at 100:11-24]. USI has no document evidencing a USI Vice-President approved any Policy amendment during the period between July 26, 2021, and August 2, 2021. [Ex. 2 at 79:13-

22]. USI has no knowledge of any Policy amendment during the period from July 26, 2021, through August 4, 2021. [Ex. 2 at 33:6-34:16, 79:13-22].

During this litigation, USI asserted that it made seventy-nine (79) Policy amendments during the period between July 9, 2021, and August 23, 2021. [Ex. 60]. USI provided a spreadsheet purporting to outline the 79 different Policy amendments and a range of purported implementation dates (the "Spreadsheet"). [Ex. 60]. The Spreadsheet does not identify the specific purported Policy amendments, does not specify the specific implementation date for each purported amendment, and it does not specify who approved each purported amendment. [Ex. 60; Ex. 2 at 30:24-32:3]. The Spreadsheet was prepared by USI's litigation counsel. [Ex. 1 at 48:7-12, 59:4-15; Ex. 2 at 12:10-21]. USI's 30(B)(6) representative could not describe any of the 79 purported amendments on the Spreadsheet, could not identify the specific implementation date for any purported amendment, and could not identify who approved any of the purported amendments on the Spreadsheet. [Ex. 2 at 33:6-21, 35:7-36:1].

Devonshire had no authority to approve any Policy amendment, and she stated that Trump approved the purported Policy amendments in the August 2 Email. [Ex. 4 at 80:9-18]. Trump testified that he had no oversight of USI's Title IX Department in 2021, and that he did not approve any Policy amendment, including anything in the August 2 Email. [Ex. 1 at 73:11-25, 75:18-21]. Lenhardt had no specific recollection of USI's Title IX policies in 2021. [Ex. 3 at 56:24-25; 57:1-13, 25; 58:1-4].

USI has never implemented a USI policy amendment or change through an email to a single student. [Ex. 1 at 165:17-20]. USI implements policy amendments or changes by placing the updated policy on its website. [Ex. 1 at 107:9-15, 108:16-19; Ex. 2 at 67:10-24]. The New Policy was implemented on August 23, 2021, by placing it on USI's website. [Ex. 2, 67:10-24].

On September 3, 2021, USI sent a communication drafted by Devonshire to faculty/staff stating that the working group had recommended updated policy definitions. [Ex. 4 at 89:16-22; Ex. 42 at 47-56].

USI did not communicate a litigation hold to USI's technology department. [Trump Dep. 1, 111:5-7]. USI did not send a litigation hold to Grand River, D. Stafford, Devonshire, Doss, or another other person or entity until November 5, 2021. [Ex. 30 at 8]. Information on USI's Title IX website during the period from July 1, 2021, through the filing of the lawsuit, was not preserved by USI. [Ex. 58 at 20:3-21:12; Ex. 38 at ¶¶ 332-337].

### The Hearing, Deliberations, and the Decision

The Hearing took place on August 4, 2021. [Dkt. 42-1, *generally*.] Within the first hour of testimony, Nutter allowed Jane to testify about: alleged statements by female non-witnesses[3] of alleged sexual assaults and rape by John, alleged statements of statements by female non-witnesses of nonconsensual sexual interactions involving John, and prior sexual acts between John and Jane. [Dkt. 42-1 at 44-51]. Nutter repeatedly asked Jane questions regarding these alleged statements. [Dkt. 42-1 at 44:15-16, 21-22, 48:16-17, 49:5-6, 17-19, 50:7-9, 51:6-9]. Answers to those questions included claims that John allegedly: sexually assaulted other girls; made-out with her friend that was "blacked-out drunk;" and takes advantage of girls when they are intoxicated. [Dkt. 42-1 at 41:10-42:1, 48:3-4, 48:16-49:3, 51:11-12, 51:12-13, 51:13-14]. Nutter took a broad view of relevance for the Hearing. [Ex. 13 at 57:10-15].

Further, Nutter, contrary to her training and knowledge of Title IX, used leading questions for Jane to agree to a timeline that she had never before advanced. [Dkt. 35-1 at 122,

---

[3] "Non-witnesses" meaning individuals who did not provide statements to the Investigator, did not testify at the Hearing, and were not subject to cross examination.

128, 198; Dkt. 42-1 at 34:25-35:17, 37:13-19]. Nutter stated that she was "just trying to create a time line" which ultimately led to Jane agreeing to a timeline that she had never before stated. [Dkt. 42-1 at  35:17, 37:13-19].

After the Hearing, Nutter asked Devonshire about sanctions and precedent. [Ex. 4 (Exhibit 67 thereto)]. Devonshire spoke with Nutter and discussed the Title IX hearing and decision making prior to the issuance of the Decision. [Ex. 25; Dkt. 315, p. 17].  Based on a request by Nutter in August 2021, Devonshire and Nutter spoke by telephone on August 23, 2021, regarding USI sanctions, and Devonshire advised that precedent for similar penetration cases was two semesters. [Ex. 25].

Nutter provided Devonshire with a draft of the Decision, and Devonshire requested that Nutter clarify the sanctions in the draft Decision. [Ex. 4 at 151:13-25; 152:1-5; 185:9-13 and Exhibit 12 thereto]. Devonshire did not request that Nutter clarify the draft Decision to make a determination on the allegation of non-consensual kissing. [Ex. 4 at 152:10-25; 153:1-25; 154:1-17]. At the time Nutter gave Devonshire the draft Decision, Nutter communicated that this was a difficult case, they were struggling, and that they were going back and forth on a determination. [Ex. 13 at 39:17-15; 30:1; 43:20-25; 123:9-22].

On August 25, 2021, USI, through its Decision Makers, issued the written determination and summary and decision as to the allegations of the Complaint (the "Decision").  [Dkts. 45-1; 46-1]. John was sanctioned with a three semester suspension and a requirement to complete sexual harassment education following the suspension. [Dkt. 45-1 at 10].

Nutter drafted the Decision. [Ex. 13 at 75:10-14]. The Decision did not use the NIBRS definition of "rape" from the Policy, or the definition of "fondling" from the August 2 Email. [Dkts. 46-1 at 2; 33-5; Ex. 33 at 28]. The Decision did not include a determination as to the

allegation of sexual assault of non-consensual kissing. [Dkt. 46-1]. As a Title IX expert and trainer, Nutter knew the Regulations mandated that a determination be made on each allegation. [Ex. 13 at 97:22-98:10]. Nutter could not explain why she and the decision-makers did not make a determination on the allegation of non-consensual kissing. [Ex. 13 at 99:5-16]. As a Title IX expert and trainer, Devonshire knew the Regulations mandated a determination be made on each allegation. [Ex. 4 at 44:2-9].

Nutter testified that Concealed Documents should have been disclosed by USI during the Title IX process because they contained inconsistencies in Jane's testimony and affected her credibility. [Ex. 13 at 58:1-14; 60:7-25; 61-71:21; 64:17-25; 66:9-25; 110:1-17]. No one at USI advised Nutter that they had instructed Jane not to talk about the certain things at the Hearing. [Ex. 13 at 110:2-7]. The Investigator testified that he would have considered any evidence possessed and provided by USI during the investigation.  [Ex. 6 at 31:24-32:2].

### John Appeals the Decision

On September 1, 2021, John submitted a written appeal of the Decision to USI. [Dkt. 47-1]. USI represented to John that it would notify John if Jane filed an appeal response. [Ex. 34 at 1; Ex. 52 at ¶5 ]. USI appointed an Indianapolis lawyer, Christopher Bayh of Barnes & Thornburg, to act as USI's appellate officer (the "Appeal Officer"). [Dkt. 48-1].

USI advised Jane that her response to John's appeal was due on September 9, 2021. [Ex. 34 at 4]. On September 10, 2021 at 10:40 a.m., Jane sent an email to Devonshire stating that she thought she had sent her appeal response before the deadline, but that she had computer technical difficulties on her end. [Ex. 34 at 29]. Jane included her written appeal response in the September 10, 2021, email to Devonshire ("Appeal Response") which Devonshire read [Ex. 34 at 29-34; Ex. 4 at 140:6-17].

29

Devonshire responded to Jane on September 10, 2023, and told her that technical difficulties did not meet the threshold for an extension. [Ex. 34 at 29]. USI, Doss, and Devonshire did not disclose or provide a copy of the Appeal Response to the Appeal Officer or John. [Ex. 61 at 63:20-64:3; Ex. 52 at ¶5]. In the Appeal Response, Jane stated that her complaint of sexual assault "was not that he kissed me without my consent." [Ex. 34 at 32].

On September 22, 2021, the Appeal Officer issued a decision affirming the Decision and stated that the sanctions would be effective September 25, 2021 at 12:00 PM (the "Appeal Decision"). [Dkt. 48-1]. USI did not disclose to the Appeal Officer that it possessed Concealed Documents favoring John. [Ex. 29 at ¶¶ 6, 13; Ex. 61 at 29:16-20]. The Appeal Officer testified that he would have considered new evidence that could have affected the outcome had it been provided to him. [Ex. 61 at 29:21-25].

Devonshire testified that the Investigator would determine what evidence was relevant for the Investigation Report, and the decision-makers would determine what evidence was relevant for the Hearing. [Ex. 4 at 168:5-9]. USI maintained some Concealed Documents in "Case # 2021-43". [Ex. 47]. USI did not provide the Concealed Documents to John during the Title IX process. [Ex. 52 at ¶3]. USI has no explanation as to why the Concealed Documents were not disclosed to the Investigator, Decision-Makers, Appeal Officer, or John. [Ex. 2 at 8:14-25; 9-10 and Exhibit 158 thereto; Ex. 5 at 80:18-23]. John's Title IX expert, Saundra Schuster, M.S., J.D., opines that USI failed to comply with Title IX best practices in many ways during the Title IX grievance process, including the gathering and production of evidence. [Ex. 51].

**The Effects of the Title IX Process and Finding on John**

To avoid being subjected to threats and harassment on USI's campus, as well as potentially encountering Jane, John chose to take online courses for USI's fall 2021 semester.

[Dkt. 130-1 at ¶ 3]. The Title IX process, Decision, and Appeal Decision caused John extreme anxiousness, and he became very depressed. [Dkt. 130-1 at ¶ 6]. John sought care from mental health providers, and he was prescribed medication for his depression and anxiety. [Dkt. 130-1 at ¶¶ 7-8]. The medications made John feel lethargic and tired, leading him to feel like a different person, and he struggled to complete his classwork. [Dkt. 130-1 at ¶ 8]. John also experienced significant weight loss due to his medications and mental health struggles. [Dkt. 130-1 at ¶ 13]. John's roommate described John's behavior during and after the Title IX Process as:

> His sophomore year, he was a lot more reserved, depressed – or depression like symptoms. He didn't leave his room for long periods of time. In his first semester, he was a lot obviously happier than his second semester. His second semester of his first year, he was pretty much locked in the dorms for long periods of time. Our coach had to bring him care packages of food because he didn't want to leave the room. So, obviously his mental state, I guess, deteriorated from there on forward.

[Ex. 60 at 43:3-12]. John also locked himself in his room more often and would often just sleep a lot of days. [Ex. 60 at 43:25-44:4]. His roommate further observed that John was not his normal self when he was on the medication. [Ex. 60 at 43:19-21]. USI was aware of John's struggles, including a report that he was suicidal. [Dkt. 130-1 at ¶¶ 10-12; Ex. 24]. John and his roommate's concerns led them to agree that his roommate would keep John's medications and give it to John in the morning and at night as regularly scheduled. [Ex. 60 at 47:10-22].

Pursuant to NCAA Policy, USI has a policy requiring disclosure of conduct that resulted in discipline through a Title IX proceeding. [Ex. 26]. USI also has a procedure that requires staff to gather information related to any Title IX discipline when choosing to recruit an incoming student athlete or transfer student-athlete. [Ex. 26]. John experienced financial losses including loss of USI scholarship monies, increased tuition, and payments to mental health providers. [Ex. 16 at ¶6]. John intends to go to law school after he completes his college education. [Dkt. 33-16

at ¶ 11]. John began an application to the University of Alabama at Birmingham, but he did not complete the application, because it would have required disclosure of the Decision, sanctions, and a Title IX rape determination. [Ex. 11 at 27:3-12].

## ARGUMENT

### I.      Count I – Title IX claim against USI.

To state a Title IX discrimination claim, a plaintiff must allege: "(1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Doe v. Columbia Coll. Chi*., 933 F.3d 849, 854 (7th Cir. 2019). It is undisputed that USI receives federal funding. [ECF No. 33-25, p. 80]. It is similarly undisputed that as a result of the Decision, Appeal Decision, and sanctions, John was excluded from participation in and denied the benefits of an educational program. Therefore, only the third element remains.

USI claims there is no evidence of anti-male bias. [Dkt. 315, p. 1]. The undisputed facts as cited above, however, support judgment in favor of John and denial of USI's motion.

- USI falsely tells John that other women have reported that his behavior has made them feel uncomfortable.
- John reports the sexual harassment via social media to USI, but USI takes no action and does not advise John that he can file a formal report of sexual harassment under the Policy.
- USI gives Notice of Allegations but excludes the specific behaviors alleged by Jane as sexual assault and omits disclosing the facts known to it at that time.
- When John requests a copy of Jane's formal complaint, USI refuses and misrepresents to John that the Notice of Allegations cut and pasted everything from Jane's formal complaint.
- While the Investigator was to determine the relevance of evidence, USI concealed numerous documents from him.
- USI instructed Jane not to disclose other incidents and reports that she had made against John to the Investigator.
- USI did not disclose Jane's specific allegations of sexual assault to John at any time during the Investigation, including prior to his interview.

32

- The Investigator interviewed Jane's roommate and included her testimony as to filing a sexual assault complaint against John for the same night that Jane filed her formal complaint but USI withheld such document from the Investigator.
- Doss and Devonshire withheld Concealed Documents from Investigator and John.
- USI told the Investigator to apply the Policy to the Investigation and to use the NIBRS definitions.
- USI sent a Hearing Notice which first stated three allegations of sexual assault alleged by Jane but did not disclose to John that new allegations were included. USI advised Nutter that the Hearing Notice contained new allegations.
- USI did not disclose to John that Devonshire determined the allegations stated in the Hearing Notice without talking to Jane, but she consulted with Nutter concerning the same.
- USI represented to John in the Hearing Notice that Nutter was retained as a decision-maker but USI did not disclose to John that Nutter was involved in discussions as to the allegations for the hearing, and that she had a conflict of interest for which John could object.
- USI represented that the Policy would govern the Title IX process, including the Investigation, Hearing, and Appeal. USI sent the August 2 Email as to violations but did not advise that it contained any amendment to the Policy.
- Nutter testified that a university cannot change policy definitions between the investigation and hearing; but she and Devonshire did so.
- USI now claims that the August 2 Email was an implementation of Policy amendments as to the definitions of Rape and Fondling but USI has no knowledge that such were approved by anyone since only VPs can approve policy amendments, and USI has never implemented a policy amendment through an email to a single student.
- USI did not disclose to John that Nutter was involved in deciding purported Policy definition amendments, and that she had a conflict of interest and bias for which John could object.
- Nutter took a broad interpretation of relevance for the hearing and allowed testimony by Jane and her roommates about alleged multiple sexual assaults by John. Nutter allowed Roommate to testify that she filed a complaint of sexual assault against John but that she never discussed the same with USI which USI knew was false.
- USI, Doss, and Devonshire did not disclose to the Decision Makers for the Hearing the Concealed Documents.
- USI, Doss, and Devonshire did not disclose to the Decision Makers for the Hearing that USI had instructed Jane not to disclose other incidents and reports that she had made against John.
- During the Hearing, Nutter asked Jane about explanations for her inconsistencies, but did not ask John about what it claimed was an inconsistency in his prior testimony.
- Nutter would repeat a question when Jane asked but refused with John asked.
- Nutter used leading questions to develop a timeline which the Decision admitted was unreliable.

- Both Devonshire and Nutter were trained and they trained universities that the definition of sexual assault for Title IX was based on the NIBRS's definitions but they agreed to apply different definitions for the Hearing and Decision.
- Devonshire knew the Decision Makers were going back and forth in deliberations but she continued to withhold the Concealed Evidence that was new evidence that would affect the outcome.
- Despite knowing that the Regulations required a determination of responsibility as to each allegation, Nutter did not include a determination of responsibility as to the allegation of nonconsensual kissing.
- Nutter imposed sanctions of three semesters for a determination that was so difficult when USI advised her that precedent was two semester.
- Nutter informed John that his appeal grounds were limited, in part, to procedural irregularities in the investigation, which was contrary to the Policy and Regulations allowing an appeal for any procedural irregularities.
- When provided a draft of the Decision, Devonshire requested a clarification of the sanction but she did not request a clarification as to the determination of the allegation of nonconsensual kissing despite her Title IX expertise knowing the Regulations mandated a determination of responsibility as to each allegation.
- After John filed his appeal, USI and Devonshire represented that it would provide a copy of Jane's appeal response.
- Jane filed an appeal response which represented, in part, that her complaint was not that John kissed her without her consent.
- USI did not disclose Jane's appeal response to John of the Appeal Officer or disclose Jane's statement denying the allegation was ever made.
- USI determined that computer technical difficulties in sending the response was not a basis for a good faith extension for a 10 hour delay.
- USI, Doss, and Devonshire withheld the Concealed Documents from the Appeal Officer which was new evidence that would affect the outcome.
- USI, Doss, and Devonshire did not disclose Nutter's conflict of interest which would have been a basis for appeal that changed the outcome.

A.     **There is no dispute as to the seriousness of a Title IX grievance process.**

Complainants and respondents have different interests in the outcome of a sexual harassment complaint. Complainants ''have a right, and are entitled to expect, that they may attend [school] without fear of sexual assault or harassment,'' while for respondents a ''finding of responsibility for a sexual offense can have a lasting impact on a student's personal life, in addition to [the student's] educational and employment opportunities[.]'' Although these interests may differ, each represents high-stakes, potentially life-altering consequences deserving of an accurate outcome.

Further, we acknowledge that being found responsible for sexual misconduct under Title IX may carry a significant social stigma and life-altering consequences that could impact the respondent's future educational and economic opportunities.

34

[Ex. 55, p. 30276]. To this end, USI promised to conduct a "thorough, fair, and impartial investigation." [Ex. 27 at 16]. While the Regulations allowed USI to delegate tasks to another, USI maintained the legal obligation to review and ensure the grievance process was conducted in accordance with Title IX.

> Nothing in the final regulations restricts the tasks that a Title IX Coordinator may delegate to other personnel, but the recipient itself is responsible for ensuring that the recipient's obligations are met, including the responsibilities specifically imposed on the recipient's Title IX Coordinator under these final regulations, and the Department will hold the recipient responsible for meeting all obligations under these final regulations.

[Ex. 55 p. 30463; *see also* Ex. 56 at ¶ 6; 34 CRF § 106.45].

**B.    USI, Doss, and Devonshire withheld material evidence during the Title IX process.**

The Regulations impose the duty to gather evidence on the recipient, *i.e.*, USI. [34 C.F.R. Section 106.45(b)(5)(i)]. USI delegated the Investigation to an outside attorney who relied upon USI to provide him with documents in its possession. [Ex. 6 at 26:2-11; 40:23-25; 41:1-3]. Devonshire became the Title IX Coordinator effective July 5, 2021, and Doss promptly gave her notice of Case File documents on July 9, 2021, which was prior to the issuance of the Investigation Report on July 15, 2021. [Ex. 6 (Exhibit 76 thereto); Ex. 47]. USI admitted that it did not produce the Concealed Documents to the Investigator. [Ex. 29 ¶¶ 2,9; Ex. 2 at 8:14-25; 9-10 and Exhibit 158 thereto]. The Investigation Report included all evidence provided to the Investigator, and it did not include the Concealed Documents withheld by USI. [Ex. 6 at 24:25-25:6; 32:6-9; 39:20-24 and Exhibit 76 thereto]. Nutter relied on USI to provide all the documents for the Hearing. [Ex. 13 at 22:5-16; 25:25; 26:1-18]. The Appeal Officer relied on the documents USI provided to him. [Ex. 61 at 44:10-19; 73:17-23].

USI cannot argue that the Concealed Documents were immaterial or irrelevant as Devonshire testified that USI delegated the determination of relevance to the Investigator and Decision Makers. [Ex.4 at 168:5-9; Ex. 53, ¶ 3]. The evidence withheld favored John as it contained statements by Jane that contradicted her testimony during the Investigation and Hearing and affected her credibility. For example, the March 19 Report contained Jane's statement that John got into bed and "undressed" and sexually assaulted her; which was contrary to her investigation and hearing testimony. [Ex. 23; Dkt. 42-1; Dkt. 35-1; Ex. 13 at 64:17-25]. The February 16 Memo contains a statement from Jane that John asked to come in her room and she said no. [Ex. 40 at 9]. This is contrary to Jane's testimony. [Dkt. 35-1; Dkt. 42-1].The February 25 Memo states that "she never thought [John] would do something like this to her." [Ex. 40 at 25]. This further shows her inconsistency and lack of credibility as she filed the October Incident Report a month later claiming that John sexually assaulted her in putting his hand down her pants and touching her on the first night they met, *i.e.*, October 4, 2020. Jane never mentioned this alleged assault during the Investigation and Hearing, and it further contradicted her testimony that they had only "made out" prior to the November 14, 2020, alleged assault. [Ex. 44; Dkt. 42-1 226:17-25; 227:1; Dkt. 35-1]. The February 18 Memo further supported John's account. [Ex. 49].

Nutter admitted that the Decision "came down to credibility." [Dkt. 317-1, p. 22]. Jane's allegation of sexual assault by John on October 4, 2020, challenges Jane's credibility and her testimony that everything was wonderful between her and John until November 14, 2020. [Ex. 13 at 66:9-25; 110:1-17]. The three Maxient Reports filed by Jane against John nearly a month after filing her formal complaint would further challenge her credibility and support John's

testimony that she was just seeking attention. [Ex. 40 at 17-21, 26-35-; Dkt. 42-1139:24-25; 140:1-13].

Nutter testified that information possessed by USI that was not provided could have been "very helpful" because it showed inconsistencies and affected Jane's credibility, and she would have expected such evidence to be provided by USI. [Ex. 13 at 58:1-14; 60:7-25; 61-71:21]. Devonshire and Trump likewise conceded that Concealed Documents should have been disclosed. [Ex. 4 at 162:7-14; 163:19-25; Ex. 1 at 36:6-9; 38:1-5 ]. The Investigator testified that he would have considered any additional evidence provided by USI. [Ex. 6 at 31:24-25; 32:1-2]. The Appeal Officer testified that it would be inconsistent with Title IX for a university to withhold relevant evidence in a grievance process. [Ex. 61 at 82:8-16].

The evidence withheld clearly favored John and disfavored Jane. Such evidence was material as there was a reasonable probability that had the evidence been disclosed to John, the Investigator, the Decision Makers, and Appeal Officer, the Decision and Appeal Decision would have been different because it put the case in a different light and undermined any confidence in Jane's account and the finding of John's responsibility. There can be no more conclusive evidence of anti-male bias than USI withholding material exculpatory evidence favorable to John and unfavorable to Jane during the grievance process. This is the suppression of material exculpatory information that an accused did not know about as recognized by the 7th Circuit. *Doe*, 43F.4th 784.

**C.    USI instructs Jane not to disclose the other alleged incidents and reports, and USI misrepresents the nonexistence of other reports to John.**

If there was any doubt as to whether the withheld evidence was favorable to John and unfavorable to Jane, USI's affirmative instruction to Jane not to disclose the reports and other incidents to the Investigator or Decision Makers confirms that. [Dkt. 42-1 96:7-21]. Title IX

experts Devonshire and Nutter conceded that it is improper for a university to instruct a student in a Title IX proceeding how to testify, and it is contrary to best practices. [Dkt. 13 at 69:10-25; 70:1-13; Ex. 4 at 65:4-12; Ex. 54 at 76:19-25; 77:1-15].

When John and his parents met with Lynn and Doss on March 26, 2021, they asked if there was any other report of misconduct as to John, and USI personnel expressly denied there was any such other report. [Ex. 12 at 25:2-25; 26-27; 28:8-13; Dkt. 33-16, ¶ 31, 36]. This was false, and USI covertly withheld the existence of Concealed Documents.

Without the benefit of complete discovery and based on the "record before us," the 7th Circuit noted that "there is room to criticize the proceedings" and that there were procedural irregularities and "imperfections." *Doe*, 43 F.4th at 800. Through discovery, the curtain has now been pulled, and the complete record discloses knowing procedural irregularities and Title IX violations involving intentional "covert" actions by USI, Doss, Devonshire, and Nutter which advanced a gender biased process resulting in the Decision and Appeal Decision. *Id*. at 793.

**D.    USI knew the covert gender bias resulted in the Decision, and that disclosure of the same would have led to a different result.**

As USI admits, "**[b]efore** the panel issued its decision, Nutter updated . . . Devonshire on the timing of the panel's decision and the back-and-forth nature of the panel's deliberations." [Dkt 315, p. 17]. Thus, USI and Devonshire knew the determination hovered on a razor-thin evidentiary margin. Notwithstanding, USI and Devonshire continued to suppress the Concealed Documents favorable to John and unfavorable to Jane which could have been disclosed to the Decision Makers as new evidence that would affect the outcome. The Regulations provide

> strong procedural rights that ensure due process protections for both complainants and respondents. These procedural rights reflect the very serious nature of sexual harassment and the life-altering consequences that may follow a determination regarding responsibility for such conduct. We believe that the procedures in the § 106.45 grievance process will ensure that recipients apply a fair, truth-seeking

process that furthers the interests of complainants, respondents, and recipients in accurately resolving sexual harassment allegations

[Ex. 55, p. 30049]. Despite another opportunity to ensure due process protections for a "thorough, fair, and impartial" process, USI continued its gender bias against John.

USI argues that it contracted out the Investigation and Hearing to unrelated parties and therefore, the Decision or Appeal Decision could not have been a result of anti-male bias. [Dkt. 315, p. 25]. The Regulations make clear that a recipient cannot bury its head in the sand and avoid responsibility for Title IX noncompliance. [Ex. 55, p. 30463; *see also* Ex. 56 at ¶ 6; 34 CFR § 106.45]. USI, Doss, and Devonshire had a duty to ensure that the Investigation, Hearing, and Appeal were conducted in accordance with Title IX's mandatory legal duties. USI argues that if a university delegates Title IX tasks, it can violate Title IX and advance intentional sex discrimination resulting in a life-altering outcome for which a Court is impotent to remedy. The law is not so absurd.

Delegating Title IX tasks does not absolve USI from liability for advancing a gender biased process which withheld material exculpatory evidence that affected the outcome. Defendants argue, "The Title IX private right of action does not task this Court with evaluation of the entire disciplinary process." [Dkt. 315, p. 23]. To the contrary, courts look at the Title IX process as a whole; not in isolation. As the 7th Circuit held, procedural irregularities "in light of all the circumstances" may support a finding of sex bias. *Doe*, 43 F.4[th] at 793; *see also* 34 CFR § 106.45(a) ("a recipient's treatment of a . . . respondent in response to a formal complaint . . . may constitute discrimination on the basis of sex").[4] **A decision which flows from a gender biased**

---

[4] Contrary to its own argument, USI's brief refers to all aspects of the Title IX process to conclude that there was no gender bias. [Dkt. 315, pp. 23-33].

**process is no less gender biased than the process which led to it**. Sex bias affected the entire USI process.

**E.    USI has no explanation why the Concealed Documents were was not disclosed during the process, and no Defendant designates evidence that the process was thorough, fair, and impartial.**

Trump, USI's 30(b)(6) designee, testified that USI has no knowledge as to why Concealed Documents were not disclosed to the Investigator, Decision Makers, Appeal Officer, or John. [Ex. 2 at 8:14-25; 9-10 and Exhibit 158 thereto ]. This purported "plausible deniability" further leads to a single inference that USI advanced a sex biased process against John which resulted in a discriminatory Decision and Appeal Decision.

In seventy-five pages of briefing, not one Defendant cites an affidavit or deposition testimony stating the Title IX process was (i) consistent with best practices, (ii) in accordance with the Regulations, or (iii) a thorough, fair, and impartial process. Likewise, not one Defendant retained an expert to attest that the Title IX process was conducted in accordance with best practices. [Ex. 55 p. 30063, recipients remain free to adopt best practices for conducting impartial grievance processes, while meeting obligations imposed under the Regulations]. Defendants' silence speaks volumes.

John, however, did retain an established Title IX expert who opines that the process did not comport with Title IX best practices, including the gathering and presenting of evidence. [Ex. 51 at 17]. Such expert testimony is "commonplace" in the Title IX context "on standards followed by schools in Title IX cases is permissible in evaluating whether a school's response to harassment is clearly unreasonable." *Pogorzelska v. VanderCook Coll. of Music*, No. 19-CV-05683, 2023 WL 3819025, at *7 (N.D. Ill. June 5, 2023). Not only does John's undisputed

evidence provide conclusive circumstantial evidence of gender bias, his retained expert's testimony supports the same.

**F.    USI, Doss, Devonshire, and Nutter failed to disclose Nutter's conflicts of interest, and the new allegations.**

When USI gave John the Notice of Allegations, it did not include the specific behaviors comprising the alleged sexual assault, or the facts known to it in the Formal Complaint, public safety reports, and Concealed Documents. When John asked for the Formal Complaint, USI had email discussions among numerous persons which it claims as privileged. [Dkt. 30]. In refusing to produce said document, USI falsely represented that it cut and pasted all in the information from the Formal Complaint in the Notice of Allegations.

USI did not inform John of Jane's allegations until the Hearing Notice. USI did not disclose that Devonshire, in communications with Trump, Doss, and Nutter, determined the allegations for the Hearing Notice without communicating with Jane. This included what Doss told Nutter was "new information for charge," *i.e.*, new allegations, including an allegation of nonconsensual kissing. USI, Doss, Devonshire, or Nutter did not disclose there were new allegations in the Hearing Notice.

USI argues:

> Before her untimely response to John's appeal, Jane already stated in writing through her response to the investigation report . . . that she was not contending there was nonconsensual kissing.

[Dkt. 315, footnote 7]. If the Investigation Report contained Jane's assertion that her complaint did **not** include an allegation of sexual assault of nonconsensual kissing, **why did USI include such allegation for the Hearing?** In such instance, the only inference is that USI included a knowingly false allegation as a "lesser included offense" to ensure a finding of responsibility against John.

Devonshire testified, however, that the nonconsensual kissing allegation for the Hearing came from the Investigation Report. [Ex. 4 at 107:6-25; 108:1-8]. If Jane made such allegation in the Investigation Report, then she falsely advanced an allegation of sexual assault when she testified at the Hearing that the kissing was consensual. Yet, USI took no action for a false filing. USI and Devonshire cannot have it both ways. Either way it shows the gender bias in USI's position and actions, and further explains why Devonshire concealed Jane's Appeal Response which would have exposed the sex bias.[5]

Nutter was involved in communications regarding the Hearing Notice, including the allegations. [Ex. 30]. As result, Nutter discussed USI's assertion that (i) Jane had stated in writing in the Investigation Report that she was **not** making an allegation of nonconsensual kissing, or (ii) that Jane did make an allegation of nonconsensual kissing in the Investigation Report. Either way, Nutter was involved in matters other than just being a Hearing officer and Decision Maker as represented in the Hearing Notice. Notwithstanding, neither Nutter nor USI disclosed this obvious conflict of interest to John to allow a challenge.

As a Title IX expert, Nutter knew that the Decision Makers were obligated to make a determination of each allegation for the Hearing. [Ex. 13 at 97:22-25; 98:8-10]. The Decision noted the three allegations, including nonconsensual kissing. Yet, the Decision Makers did not make a determination of this allegation in the Decision. Nutter could not explain why no determination was made despite the legal mandate of Title IX. [Ex. 13 at 99:5-16]. The Decision stated that Jane's account was consistent at all times, and the only way to reach such conclusion

---

[5] To avoid producing Jane's Appeal Response, Devonshire claimed that a computer technical problem was not a good faith basis for Jane's ten hour delay in submitting her response. [Ex. 4 at 136:1-5]. Even this Court recognizes that a computer technical problem is a good faith basis for relief. [Electronic Case Filing Policies, Section 16].

was to avoid a determination on the nonconsensual kissing allegation. Nutter ignored her Title

IX expertise to avoid Jane's inconsistency and a determination unfavorable to Jane and favorable

to John.

**G.      USI and Devonshire now claim that Policy amendments were implemented
         immediately prior to the Hearing and contrary to Title IX and USI policy.**

Over the course of a few hours on August 2, 2021, Devonshire consulted with Nutter and

they agreed to create new violations based on non-Policy definitions for the Hearing. [Ex. 33 at

28]. Both Devonshire and Nutter were trained and trained others on the fact that Title IX uses

NIBRS definitions in defining sexual assault. [Dkt. 33-18, 33-19, 33-20; Ex. 4 and Exhibit 72

thereto, USI 06831-08632]. The Office of Civil Rights also noted that Title IX incorporates the

NIBRS definitions as to the definition of sexual assault. [Ex. 56]. The Policy used the same

NIBRS definitions for sexual assault. [Ex. 27p. 5]. Nutter testified that it is contrary to best

practices for a university to change policy definitions between the investigation and hearing [Ex.

13 at 30:15-15; 31:1-18], but that is exactly what USI, Doss, Devonshire and Nutter now claim

to have done.

To justify the clear gender bias in doing so, USI now asserts that the August 2 Email was

the implementation of Policy definition amendments. [Ex. 60]. Yet, Devonshire testified that she

had no authority to make Policy amendments and that Trump approved the purported Policy

definitional amendments. [Ex. 4 at 80:9-18]. Trump, however, testified that he did not approve

any Policy amendment, and only USI VPs can approve policy amendments. [Ex. 1 at73:11-25;

100:11-24]. Trump further testified that USI has never implemented a policy amendment through

an email to an individual student. [Ex. 1 at 165:17-20]. USI's 30(b)(6) designee on this topic

testified that USI has no knowledge as to who, if anyone, approved the purported Policy

amendments in the August 2 Email or on the Spreadsheet. The August 2 Email did not reference

any Policy amendment, and Devonshire did not inform John of any Policy amendment in the meeting on August 3, 3021. [Ex. 33 at 28; Dkt. 60 at 2].

In discovery, USI produced a Spreadsheet claiming 79 amendments to the Policy during the period from July 9, 2021, to August 23, 2021. [Ex. 60]. USI's 30(b)(6) on these topics testified that USI has no knowledge as to who approved any Policy amendment on the Spreadsheet, what each Policy amendment was as noted on the Spreadsheet, and the implementation date for each of the 79 purported Policy amendments. [Ex. 2 at 33:6-25; 35:7-25; 36:1-6; (Exhibit 58 thereto)]. USI's new litigation "amendment" explanation is further contradicted by USI's Working Group that completely drafted a new sexual harassment policy, *i.e.*, the New Policy, and the same was implemented on August 23, 2021. [Ex. 30 at 73:20-25; 74:1, and (Exhibit 30 thereto USI 10907)]. On September 3, 2021, USI sent a communication, **drafted by Devonshire**, to faculty and staff stating that the Working Group recommended the "updated definitions" for sexual assault in the New Policy. [Ex. 4 at 89:16-22 (and Exhibit 30 thereto USI 11143-11153)]. USI's new "amendment" assertion is further contradicted by the Decision which recites a different definition of "Fondling" than contained in the August 2 Email. [Dkt. 46-1; Ex. 33 at 28].

Devonshire and Nutter knew of the impropriety of changing Policy terms two days prior to the Hearing. Once again, neither USI nor Nutter disclosed her conflict of interest in going outside her sole Hearing officer/Decision Maker duty as represented to John. The only reasonable inference as to why "top-shelf" experts Devonshire and Nutter would do what they knew was contrary to the Policy and Title IX is to give USI a means to find John guilty of rape and ensure a response that would be favorable to the public pressure on USI being led by Jane, Roommate, and another USI female student.

USI argues that the August 2 Email did not change John's defense that the alleged assault never occurred. [Dkt. 315, p. 30]. John's defense, however, does not "sanitize" USI, Devonshire, Doss, and Nutter's conduct. USI repeatedly argues that neither John nor Advisor alleged gender bias during the process. *Id*. Because Defendants concealed their covert activities from John and Advisor, there was no way for them to have known of the same during the process. [Ex. 52 ¶ 11; Ex. 53 ¶8]. "All of the circumstances" learned through complete discovery evidence a pattern of intentional covert misconduct by USI, Doss, Devonshire, and Nutter violating Title IX and the Policy which support a finding of sex bias against USI.

**H.     USI viewed females as the only victims of sexual harassment.**

When USI first met with John in February 2021, it advised him that there were several female students other than Jane who advised that his behavior made them feel uncomfortable. [Ex. 5 at 151:7-19 (and Exhibit 22 thereto, USI 01387)]. USI now concedes that it has no documents as to the same. [Dkt. 36 at ¶¶ 286-287; Ex. 5 at 153:4-22]. John reported the false and harassing social media posts by female USI students to Title IX personnel in March 2021. Such social media posts constituted sexual harassment and stalking under the Policy and USI's Code of Conduct. ]. USI discussed a female student torturing John on social media, and that the same violated USI policy, but USI took no action because against the female perpetrator.[Ex. 45].

When meeting with John, USI's Title IX personnel did not advise John that he could file a formal complaint under the Policy as to the female students making the false and harassing posts, and USI took no action against the female perpetrators. [Ex. 53 ¶ 2]. This demonstrates that USI did not see men as victims of sexual harassment, and it only viewed them only as perpetrators when accused. The outside pressure asserted that USI did not take claims of sexual assault against females seriously. In response, USI made a post that it takes all allegations of

sexual seriously, but this merely referred to allegations raised by female students, and not male

students like John who reported sexual harassment but USI took no action thereon. This further

shows that USI had a preconceived gender bias against males during the Title IX process.

I.      **USI knew that John did not advance a "new claim."**

At the Hearing, Nutter asked Jane about inconsistencies, and she allowed Jane the

opportunity to address her inconsistencies. [Dkt. 42-16:17-25; 21:8-24; 53:4-22; 240:3-9]. But

Nutter did not ask John about what the Decision referred to as a "new claim" that Jane was

confusing matters with another time John fingered Jane. [Dkt. 42-1;  Ex. 13 at 111:19-25; 112:1-

25; 113:1-2]. Nutter trained universities and was trained on asking questions about an

inconsistency. [Ex. 13 at 110:15-23 ]. Nutter directly asked John if he had previously fingered

Jane to which he answered that he had, and he stated that he did not remember if he told the

Investigator but he told Advisor. [Dkt. 42-1 146:3-25; 147:1-14].

Nutter did not ask John any perceived inconsistency, and Advisor was not allowed to ask

questions of John to clarify. [Dkt. 33-12]. John has explained why he did not mention the prior

fingering of Jane to the Investigator [Dkt. 33-16, ¶ 51-64]. USI concedes that Nutter "gave Jane

an opportunity to respond to John's new claim" [Dkt. 315, p. 15], but Nutter never gave John a

similar opportunity to explain what she considered an inconsistency affecting John's credibility

and the outcome of the Decision. This is similar to Nutter repeating a question when asked by

Jane, but then refusing to repeat a question when asked by John. [Dkt. 42-1 15:15-22; 120:3-4].

This further shows the gender bias against John.

USI knew that John had **not** advanced a "new claim" because he had disclosed to Doss

and Lynn when he met with them in February 2021, that he had fingered Jane on a prior occasion

at her initiation and with her consent. [Ex. 11 242:12-25; 243-244; 245:1-25; 267:11-13; Ex. 14

at 13-14; Ex. 12 at 47-50; Ex. 53 ¶ 5; Dkt. 315, p. 5]. John also had texts with his mother on

**March 21, 2021**, where she was asking about his interaction with Jane, and John stated:

> The only other sexual thing that happened was one night she asked me to finger her. She initiated it and wanted me to do it. Other than that the only other thing was that I owed her money from times when paid for my food sometimes, and I didn't get the change to pay her back until all of this happened.
>
> . . . I looked back at what I told title IX when I went to my meeting
>
> Ye I told them about it when I went to my meeting in February
>
> So title ix knew about everything that happened between me and [Jane]
>
> That is the truth other then kissing and cuddling that was the only sexual contact that happened it happened once

[Ex. 12 (Ex. 119 thereto); Ex. 14 at 13-14]. Thus, John had communicated the prior consensual

fingering of Jane to both USI and his mother ***prior*** to the Notice of Allegations, his Investigation

interviews, the Hearing Notice, and the Hearing. Thus, there was no "new claim."

Because Nutter did not give John an opportunity to explain what she later determined to

be a critical inconsistency, she failed to follow her own expertise and favored  Jane's testimony.

Nutter's gender bias was further evidenced when she imposed a three semester suspension

despite the difficulty in making a determination, and Devonshire advising that two semesters was

precedent for similar conduct. [Dkt. 42-1; Dkt. 60-2].

**J.      USI's argument that John lacks Title IX standing for injunctive relief is baseless.**

USI asserts that John lacks standing to seek injunctive relief under Title IX, and therefore

this Court lacks authority to issue injunctive relief even if it determines that USI wrongfully

discriminated against John. [Dkt. 315, p. 33]. This is meritless.

USI's imposed discipline on John and per its policy, "suspension is a matter of permanent

record" and student behavior records are "retained indefinitely. [Dkt. 33-15, Section 1.40]. The

fundamental purpose of Title IX would be eviscerated if universities can violate its legal requirements and leave a student without full relief. Not surprisingly, USI fails to cite a single Title IX case supporting its argument, and it simply ignores 7th Circuit precedent to the contrary.

> John argued that he is also entitled to an injunction ordering university officials to expunge the finding of guilt from his disciplinary record. For this relief, John has standing: John's marred record is a continuing harm for which he can seek redress. *See, e.g.*, *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (pursuing expungement of university records "serve[s] the purpose of preventing present and future harm"); *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (seeking to "remove the negative notation from appellants' disciplinary records" is "nothing more than prospective remedial action"); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (an "F" grade and a plagiarism conviction "constitute[d] a continuing injury to the plaintiff" and an action to remove them was "prospective in nature").

*Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019).

The undisputed facts show the covert activities and intentional procedural irregularities of USI and its Title IX representatives to discriminate against John on the basis of his sex. John is entitled to judgment as to liability against USI on Count I. The Court should further deny USI's Motion on Count I, or alternatively find that a genuine issue of material fact exists as to whether USI discriminated against John on the basis of his sex during the Title IX process and the resulting Decision and Appeal Decision.

## II.   Count II - 42 U.S.C. § 1983 claims against Doss, Devonshire, and Nutter.

### C.  Doss and Devonshire's arguments in support of their Motion for Summary Judgment are waived.

Doss and Devonshire's "Argument" to Count II states a single conclusory sentence without citation to any fact, evidence, or legal authority, and without argument development.

[Dkt. 315, p. 33, Section E]. Such fails to present a cogent argument and is a waiver. *Ernie G. v. Kijakazi*, No. 1:20-CV-3288-MJD-RLY, 2022 WL 168348, at *1 (S.D. Ind. Jan. 18, 2022).[6]

In their "Introduction," Doss and Devonshire "incorporate by reference" unspecified "reasons in the pending Motion to Dismiss and supporting briefing" as to Count II. [Dkt. 315, p. 1]. Such improperly asks the Court to perform Doss and Devonshire's obligation under FRCP 56. *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011) ("It is not this court's responsibility to research and construct the parties' arguments.").

> Petitioners direct us to a document filed in the district court, but we have not read it because adoption by reference amounts to a self-help increase in the length of the appellate brief. Even when a litigant has unused space . . . incorporation is a pointless imposition on the court's time. A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.

*McCarthy* at *3–4.

> The court declines to consider Mr. Tedrow's incorporated arguments. By attempting to incorporate arguments from other briefs and opinions without making those arguments, Mr. Tedrow asks the court to "read everything [he] ha[s] filed and determine how the arguments [he] make[s] and the information [he] provide[s] in Document A might be applied to bolster the argument [he] make[s] in Document C." *McCarthy v. Fuller*, No. 1:08-CR-994, 2014 WL 4672394, at *3, 2014 U.S. Dist. LEXIS 130848, at *8–9 (S.D. Ind. Sept. 18, 2014), *rev'd and remanded on other grounds*, 810 F.3d 456 (7th Cir. 2015). This unfairly deprives the opposing party the opportunity to respond to an argument that the court might construct, *id.*, amounts to a "self-help increase in the length of the ... brief," *DeSilva v. DiLeonardi*, 181 F.3d 865, 866 (7th Cir. 1999), and inappropriately asks the court to "play archaeologist with the record." *Id.* at 867.

*Tedrow v. Franklin Twp. Cmty. Sch. Corp.*, No. 1:21-CV-453 RLM-MG, 2023 WL 3602712, at *9 (S.D. Ind. May 23, 2023). As a result, Doss and Devonshire waived their argument on Count II. *Kijakazi, supra.*

---

[6] Defendants cannot advance new argument or evidence in their reply brief. *Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utilities*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019).

**B.  The undisputed facts entitle John to judgment as to liability on Count II and preclude Defendants' motions.**

A successful Due Process claim must meet the following elements: 1) a protected interest 2) a deprivation of that protected interest, and 3) a denial of due process. *Price v. Board of Educ. Of City of Chicago,* 755 F.3d 605, 607 (7th Cir. 2014). The undisputed material facts establish that John is entitled to judgment as a matter of law as to liability on his Due Process claims. Defendants' respective motions under Count II should be denied, or alternatively, there is a genuine issue of fact as to whether Doss, Devonshire and Nutter violated John's Due Process rights.

**1.  John suffered deprivations of his protected interests.**

In order to satisfy the first two elements of his procedural Due Process claim, John need only establish the existence and deprivation of a protected property interest or the existence and deprivation of protected liberty interest. *Charleston v. Bd. of Trs. of the Univ. of Ill. at Chi.,* 741 F.3d 769, 772 (7th Cir. 2013). The undisputed material facts show that John suffered a deprivation of both a protected property and liberty interest as a result of Doss, Devonshire, and Nutter's misconduct.

**(i)  Property Interest**

While John recognizes that this Circuit has long held that there is not a stand-alone property interest in one's education, such an interest may exist by virtue of contract between a student and a university. *Doe v. Purdue,* 928 F.3d 652, 660 (7th Cir. 2019). Indiana courts have long recognized that the relationship between student and institution is contractual in nature. *See e.g. Amyaya* v. *Brater,* 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013) ("the legal relationship between a student and university [i]s one of implied contract"); *Gordon v. Purdue Univ.,* 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007) ("[T]he relationship between a student and an

educational institution is contractual in nature…."); *Neel v. Indiana University Board of Trustees,* 435 N.E.2d 607, 610 (Ind. Ct. App. 1982) ("The most pervasive and enduring theory is that the relationship between a student and an educational institution is contractual in nature.") This contractual relationship has been recognized by the Seventh Circuit and acknowledged as the standard throughout the United States. *See Ross v. Creighton,* 957 F.2d 410, 416 (7th Cir. 1992) ("It is held generally in the United States that the 'basic legal relation between a student and a private university or college is contractual in nature.")

Further, "[i]t is generally well-accepted that the catalogues, bulletins, circulars, and regulations of a university made available to the matriculant become of [sic] part of the contract." *Amaya,* 981 N.E.2d at 1240 (citing *Ross,* 957 F.2d at 416). The Policy was no less part of a contract between John and USI.

The undisputed material facts demonstrate the existence of an implied contract with USI, including the "exact promises [USI] made to [John] and, and the promises that [John] made in return." *See Doe v. Purdue,* 928 F.3d at 660 (acknowledging that a student claiming a violation of due process must be specific as to the particulars of the implied contract.) At the time the Title IX Process commenced, John was a student in good-standing and paying tuition to USI. [Dkt. 33-16 ¶¶ 2-10]. In addition to paying tuition, John's consideration as part of his contract with USI was his compliance with all requirements of enrollment imposed by USI, which included compliance with the Policy, a specific "term and condition of enrollment at the University." [Ex. 27 at 1].

In return, USI was not only to provide John with an education, it was, among other things, required to comply with the terms of the Policy. USI promised John that he would not be sanctioned or suspended for a violation of the Policy without good cause and through a process

that was fair, impartial, thorough, equitable and in accordance with the process, procedure, and rights outlined in the Policy and Regulations. [Ex. 27]. USI granted John specific rights in the Policy which afforded him a right to a continuing education absent a process in accordance therewith which resulted in a determination and sanction with good cause. [Ex. 27]. These obligations were expressly acknowledged by USI's statement, "[W]e do have certain Federal regulations and other rules that we must follow. These are meant to guide us as we provide due process to all parties and to not follow them could result in dire consequences, such as an overturned decision, for everyone involved." [Ex. 32 at 2].

The Policy contained (i) John's agreement to be bound by the Policy as a term of his enrollment, and (ii) USI's agreement that it will conduct a Title IX grievance process in accordance with the Policy and applicable law. Thus, the Policy unambiguously extended benefits, terms, obligations, and agreements between John and USI.  Any argument by Doss, Devonshire or Nutter to advance form over substance relative to the Policy is readily rejected. *See e.g.*, *Turner v. Indiana Teachers' Ret. Fund*, No. 1:07-CV-1637-DFH-JMS, 2008 WL 2324114, at *5 (S.D. Ind. June 5, 2008) ("the Seventh Circuit has taught courts to look to substance over form when evaluating the entity's general legal status.") citing *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 696 (7th Cir. 2007); *Huber v. Sering*, 867 N.E.2d 698, 704 (Ind. Ct. App. 2007) (conceiving the relationship of a vendor-vendee in different terms than mortgagee-mortgagor is to pay homage to form over substance).

It is clear that John had an implied contract with USI, and with that, a specific right to a fair, just, and impartial Title IX grievance process. Accordingly, the undisputed material facts illustrate the existence of a protected property interest of which he was deprived by virtue of the Decision sanctions. [Dkt. 49-1 at 9].

### (ii) Liberty Interest

John has also shown that Doss, Devonshire and Nutter deprived him of a protected liberty interest. In order for John's liberty interest theory to move forward, he must establish that he suffered a change in legal status, as well as state-inflicted reputational damage, commonly known as the "stigma-plus" test. *Doe v. Purdue,* 928 F.3d at 661.

It is beyond dispute that John's three semester suspension from USI constitutes a change in legal status. *See Doe v. Purdue*, 928 F.3d at 662 ("After conducting an adjudicatory proceeding, Purdue formally determined that John was guilty of a sexual offense. That determination changed John's status: he went from a full-time student in good standing to one suspended for an academic year.")

In the Preamble to the Regulations, the Department of Education repeatedly recognized the seriousness of any disclosure of a Title IX determination, which include "life-altering consequences that flow from a determination regarding responsibility," therefore emphasizing "the need for each determination to be factually accurate." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 88 Fed. Reg. 30026, 30378 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106). Those consequences include "reputational stigma" and a "lasting impact on a student's personal life, in addition to [the student's' 'educational and employment opportunities'." *Id.* at 30276 (citing *Doe v. Univ. of Cincinnati,* 872 F.3d 393, 403 (6th Cir. 2017)).

Courts have recognized stigma-plus claims where the student has to self-report or authorize the report of Title IX sanctions. *See Roe v. Purdue,* 2022 WL 124644, at *9 (N.D. Ind. 2022) ("[T]he disclosure of Roe's sanction may impact her future education and employment opportunities. Roe may be the person who either has to self-report this sanction, or authorize its

report by Purdue…"); *Doe v. Purdue,* 464 F.Supp.3d 989, 1002 (N.D. Ind. 2020) (compelled disclosure of Title IX discipline to graduate schools and licensing boards satisfies the stigma-plus test.).

Under the Fourteenth Amendment, John has a liberty interest to pursue "a trade, profession, or calling." *Lawson v. Sheriff of Tippecanoe* County, 725 F.2d 1136, 1138 (7th Cir. 1984) ("[I]f a state excludes a person from a trade or calling, it is depriving him of liberty, which it may not do without due process of law.") For John, that chosen calling is becoming a lawyer after completing his college education and attending law school. [Dkt. 33-16 at ¶ 11]. John, however, cannot pursue that calling so long as the false Title IX finding remains on his records. John's attempts to continue his college education at a different institution during the pendency of this matter has confirmed that disclosure of the Title IX finding is certain until it has been removed from his records. [Ex. 11 at 27:3-12]. Even if John could be admitted to another university, and then law school, becoming a licensed attorney would no doubt involve a legal obligation to disclose the Title IX findings to the state bar. Such compulsory disclosure in order to pursue a chosen calling cannot be considered self-reporting. *See Doe v. Purdue,* 464 F.Supp.3d at 1002.

Moreover, John has already suffered a hit to his reputation as his former status as a student athlete has already triggered disclosure of the Title IX discipline by USI. [Ex. 26]. Such disclosure may already serve to severely limit John's options for playing soccer as he completes his college education, even if his records are ultimately expunged.

Defendants' reliance on *Malholtra v. University of Ill. At Urbana-Champaign*, 77 F.4th 532 (7th Cir. 2023), is misplaced. In that case, the plaintiff only suggested he "may" be effected by a required disclosure. *Id*. at 538. Even more critically, the plaintiff was suspended for

throwing a party during the height of COVID-19 lockdown restrictions in violation of university rules. *Id*. at 534. John's claims are distinguishable from *Malhotra* because John would be disclosing a suspension over alleged rape. Such disclosure would without doubt severely limit if not close off his chances of attending a law school as well as becoming a member of the bar. Given that John will have to disclose the suspension or allow it to be disclosed, a jury could find that John has "sustained a loss of a liberty interest in a stigma-plus claim as a result of a flawed investigatory process." *Roe* v. *Purdue*, 2022 WL 124644 at *9.

Based on the undisputed material facts, John has satisfied both elements of the stigma-plus test. His three-semester suspension from USI marked a change in his legal status, which coupled with the certain disclosure of his wrongfully imposed Title IX determination and discipline, establishes a liberty interest.

### 2. John was denied due process throughout the Title IX Process.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations omitted). The procedures required in school discipline cases is "context-specific." *Doe v. Purdue University*, 928 F.3d 652, 665 (internal citations omitted). The higher the education level, the more procedure a student is entitled to. See *Pugel v. Bd. Of Trs. Of Univ. of Ill.*, 378 F.3d 659, 663-64 (7th Cir. 2004). "Universities must provide stronger safeguards where more severe consequences are at stake, such as longer-term suspensions or expulsions." *Doe v. Trustees of Indiana University*, 496 F.Supp.3d 1210, 1219 (S.D. Ind. 2020) (citing Purdue, 928 F.3d at 665).

Particularly relevant to this matter, the Southern District has found that suppression of relevant credibility evidence is a procedural defect. *Id*. at 1222 (finding plaintiff alleged a

procedural defect where hearing officer prevented witness from opining on complainant's motivation for making a false accusation). The Seventh Circuit has made clear that making unsubstantiated determinations about a complainant is "fundamentally unfair." *See Id.* at 1221 (citing *Purdue*, 928 F.3d at 664).

### (i)  Doss and Devonshire

As discussed in greater detail in Section I above, Doss and Devonshire's actions throughout the Title IX Process resulted in a "fundamentally unfair" process to achieve the goal of finding John responsible for sexual assault. *See id.*

### (ii) Nutter

As explained in greater detail in Section I above, Nutter's defiance of her Title IX training and expertise and the Regulations and Policy in order to favor Jane throughout the Hearing and afterward, in addition to her undisclosed conflicts of interest, served to deny John his due process rights and ensure a finding that he was responsible for sexual assault.

There has never been a dispute as to Nutter's violations of the Regulations and Policy, and she does not address the aforementioned undisclosed conflicts. Instead, upon her realization that the undisputed material facts demonstrate a denial of due process on her part, Nutter asserts on multiple occasions that John has no evidence of that her actions were motivated by gender bias. [Dkt. 317-1 at 4, 15, 20]. Whether these assertions are the result of confusion over the claims at issue or a misguided attempt to add an additional element to John's claim, what remains true is that, in order to succeed on his due process claim, John need only establish the deprivation of a

protected interest as a result of a denial of due process, which he has done so above[7]. *See Price,* 755 F.3d at 607.

The undisputed material facts establish that John is entitled to judgment as a matter of law as to liability on his Due Process claims. Defendants' respective motions under Count II should be denied, or alternatively, there is a genuine issue of fact as to whether Doss, Devonshire and Nutter violated John's Due Process rights.

### III.    Count III – IIED claims against Defendants

### A.  The IIED elements

"To establish a claim of intentional infliction of emotional distress, a plaintiff must prove by a preponderance of the evidence that the defendant: (1) engage[d] in extreme and outrageous conduct (2) which intentionally or recklessly (3) cause[d] (4) severe emotional distress to another*." State v. Alvarez by next friend Alvarez,* 150 N.E.3d 206, 218–19 (Ind. Ct. App. 2020) quoting *Westminster Presbyterian Church of Muncie v. Cheng*, 992 N.E.2d 859, 870 (Ind. Ct. App. 2013), *trans. denied*.

> The conduct must be particularly deplorable to meet the extreme and outrageous requirement. Conduct is extreme and outrageous: 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'
> *Alvarez* quoting *Conwell v. Beatty*, 667 N.E.2d 768, 777 (Ind. Ct. App. 1996) (quoting

*Restatement (Second) of Torts* § 46 cmt. d (1965)), *reh'g denied*.

---

[7] While John contends that the undisputed material facts indeed show that Nutter acted pursuant to gender bias, success on his Due Process claim does not depend on proving the source of her motivations. *See Price,* 755 F.3d at 607.

"[T]he Restatement of Torts explains that the tort can occur not only where an actor desires to inflict severe emotional distress, but also where he knows that such distress is certain, or substantially certain, to result from his conduct." *Arizanovska v. Wal-Mart Stores, Inc.*, No. 1:09-CV-1404-RLY-DML, 2011 WL 4402561, at *7 (S.D. Ind. Sept. 22, 2011), *aff'd on other grounds*, 682 F.3d 698 (7th Cir. 2012) quoting *Chivers v. Central Noble Comm. Schools,* 423 F.Supp.2d 835, 857 (N.D. Ind. 2006).

The failure to perform a duty can support an IIED claim. *Chivers,* at 857. The Seventh Circuit has noted that extreme and outrageous conduct may arise from an abuse of authority which gives one the authority over another or the power to affect one's interests. *Bast v. Ford Motor Credit Corp.*, 631 F.2d 508, 509 (7th Cir. 1980) citing *Public Finance Corp. v. Davis*, 360 N.E.2d 765 (1976) citing Restatement of Torts. The Indiana Court of Appeals has recognized an IIED claim in the context of an investigation:

> Appellees first assert that "[c]onducting an internal investigation, reporting possible theft to the police, and cooperating with police and prosecutors is not extreme and outrageous conduct." . . . But this argument presupposes that Ruffin had belief or grounds for belief in the truth of his statements to IMPD, and we have already held that this is a matter for jury determination.

*Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 550 (Ind. Ct. App. 2015)*.* Ind. Ct. App. 2016) citing Restatement (Second) of Torts Section 46 (1965). In *Hall v. Shaw*, 147 N.E.3d 394, 408–09 (Ind. Ct. App. 2020) *trans. denied* 160 N.E.3d 517, the Court of Appeals held that a single, expletive-laced voicemail could satisfy the extreme and outrageous IIED standard.

In *State v. Alvarez by next friend Alvarez*, 150 N.E.3d 206, 211 (Ind. Ct. App. 2020), residents of a public housing complex brought an IIED action against the state of Indiana alleging it knew soil and air were contaminated by hazardous substances around the complex but did not inform or provide safeguards for the plaintiffs. *Id.* The Indiana Court of Appeals affirmed

58

the trial court's *denial* of defendants' motion for judgment on the pleadings regarding the IIED

distress stating, "a civilized society should not be expected to tolerate 'a government standing

silent while knowingly exposing its most-vulnerable citizens to toxic substances when

reasonable alternatives [exist].'" *Id*. at 219.

**B.     Judgment as a matter of law is appropriate in John's favor on the IIED claims.**

IIED cases are fact sensitive and "in the appropriate case, the question can be decided as

a matter of law." *Ali v. All. Home Health Care, LLC*, 53 N.E.3d 420, 433 (Ind. Ct. App. 2016)

citing Restatement (Second) of Torts Section 46 (1965).

**C.     The undisputed facts entitle John to judgment as to liability on Count III and preclude Defendants' motions.**

As set forth in Section I and referenced herein, Defendants' conduct was extreme and

outrageous and intentionally and recklessly caused severe emotional distress to John. Defendants

knew that outcomes in Title IX grievance proceedings can have "life-altering" effects, including

severe emotional distress. But they intentionally disregarded their duties, Policy, and Regulations

to intentionally and recklessly cause harm to John. In fact, USI reached out to John and his

counsel after the Decision because it received a report that John was suicidal. [Ex. 24]. While

Defendants do not challenge the emotional distress suffered by John, the undisputed evidence

establishes that John suffered severe emotional distress to the point of considering suicide

resulting from Defendants' outrageous conduct. [Ex. 11 at 67:24-25; 68:1-12, 18-25; 69:1;

226:3-10; Dkt. 130-1, ¶ 3-14; Dkt. 33-16; Ex. 53, ¶ 6].

Defendants had the opportunity at every stage of the Title IX process to disclose their

active concealment of material evidence, correct the knowing and intentional misconduct and

misrepresentations, and prevent their intentional and reckless emotional distress to John. But

Defendants continued to advance the outrageous misconduct knowing the emotional distress that would result from their conduct.

This case presents a truly rare circumstance "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *State v. Alvarez by next friend Alvarez,* 150 N.E.3d 206, 218–19 (Ind. Ct. App. 2020) (quoting *Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999)). John's IIED claim is not a "garden variety" objection to a university investigation. This case is in line with *Alvarez*'s IIED analysis whereby a civilized society should not be expected to tolerate a university standing silent while knowingly exposing a vulnerable student to a toxic process and outcome when reasonable alternatives exist, *i.e.*, Title IX compliance and a fair, thorough, and impartial process.

### 1. USI, Doss, and Devonshire.

USI, Doss, and Devonshire's "Argument" as to Count III consists of a single conclusory sentence without factual citation, argument development, or legal authority. [Dkt. 315, p. 33, Section E]. This fails to present a cogent argument and is a waiver. *Kijakazi, supra.* In their "Introduction," Defendants state that Count III "fails to state a claim . . . for the reasons stated in their pending Motions to Dismiss and supporting briefing, incorporated herein." *Id*. at 2. First, incorporation to lengthen the brief and have this Court determine applicable "reasons" is precluded by *McCarthy*, *DeSilva*, and *Tedrow, supra*. Secondly, the motions to dismiss address **allegations** in the Second Amended Complaint, and **not facts** contained within Defendants' "Statement of Material Facts Not in Dispute." *See* Local Rule 56-1(e) ("facts as claimed and supported by admissible evidence"). Thus, said Defendants fail to advance a cogent IIED

argument based on designated facts. Such is a waiver of their argument on Count III. *Kijakazi, supra.*

### 2.   Grand River and Nutter.

Grand River and Nutter next incorporate from USI's brief "any applicable legal argument that bolsters and supports" their argument. [Dkt. 317-1, p. 4]. They do not, however, seek to incorporate any USI argument "viewed by the Court to be at odds with assertions and arguments" made by Company and Nutter. *Id*. This improperly asks the Court to perform their obligation under FRCP 56, and it is ineffective. *See also Draper, McCarthy*, *DeSilva,* and *Tedrow, supra.*

Grand River and Nutter rely solely on the following facts:

- Nutter's intention was to conduct a fair, thorough, and impartial hearing;
- Nutter asked questions of both [John] and Jane;
- Nutter weighed the evidence and it was a difficult case that the decision-makers wrestled with and the decision came down to credibility;
- Company was retained to review the facts, the policy, and render a decision based on the evidence.

[Dkt. 317-1, p. 22]. They simply ignore the voluminous facts set forth above evidencing Nutter's outrageous conduct during the Title IX process leading to the Decision. They cite *Ayala v. Butler Univ.*, No. 116CV01266TWPDLP, 2018 WL 5117292, at *7 (S.D. Ind. Oct. 19, 2018) as support but this Court in *Ayala* did not opine on the IIED claim because the plaintiff conceded summary judgment on that claim. *Id*. Thus, it is irrelevant.

### (i)   Punitive damages can be assessed against Grand River.

Grand River asserts that punitive damages can only be assessed against it under respondeat superior liability if there is "evidence of positive or collusive action by the employer." [Dkt. 317-1, p. 25]. Grand River is subject to punitive damages under the very caselaw they cite. *In Estate of Mayer v. Lax, Inc*., 998 N.E.2d 238 (Ind. Ct. App. 2013), held that

punitive damages can properly be awarded against an employer because of an employee's act if any of the following is true:

> (a) the principal or a managerial agent authorized the doing and the manner of the act, or
> (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
> (d) the principal or a managerial agent of the principal ratified or approved the act.

*Id*. at 261.

### (ii)   Nutter was employed in a managerial capacity and was acting within the scope of her employment.

Grand River executed a contract with USI under which Nutter was appointed as the Hearing officer. [Ex. 54 18:7-23 and Exhibit 58 thereto]. Nutter was a "senior investigator and hearing officer" in August of 2021 who had "extraordinary expertise in Title IX at the time of the USI contract." [Ex. 54 23:23-24:10]. The services Nutter provided were within the course and scope of her employment with Grand River. [Ex. 54 at 22:25-23:4; Dkt. 303, ¶ 434-435].

### (iii)   Grand River authorized Nutter's actions and ratified them.

Whether an employer has ratified an employee's conduct is generally a factual question [*Lax* at 262], but here the undisputed facts prove ratification as a matter of law. At the latest, Grand River was notified of the misconduct allegations when the Second Amended Complaint was filed. [Dkt 196]. Grand River then retained counsel and filed a joint Answer denying that Nutter committed any wrongdoing and stating that she was acting within the course and scope of her employment. [Dkt 303, ¶¶ 434-435] Grand River and Nutter further filed a joint Motion for Summary Judgment, and in their supporting brief, reaffirmed Nutter's conduct and denied any misconduct. [Dkt 317-1 at 22, 24]. Grand River further agreed to cover Nutter under its insurance. [Dkt 261 at ¶ 2]. Grand River billed USI at an hourly rate under the Contract, and was

paid for Nutter's services. [Ex. 54 at 46:14-21 and Exhibit 58 thereto; Exhibit 21]. Grand River authorized then ratified Nutter's conduct through the such conduct. In addition, failure to discharge, reprimand, or discipline an employee who has committed misconduct is evidence of ratification." *Id*. Nutter continues to be employed by Grand River. [Shipper Depo., 24:21-25; 25:1-19].

John's designated facts present clear and convincing evidence that Nutter acted with malice, gross negligence, and oppressiveness that was not result of a mistake, error, overzealousness, negligence, or other human failing supporting the imposition of punitive damages. *Erie Ins. Co. v. Hickman by Smith,* 622 N.E.2d 515, 520 (Ind.1993). Thus, punitive damages may be assessed against Grand River.

### 3.  D.Stafford.

D.Stafford "incorporates by reference any arguments which Devonshire asserts in her brief in support of her motion for summary judgment." [Dkt. 319-1, p. 2]. D.Stafford further states, "[John's] IIED claim is subject to [D.Stafford's] pending motion to dismiss, which [it] incorporates by reference." [Dkt. 319-1, p. 2]. Such is precluded under *McCarthy*, *DeSilva,* and *Tedrow*. Moreover, the FRCP 12(b) standard is different from the FRCP 56 standard.

D.Stafford argues that the allegations in the Second Amended Complaint are "sparse" as to it and Devonshire. [Dkt. 319-1, p. 2]. This is irrelevant as notice pleading is the standard for the complaint, and summary judgment is based on the designated evidentiary facts. The above designated facts of Devonshire's extreme and outrageous conduct preclude relief to D.Stafford.

D.Stafford cites no reported IIED case which involves facts where university personnel and Title IX experts knowingly withheld exculpatory evidence throughout a Title IX process, intentionally disregarded and violated university policy and the Regulations, and advanced

covert misconduct at every step of the Title IX grievance process. The undisputed facts herein evidence precisely why this case is an outlier; where any average member of the community would review these facts and arouse resentment against Defendants and exclaim, "Outrageous!"

The undisputed, material facts establish that John is entitled to judgment as a matter of law as to liability on the IIED claim against Defendants. Defendants' respective motion under Count III should be denied, or alternatively, there is a genuine issue of material of fact as to whether Defendants' conduct constitutes an IIED.

## CONCLUSION

Based on the foregoing, the Court should grant John's Cross-Motion for Summary Judgment and enter judgment in John's favor as to liability against Defendants on the Second Amended Complaint. The Court should further deny each Defendant's respective Motion for Summary Judgment, or alternatively find there is a genuine issue of material fact as set forth above precluding judgment on said motions. The Court should further grant all other just relief.

Respectfully submitted,

ZIEMER, STAYMAN, WEITZEL & SHOULDERS, LLP

By: /s/ Robert L. Burkart
    Robert L. Burkart #16664-82
    Keith W. Vonderahe #21908-82
    Matthew S. Koressel #35276-49
    20 NW First Street, 9th Floor
    PO Box 916
    Evansville, Indiana 47706-0916
    Phone: (812) 424-7575
    Fax: (812) 421-5089
    rburkart@zsws.com
    kvonderahe@zsws.com
    mkoressel@zsws.com

    Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 27th day of December, 2023, a copy of the foregoing motion was filed electronically. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Robert L. Burkart*
Robert L. Burkart