UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:21-cv-00144-TWP-CSW |
| | ) | |
| UNIVERSITY OF SOUTHERN INDIANA, | ) | |
| KAREN NUTTER, | ) | |
| GRAND RIVER SOLUTIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON PENDING SUMMARY JUDGMENT MOTIONS AND PLAINTIFF'S MOTION TO STRIKE

This matter is before the Court on Defendant University of Southern Indiana's ("USI") Motion for Summary Judgment (Filing No. 314), Defendant Grand River Solutions ("GRS") and Karen Nutter's ("Nutter") (together with GRS, "GRS Defendants") Motion for Summary Judgment (Filing No. 317), and Plaintiff John Doe's ("John") Cross Motion for Summary Judgment as to Liability on Plaintiff's Second Amended Complaint as to all Defendants (Filing No. 329). John has also filed a Motion to Strike new arguments raised in USI's reply brief (Filing No. 372).  For the following reasons, USI and GRS Defendants' Motions for Summary Judgment are **granted** and John's Cross-Motion and Motion to Strike are **denied**.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to the non-moving party for each respective motion.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.      **Factual Background**

This case arises from a sexual assault allegation made by Jane Doe ("Jane") in February 2021, where Jane accused John of a sexual assault that took place November 14, 2020 (Filing No. 196 ¶ 85).  The parties have presented extensive (and oversized) briefing of factual allegations and designations of evidence in support of their respective motions.  For purposes of this Order, the Court summarizes the relevant facts that are necessary to establish the points of law being argued.

1.      **The Sexual Assault Allegation**

During the 2020–2021 school year, John and Jane were both freshman at USI (Filing No. 35-1 at 12).  They met and became friends during the Fall 2020 semester.  *Id.*  That year, Jane shared a dorm room with M.B., and they shared a suite with H.W. and I.F.  *Id.* at 4.  John lived in a residence hall located next to Jane's.  *Id.* at 5.  According to Jane, she and John were best friends and hung out almost every day.  *Id.* at 4, 34, 53.

On November 13, 2020, Jane was hanging out with her suitemates, John, and a few other male friends.  *Id.* at 12.  The group went to Taco Bell restaurant where they socialized and consumed alcohol in the parking lot.  *Id.*  After gathering in Taco Bell's parking lot, the group returned to campus and went to Jane's suite to continue drinking and socializing; John went back to his residence.  *Id.* at 7, 12, 13, 56.  On November 14, 2020, around 2:00 a.m., John received a Snapchat from Jane asking him to come up to her dorm room, and he went.  *Id.* at 13.

Jane was intoxicated, and she alleges that on the morning of November 14, 2020, John joined her in bed and touched her breasts and fingered her vagina without her consent.  *Id.* at 6, 33–34, 41–42, 101, 128.  John does not dispute that Jane was intoxicated and he helped her into her bed (Filing No. 42-1 at 111–112, 115–117, 125–128).  But he denies being *in* the bed with Jane and denies any sexual touching. *Id.* at 7, 62–64, 210.

On February 11, 2021, Jane told her roommates about the non-consensual encounter that occurred on the morning of November 14, 2020. *Id.* at 169:15–170:6. Jane's roommate reported the alleged incident to USI public safety ([Filing No. 35 at 123](#)). A Vanderburgh County Sheriff's Deputy interviewed both Jane and her roommate and prepared separate reports. *Id.* at 123–29, 188–93. On February 12, 2021, John received a letter from USI stating that he was to have no contact with Jane ([Filing No. 341-11 at 31](#):19–32:5). Shortly after, USI began an investigation into the alleged sexual assault by John on November 14, 2020.

On February 16, 2021, USI Deputy Title IX Coordinator Dameion Doss ("Doss") and USI's then Title IX Coordinator, Carrie Lynn ("Lynn"), met with Jane. A written "Memo of Conversation" was created by USI regarding the conversation with Jane (the "February 16 Memo") (*see* [Filing No. 332-34](#)). On February 18, 2021, Doss and Lynn met with John and a written "Memo of Conversation" was created (*see* [Filing No. 332-35](#)).

### 2. **Jane's Formal Complaint to USI**

On February 25, 2021, Jane made a complaint to USI's Title IX Officer accusing John of sexual assault on November 14, 2020 (the "Formal Complaint") ([Filing No. 332-29](#)). That same day, Doss and USI Deputy Title IX Coordinator Dr. Shelly Blunt ("Blunt") met with Jane for a follow-up meeting to discuss the alleged sexual assault by John on November 14, 2020 ([Filing No. 332-36](#)). A written "Memo of Conversation" was created by USI as a result of the meeting (the "February 25 Memo"). *Id.* USI also opened a Title IX "Case File" for the Formal Complaint and identified it as "Case #2021-43" ([Filing No. 332-33](#)).

### 3. **The Notice**

On March 26, 2021, Lynn advised John that USI received a formal complaint of sexual harassment under Title IX and USI's Sexual Harassment Policy ("Policy") ([Filing No. 38-1](#)). The letter sent by Lynn gave John written notice of the allegations of sexual harassment asserted against

him: "The Complainant, [Jane], states in her Formal Complaint that the Respondent, [John], violated the University of Southern Indiana's Sexual Harassment Policy by committing Sexual Assault, as defined as a forcible sex offense, that occurred on November 14, 2020 on the University campus in Newman Hall, Room 309." *Id.* Lynn's March 26, 2021 letter also gave John notice about USI's grievance policy and his rights under USI's Title IX policy and gave notice that USI would investigate the sexual harassment allegations. *Id.* at 1–2. It further advised him that USI's "receipt of the Complaint and the University's inclusion in this notification of the above statement regarding the allegations of sexual harassment does not imply a decision by the University has been made regarding the Complaint" and that he "is presumed not responsible for the alleged offense and a determination regarding responsibility is made at the conclusion of the grievance process." *Id.* at 1. And finally, USI's March 26, 2021 letter to John disclosed the identity of the investigator assigned to investigate Jane's complaint of sexual assault and advised John of his right to object to the investigator selected if he believed a conflict of interest existed. *Id.* at 2.

### 4. **The Investigation**

On April 1, 2021, USI initiated its investigation of Jane's allegations (Filing No. 35-1 at 2). Demetrius J. Peterson ("Peterson"), a male attorney from the law firm Husch Blackwell LLP, was to serve as the Title IX investigator on USI's behalf (Filing No. 38-1 at 2). USI directed Peterson to "investigate the complaint in accordance with the investigation process outlined in the policy." (Filing No. 332-6 at 26:7–12.) The Policy defined sexual harassment as conduct on the basis of sex in pertinent part, as follows: "Sexual assault, meaning an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation ("FBI") (https://ucr.fbi.gov/nibrs/2012/resources/nibrs-offense definitions)." (Filing No. 35-1 at 1, 3.)

Peterson interviewed Jane, John, and witnesses the parties identified (Filing No. 35-1 at 1–3).  He also collected other evidence as part of his investigation:  copies of text messages, Snapchat screenshots, body cam interview of Jane, a TikTok video of Jane, a video recording of Jane from the morning of the incident, a video recording of an interview with H.W., a USI Public Safety report, and case reports from the Vanderburgh County Sheriff's office.  *Id.* at 188–201.  In addition to the evidence Peterson gathered on his own, he relied on some documents shared by USI (Filing No. 332-6 at 13:16–18).  USI provided Peterson with the Policy and the Formal Complaint.  *Id.* at 26:7–11.  But USI did not provide Peterson all reports and memoranda. *See id.* at 40:20–24. Peterson summarized the evidence he received to form his final investigation report (Filing No. 35-1 at 1–14).

Peterson originally submitted his final report to USI on June 4, 2021; but a week later, USI notified Jane and John that the investigation was being reopened to provide additional time to question a previously unavailable witness.  *Id.* at 3.  Peterson's true final report consisted of fourteen single-spaced pages, with one hundred ninety-six pages of appended evidence (Filing No. 35-1).  USI provided John and Jane an opportunity to review the report and submit written responses.  *Id.* at 203–210. The final report dated July 15, 2021 included Appendix E which contained copies of John's and Jane's written responses to the report.  *Id.*

### 5.  **Events Between the Investigation and the Hearing**

#### a.  **John Faces Social Media Attacks**

After Jane's allegation against John, her roommate, M.B., created social media posts accusing John of sexual assault (Filing No. 33-2).  The social media posts included M.B. identifying John in a soccer team photograph, a TikTok accusing John of sexual assault, and multiple comments left on USI's athletic team Instagram page.  *Id*.  She also made multiple posts asking that USI kick John off the soccer team until the investigation concluded.  *Id*.  In response,

USI deleted the negative social media comments and blocked certain users from leaving comments at all (see Filing No. 33-2 at 7).

On March 25, 2021, USI's student publication, The Shield, published an article titled "Student reports sexual assault, says officials aren't serious" (the "Article") (Filing No. 33-26). In the Article, an anonymous female student accused USI of not taking seriously a report she made alleging she was sexually assaulted by a male USI student. *Id.* In the Article, the student stated she wanted "[the male] to be removed from campus" so "[the sexual assault would not] happen to any more girls." *Id.* at 3. The student further stated that USI was "supporting rape culture and discouraging women from going to college and speaking up for themselves." *Id.*

Also in March of 2021, a female USI student created an online petition accusing John of sexually assaulting seven different USI female students (the "Online Petition") (Filing No. 33-4). The Online Petition accused USI of "allowing a predator to have free range of their college campus." *Id.* at 2. USI circulated the Online Petition to various USI employees (Filing No. 45). USI was also aware that in the same month, John was subjected to verbal harassment at a USI athletic event in which he was participating (Filing No. 332-27). John believes the Online Petition and M.B.'s social media posts violated USI's Student Conduct Policy for social media harassment and cyber-bullying (*see* Filing No. 332-27 at 64–66; Filing No. 342 at 13).

On March 26, 2021, John and his parents met with USI to discuss the false statements made against him, the harassment he faced, and the threatening social media posts targeting him (Filing No. 332-27 at 15–16). A written "Memo of Conversation" was created by USI as a result of the meeting. *Id.*

### b.   Beth Devonshire Becomes USI's Title IX Coordinator

On July 2, 2021, Lynn left her employment at USI as the Title IX Coordinator. USI then appointed Beth Devonshire ("Devonshire") as the Interim Title IX Coordinator effective July 5,

2021 (Filing No. 33-6).  Devonshire was contracted through D. Stafford & Associates ("Stafford")

—a consulting firm that has expertise in Title IX and its regulations (Filing No. 320-1 at 10:6–19).

Devonshire assumed Lynn's responsibilities and began supervising Doss (Filing No. 315-2 at 6:22–

7:10).

### c.   Pre-Hearing Preparation

On July 26, 2021, USI sent John a letter notifying him that a hearing on the Formal

Complaint was scheduled for August 4, 2021, by Zoom (the "Hearing Notice") (Filing No. 40-1).

USI retained three individuals (collectively, the "Decision Makers") from GRS, an independent

firm that specializes in Title IX services, to conduct the panel hearing ("Hearing") and render a

written responsibility determination and, if applicable, a sanction determination.  *Id*.  Nutter was

designated the Hearing Officer, and one Decision Maker was a male.  *Id.* at 1.

The Hearing Notice disclosed the identity of the Decision Makers, gave John and his

advisor, attorney Keith Vonderahe ("Advisor"), a chance to object to any of these Decision Makers

and to request that they be replaced, and provided information about the Decision Makers, the

panel hearing, and John's rights.  (Filing No. 40-1 at 1–2; Filing No. 49-1 at 7.)  John filed no

objection to the Decision Makers assigned to preside over the panel hearing and render a

responsibility determination (Filing No. 49-1 at 7).

Prior to the Hearing, Devonshire and Nutter worked together to draft a follow-up email to

the Hearing Notice, informing both Jane and John of the scope of the Hearing (*see* Filing No. 332-

22).  On August 2, 2021, Devonshire sent Nutter an email stating:

> Hi,
>
> thoughts [sic] on this language in the follow-up to narrow the scope.  Even if we
> left with the kick to NIBERS it would still be all the forceable and non-forcible so
> trying to limit

Similarly, as a follow-up to the letter from the 26th, please note that the specific violations in which the hearing will focus upon are the following:

- 2.9.2 A: Rape (or attempts to commit same)
  The penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.

- 2.9.2 D Fondling (or attempts to commit same)
  The touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental incapacity.

(Filing No. 332-25 at 26.)  The description of fondling in Devonshire's email to Nutter was not the same as the FBI National Incident-Based Reporting System definition in the Policy (*compare id. with* Filing No. 33-5).

Following the conversation with Nutter, Devonshire sent an email to John and his Advisor (the "August 2 Email"), which stated:

I wanted to follow-up per the letter sent on July 26th and see if you would like to meet with me via zoom to review the process and answer any questions that you might have. I have attached the hearing agenda as well as the statement of rights and process and happy to review them both with you prior to the hearing.

Similarly, as a follow-up to the letter from the 26th, please note that the specific violations in which the hearing will focus upon are the following:

- Rape (or attempts to commit same)
  The penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.

- Fondling (or attempts to commit same)
  The touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental incapacity

Please let me know if you have any questions or would like to meet with me.

8

(Filing No. 332-25 at 28). The August 2 Email disclosed the new definitions and specific sexual misconduct violations on which the Hearing would focus (Filing No. 41-1). Although the definitions were new, John admits that they did not change his defense because his defense was that he was never in Jane's bed on November 14, 2020, so nothing happened between them that morning (Filing No. 316-1 at 35:7–18; 36:1–25).

**6.   The Hearing**

On August 4, 2021, USI conducted the Hearing on Jane's allegations via Zoom (*see generally* Filing No. 42-1).  The Hearing lasted approximately five and a half hours, excluding breaks, with audio recorded (*compare* Filing No. 58-2 *with* Filing No. 59).  The Hearing format was consistent with that outlined in the Hearing Agenda (Filing No. 58-2; *see also* Filing No. 42-1 at 2–247.  At the beginning of the Hearing, John and his Advisor consented to the procedural rules that governed the Hearing (Filing No. 42-1 at 5–6).  The Hearing included questioning of Jane, John, and two witnesses (Jane's roommate and Jane's suitemate) (Filing No. 42-1 at 2–243).  Nutter questioned John, Jane, and all witnesses, John's Advisor cross-examined Jane and both witnesses, and Jane's advisor cross-examined John and both witnesses.  *Id.* at 68–99.

**7.   The Decision**

On August 25, 2021, after three weeks of deliberations, the Decision Makers issued a written determination and the summary and decision as to the allegations of the Formal Complaint (the "Decision") (Filing No. 45-1; Filing No. 46-1).  The Decision Makers noted Jane's allegation "that while in her residence hall room, [John] kissed her, touched her breast, and digitally penetrated her vagina without her consent." (Filing No. 46-1 at 1).  In making their analysis, the Decision Makers stated "the issue is not merely what conduct occurred and whether [John] engaged in unwelcome conduct, but also whose version of the events is more credible, as the details of each account are irreconcilable."  *Id*. at 9. The Decision Makers found that John "violated

University policy against Sexual Harassment, specifically Rape and Forcible Fondling." *Id.* at 10. John was sanctioned with a three-semester suspension (effective fall semester 2021 and eligible to return Spring 2023) and a requirement to complete Title IX sexual harassment education following the suspension (Filing No. 45-1 at 1).

The Decision outlined facts the Decision Makers deemed undisputed and their analysis of such facts (*see* Filing No. 46-1 at 2–10). They noted John's changing testimony, stating it was "directly and dramatically at odds with his statement during the [I]nvestigation that he and [Jane] had only ever kissed and cuddled" and "his new claim at the hearing that [Jane] was making this allegation because she was confusing it with another time when he 'fingered' her." *Id.* at 9. The Decision Makers also cited the corroborating testimony of Jane's suitemate, a third-party eyewitness, who saw John lying with Jane on her bed. *See id.*

Considering all the evidence before them, the Decision Makers found that "[Jane's] account [was] more credible than [John's]" and that "it is more likely than not that in the early morning hours of November 14, 2020, [John] touched [Jane's] breasts and vagina, and digitally penetrated her, without her consent." *Id.* at 10. The Decision Makers informed John of his right to appeal the finding of responsibility and sanction (Filing No. 45-1).

**8.    The Appeal**

On September 1, 2021, pursuant to USI's Policy, John appealed the determination of responsibility (Filing No. 47-1). USI appointed Christopher Bayh (the "Appeal Officer") of Barnes & Thornburg, LLP, to act as USI's appellate officer (Filing No. 48-1). John was notified of USI's decision to retain the Appeal Officer and his right to object if he believed a conflict of interest existed (Filing No. 61). John did not object to the Appeal Officer (Filing No. 62).

USI imposed a deadline of September 9, 2021, for Jane to submit any response to John's appeal, and USI notified John and his Advisor of this deadline on September 2, 2021 (*see* Filing

No. 61 at 2; Filing No. 101-1 ¶ 5).  USI also informed John that they would notify him if Jane filed

an appeal response (Filing No. 332-26 at 1).  On September 10, 2021, Devonshire contacted Jane

to inform her that she missed her deadline to submit a response to John's appeal (Filing No. 101-1

¶ 5).  Following Devonshire's email, Jane submitted her untimely response (*see* Filing No. 63).

USI rejected Jane's untimely response and did not provide it to the Appeal Officer.  *Id.*

On September 22, 2021, the Appeal Officer issued a decision affirming USI's determination

of responsibility and sanction (Filing No. 49-1).  The Appeal Officer cited three possible grounds

for appeal and noted that John's appeal focused on only two of those grounds: various procedural

irregularities in USI's Title IX process, and several types of biases against John.  *Id.* at 2.  To

succeed on his appeal, John needed to show that one of those two defects "affected the outcome"

of the Decision.  *Id.*  The Appeal Officer addressed each of John's grievances, finding that John

had not demonstrated a violation of any governing procedural rule or any bias, and that none of

John's grievances affected the panel's determination.  *Id.* at 2–9.  The Appeal Officer further noted

that John and his Advisor had several opportunities to raise the alleged procedural irregularities

before the Decision but chose not to.  *Id.* at 4–6.  The Appeal Officer concluded that John's appeal

contentions were "in reality . . . objections to how the panel weighed the evidence."  *Id.* at 9.  The

Appeal Officer transmitted his decision in a letter dated September 22, 2021 (Filing No. 48-1).

**B.**     **Procedural Background**

On September 4, 2021, John filed his original Complaint in state court (Filing No. 1-1).

USI removed the case to federal court on September 29, 2021 (Filing No. 1).  On October 18,

2021, John filed an Amended Complaint against USI, which included only three claims: (1)

violation of Title IX; (2) preliminary and permanent injunction; and (3) attorneys' fees (Filing No.

27).  John filed a Motion for Preliminary Injunction on October 20, 2021 (Filing No. 33).  The

Court heard oral argument on December 17, 2021 (Filing No. 105), and on May 10, 2022, the

Court denied the Motion for Preliminary Injunction, finding that John did not have a reasonable likelihood of success on the merits of his Title IX claim and that his alleged harms were not irreparable (Filing No. 133).   On May 17, 2022, John appealed the denial of his Motion for Preliminary Injunction (Filing No. 137).   On August 8, 2022, the Seventh Circuit Court of Appeals affirmed this Court's denial of the preliminary injunction.  (Filing No. 158); *Doe v. Univ. of S. Ind.*, 43 F.4th 784 (7th Cir. 2022).

On April 24, 2023, John filed the operative Second Amended Complaint against USI and added Doss, Devonshire, Stafford, and the GRS Defendants (Filing No. 196).  The Second Amended Complaint asserts three claims: Count I: Violation of Title IX (against USI only); Count II: Claims under 42 U.S.C. § 1983 (against all Defendants); and Count III: Intentional Infliction of Emotional Distress ("IIED") (against all Defendants). *Id.* at 50–55.

In May of 2023, USI sought dismissal of Count III (Filing No. 209), Doss and Devonshire sought dismissal of Counts II and III (Filing No. 219), and Stafford sought to dismiss Counts I, II, and III (Filing No. 248).  In November 2023, while the motions to dismiss were still pending, all Defendants filed motions for summary judgment as to all claims against them (Filing No. 314; Filing No. 317; Filing No. 319).  In December 2023, John filed his Cross-Motion for Summary Judgment as to liability on all claims against all Defendants (Filing No. 329).

On March 25, 2024, the Court granted USI's Motion to Dismiss Count III of the Second Amended Complaint, granted Doss and Devonshire's Motion to Dismiss Counts II and III of the Second Amended Complaint, and granted Stafford's request to dismiss Count III (Filing No. 379). As a result, Doss, Devonshire, and Stafford were terminated from this case.  The Court accordingly denied as moot Doss, Devonshire, and Stafford's motions for summary judgment and John's Cross-Motion for Summary Judgment as to Doss and Devonshire on Counts II and III, Stafford on Count

III, and USI on Count III.  *Id.* at 33–34.  Only Count I against USI, Count II against Nutter, and

Count III against GRS Defendants remained pending.  *Id.* at 34.

On May 6, 2024, USI filed a motion to dismiss for lack of jurisdiction on John's Title IX

injunctive relief claim (Filing No. 404).  On July 23, 2024, the Court granted USI's motion,

dismissing John's Title IX injunctive relief claim (Filing No. 448).   The claims remaining are

Count I: Violation of Title IX against USI for damages only; Count II: Claims under 42 U.S.C. §

1983 against Nutter; and Count III: Intentional Infliction of Emotional Distress against the GRS

Defendants.  The parties' three summary judgment motions as to these remaining claims are now

fully briefed, as is John's Motion to Strike new arguments raised in USI's reply brief.  These four

motions are therefore now ripe for the Court's review.

## II.   SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary

judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v.

Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary

judgment, the court reviews "the record in the light most favorable to the non-moving party and

draw[s] all reasonable inferences in that party's favor."  *Zerante*, 555 F.3d at 584 (citation omitted).

"However, inferences that are supported by only speculation or conjecture will not defeat

a summary judgment motion."  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007)

(citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on

a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific

factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The fact the parties have filed cross-motions for summary judgment does not alter the standard set forth in Federal Rule of Civil Procedure 56(c)(2). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. With cross-motions, the court is required to "construe all inferences in favor of the party against whom the motion under consideration is made." *Metro Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002).

## III.   DISCUSSION

### A.   Motion to Strike (Filing No. 372)

As an initial matter, the Court addresses John's request to strike new arguments raised in USI's reply brief, specifically all arguments as to the Indiana Tort Claim Act ("ITCA") and

immunity thereunder.  John contends that these arguments are new, as they were not raised in USI's Brief in Support of its Motion for Summary Judgment. *See Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019) ("New arguments and evidence may not be raised for the first time in a reply brief.  Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief.").

The Court need not address whether USI did, or did not, raise arguments as to the ITCA in their Brief in Support of Summary Judgment.  USI properly raised their ITCA arguments in their Motion to Dismiss, (Filing No. 209 at 1), and John's Second Amended Complaint failed to allege that he complied with ITCA requirements.  On March 25, 2024, the Court granted USI's motion to dismiss Count III of John's Second Amended Complaint--Intentional Infliction of Emotional Distress—because John failed to comply with the notice requirements of ITCA and therefore was barred from pursuing an IIED claim against USI.  (Filing No. 379 at 15.)  For this reason, John's Motion to Strike is **denied as moot**.

**B.**    **USI's Motion for Summary Judgment (Filing No. 314)**

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  A Title IX sex discrimination claim requires proof that "(1) the educational institution received federal funding, (2) [the] plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against [the] plaintiff based on gender."  *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019).  It is undisputed that USI receives federal funding, and that John was "excluded from participation in [or] denied the benefits of . . . [an] education program" when USI suspended him.  20 U.S.C. § 1681(a).  Violations of the statute are subject to a private suit for both equitable relief

and damages. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979). The success of John's claim depends on whether USI discriminated against him "on the basis of sex."

The Court must determine whether a reasonable jury could find that USI discriminated against John "on the basis of sex" during any part of John's Title IX process. *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019). A plaintiff can demonstrate bias by showing: "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest . . . justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). "A decision that is against the substantial weight of the evidence and inconsistent with ordinary practice or sanctions may give rise to an inference of bias, although not necessarily bias based on sex." *Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020) (citing *Doe v. Baum*, 903 F.3d 575, 585–86 (6th Cir. 2018).

John provides a three-page, unnumbered list of purportedly undisputed facts that demonstrate anti-male bias (Filing No. 342 at 32–34). He states that these facts are "cited above" but does not identify what portions of the record (or even what portions of his twenty-six-page statement of facts) support each of these purportedly undisputed facts. "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). Further, as explained within this Order, where there are citations, many are mischaracterizations of the evidence (*e.g.*, reports of other women feeling uncomfortable, USI doing "nothing" about Facebook posts). What is more concerning is there is no argument or legal authority whatsoever. Accordingly, the Court will only address the evidence for which John offers record citations and argument. The evidence for which John offers record citations and argument can be summarized

into five categories: alleged issues with concealed material evidence, USI's failure to disclose non-consensual kissing allegation, policy amendments made by USI prior to the Hearing, USI's response to online harassment, and Nutter's actions. The Court will address these arguments in turn.

### 1.   __Undisclosed Documents__

John argues that USI concealed material evidence during the Title IX process (the "Undisclosed Documents") (*see* [Filing No. 342 at 35](#)). As an initial matter, John fails to show that the undisclosed evidence was material to the Title IX decision. He also fails to show that sex bias motivated USI's decision to withhold the allegedly material evidence.

The Department of Education requires an institution to "gather[] evidence sufficient to reach a determination regarding responsibility," "not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence," and to "create an investigative report that fairly summarizes relevant evidence." 34 C.F.R. § 106.45(b)(5)(i), (iii), and (vii). John's allegation that USI concealed evidence is not material unless he designates evidence to show that USI "deviated from proper procedures not because of human error but by design, to achieve covertly what it could not do openly: discriminate against [John] on the basis of his sex." *Doe*, 43 F.4th at 793.[1]

USI gathered multiple documents that it turned over to Peterson, but it failed to include the February 16 Memo, the February 25 Memo, or the March 19 Report. John contends that USI's failure to provide these Undisclosed Documents creates a genuine issue of material fact because

---

[1] In citing the Seventh Circuit's decision on John's Motion for Preliminary Injunction, the Court acknowledges that it is not bound by that decision in ruling on the parties' summary judgment motions. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 292 (7th Cir. 1998). The Court is also mindful that it "must be cautious in adopting findings and conclusions from the preliminary injunction stage in ruling on a motion for summary judgment" because preliminary injunction decisions are often based on a "hurried consideration" of limited evidence, and because the standard for preliminary injunctions differs from the standard for summary judgment. *Commc'ns Maintenance, Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205 (7th Cir. 1985).

the documents concealed were relevant to his credibility.  John argues the March 19 Report is material because it contained Jane's statement that John got into her bed, undressed, and sexually assaulted her.  USI argues persuasively that all statements made by Jane in the Undisclosed Documents constitute inadmissible hearsay, as they were not made during the Hearing, and are speculative as alleged impeachment of Jane's credibility.  It is also speculative that the Decision Makers would have come to a different conclusion had they reviewed the Undisclosed Documents. John has designated no evidence that the Decision Makers would have found John not responsible had they reviewed the Undisclosed Documents.

USI's failure to disclose the documents John desired to its Investigator is also not enough to establish anti-male bias.  John has not tied USI's decision to withhold documents to his sex.  He has not pointed to any similarly situated female respondent who had all documents included in an investigative report.  Universities are allowed to make relevance determinations in viewing and collecting evidence, and such determinations can be based on a legitimate nondiscriminatory reason.  *See Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017).  There is no requirement that USI gather *all* evidence, but rather, that USI gather evidence *sufficient to reach a determination*.

Moreover, John's use of the word "conceal" is misleading.  To conceal means to prevent disclosure or recognition of. *Conceal*, Meriam-Webster (11th ed. 2003). At any point, Peterson or John's Advisor could have requested the Undisclosed Documents from USI if they believed those documents were material to the case.  Both Peterson and John's Advisor knew how to request and obtain documents from USI (*see* Filing No. 316-3 at 2:18–21).  USI's failure to provide documents that neither John nor Peterson sought does not show evidence of sex bias.  *See Doe v.*

*Columbia Coll. Chi.*, 299 F. Supp. at 955 (finding that allegations that an investigation excluded evidence did not show sex bias when there were legitimate truth-seeking reasons for the decision).

    **2.**    <u>**USI's Failure to Disclose Non-Consensual Kissing Allegation**</u>

John argues that USI's failure to inform him of Jane's allegation of non-consensual kissing initially is evidence of anti-male bias.[2]  In the Notice of Allegations, USI explicitly states "[t]he following is a *summary* of the allegations of sexual harassment contained in the Complaint." (*See* <u>Filing No. 38-1</u>) (emphasis added).  John does not cite to any Title IX or USI policy that requires USI to specify the behaviors comprising the alleged sexual assault at the time the Notice of Allegations is provided.  USI made John aware of the non-consensual kissing allegation in the Hearing Notice (which would have allowed John time to prepare a defense) (<u>Filing No. 40-1</u>).  While waiting to disclose the allegations to John may be poor practice, it was not in violation of any policies and is not evidence of discrimination based on sex.

Next, John insinuates that USI's decision to include the non-consensual kissing allegation in the Hearing is evidence of anti-male bias because "USI included a *knowingly false allegation* as a 'lesser included offense' to ensure a finding of responsibility against [him]."  (<u>Filing No. 342 at 41</u>) (emphasis added).  He argues USI knew the non-consensual kissing allegation was false because "the Investigation Report contained Jane's assertion that her complaint did not include an allegation of sexual assault of nonconsensual kissing."  *Id.*  John relies on a portion of USI's brief to support his argument but does not designate any evidence demonstrating that USI knew, before the Hearing began, that Jane was not contending there was non-consensual kissing (*see* <u>Filing No. 315 at 19</u> n.7 ("Jane already stated in writing through her response to the [I]nvestigation [R]eport

---

[2] John suggests that "USI falsely represented that it cut and pasted all in [*sic*] the information from the Formal Complaint in the Notice of Allegations." (<u>Filing No. 342 at 41</u>.)  John cites no evidence to support this assertion, as the Formal Complaint was not provided due to privilege.

and testified at the panel hearing that she was not contending there was nonconsensual kissing.")).

What the designated evidence does demonstrate is that Jane stated the kissing was consensual

unequivocally, for the first time *during* the Hearing, not prior (Filing No. 42-1 at 21:2–3)[3].  At the

time USI crafted the Hearing Notice allegations, they had multiple statements from Jane that she

did not want to kiss John and that she asked him to stop kissing her (*see* Filing No. 35-1 at 6, 40–

41, 203).  No reasonable juror could find that USI advanced a *knowingly* false allegation of non-

consensual kissing when Jane repeatedly told USI that she did not want to be kissed and USI was

aware that Jane was intoxicated during this entire encounter.

Moreover, to the extent John is arguing that USI's failure to render a determination on the

non-consensual kissing allegation is evidence of anti-male bias, the Seventh Circuit has already

rejected this argument.  *See Doe*, 43 F.4th at 797 ("The failure to make a finding on the abandoned

non-consensual kissing point does not seem like convincing evidence of bias against men in

general or John in particular.").  Although Title IX committees are supposed to render

determinations of responsibility for each allegation in a complaint, failing to do so here does not

create a genuine dispute of material fact as to gender bias.

### 3.    USI's Policy Amendments

John also contends that policy amendments made by USI prior to the Hearing (the "Policy

Amendments") are evidence of anti-male bias because they were implemented immediately prior

to the Hearing and were contrary to Title IX and USI policy (*see* Filing No. 342 at 43).  The

evidence designated by John does not support his assertion that the Policy Amendments made were

---

[3] At the Hearing, Jane testified: "I think I said this in the report, but the kiss was consensual, I guess." (Filing No. 42-1 at 2–3.)  However, nowhere in the Investigative Report does it mention Jane saying the kiss was consensual (*see generally* Filing No. 35-1).

contrary to Title IX or USI's policy.[4]  John also fails to explain how the Policy Amendments, which changed the definitions of rape and fondling, prejudiced him in any way.  It would be hard, if not impossible, for a reasonable juror to find that USI exhibited anti-male bias by changing the definitions when under either set of definitions, John would have had the same defense—that he was never in Jane's bed on the morning of November 14, 2020 (*see* Filing No. 316-1 at 35:7–18; 36:1–25).

More significantly, John does not dispute that the Policy Amendments applied equally to Jane and every other student at USI.  An amendment that applies equally to students, regardless of sex, is not evidence of anti-male bias.  *See Doe*, 43 F.4th at 797 (holding that because "the appeal policy applied to every respondent and every complainant, regardless of sex[,] [USI] did not act with an anti-male bias against John by enforcing a generally applicable policy that also applied to Jane.").

### 4.     USI's Response to Online Harassment

John further argues that USI's bias is shown by its failure to appropriately address online harassment by female students.[5]  John states that he reported "false and harassing social media posts by female USI students to Title IX personnel in March 2021," but "USI's Title IX personnel

---

[4] John cites various exhibits (*see* Filing No. 342 at 43) but does not direct the Court to any specific page. *See* S.D. Ind. L.R. 56-1(e) ("The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."). Insofar as the evidence he cites supports his argument, the Court is unable to locate the precise portion. *Ritchie*, 242 F.3d at 723 ("[T]he court is not required to scour the record in search of evidence to defeat a motion for summary judgment.").

[5] John also alleges that USI falsely "advised him that there were several female students other than Jane who advised that his behavior made them feel uncomfortable." (Filing No. 342 at 45.)  John claims this statement was "false" because "USI now concedes that it has no documents as to the same." *Id.* at 32, 45. John fails to explain how USI's statement about the other complaints (even if false) shows that USI saw women as the only victims of harassment, so this argument does not support John's Title IX claim.  More concerningly, though, John's suggestion that USI lied about the other complaints appears to be based on a mischaracterization of the evidence.  In USI's discovery responses, for example, USI never stated that it had no written reports of other complains; instead, it objected to John's request for such documents (Filing No. 330-10 at 23–24).  Likewise, during his deposition, Doss did not state that there were no other complaints, though he did explain that the complaints were not always written and could have been made through telephone calls or in person (Filing No. 341-5 at 152–53).

did not advise John that he could file a formal complaint under the Policy as to the female students making the false and harassing posts, and USI took no action against the female perpetrators." (Filing No. 342 at 45.)  John reasons that "[t]his demonstrates that USI did not see men as victims of sexual harassment, and it only viewed them only as perpetrators when accused."  *Id*.

The fact that USI did not, unprompted, advise John that he could file a formal complaint against his online harassers does not support his Title IX claim.  There is no evidence that USI told John that he *could not* file a formal complaint.  Nor is there evidence that USI typically notified female complainants that they could file formal complaints.  Stated differently, John does not show that USI deviated from a policy or practice by not affirmatively advising John about his right to file a formal complaint, so this fact fails to demonstrate any bias.

Similarly, the fact that USI did not "take action" against the women posting on social media does not demonstrate an anti-male bias, since there is no evidence that male students making similar posts would have been subjected to some type of disciplinary action.  John's evidence regarding the social media posts is unpersuasive for two additional reasons.  First, as John himself alleges, USI *did* take *some* action in response to the posts (Filing No. 342 at 14 ("USI deleted negative social media comments and blocked certain persons from making comments on USI's athletic team Instagram page.")).  Second, John does not explain how USI's response to personal attacks on social media demonstrates USI's biases as to sexual assault.  It is too great a leap to suggest that USI's response to John's social media harassment shows that USI views only women as victims of any type.

In sum, the evidence of USI's response to John's online harassment does not tend to show anti-male bias by USI.  The evidence shows only non-errors by USI in response to a different type

of harassment, and the inferences that John asks the Court to draw based on this evidence are not reasonable.

### 5.   <u>Nutter's Conflicts, Hearing Questions, and Suspension Determination</u>

Lastly, John contends that USI's gender bias is evidenced by its failure to disclose Nutter's "conflicts of interest," Nutter's unbalanced questioning of John and Jane at the hearing, and Nutter's decision to suspend John for an unprecedented three semesters (Filing No. 342 at 41, 46–47).  With respect to the "conflict of interest," John asserts that "USI did not disclose that Devonshire, in communications with Trump, Doss, and Nutter, determined the allegations for the Hearing Notice without communicating with Jane."  *Id.* at 41.  It is unclear how Nutter's advanced knowledge of the topics for the hearing creates a conflict of interest; surely a judge is not conflicted out of her trials merely because she knows what arguments the parties will make.  John appears to imply that Nutter had a conflict of interest because she *chose* the topics on which she would issue findings, but that implication is not supported by the evidence.  Nutter, at most, offered feedback on a proposed definition used in the Hearing Notice (Filing No. 332-4 at 114:19–24).  The Court therefore sees no "conflict of interest." But more importantly, John offers no evidence that Nutter's involvement in preparing the Hearing Notice was irregular, and he fails to explain how any alleged conflict shows that USI acted with anti-male bias.

John also complains that at the hearing, Nutter allowed Jane, but not John, to explain inconsistencies in her statements, and that Nutter imposed a three-semester suspension on John, even though Nutter found it difficult to make a determination in this case and similar conduct in other cases yielded only a two-semester suspension (Filing No. 342 at 46–47). This evidence does tend to show that Nutter deviated from her own best practices, however, it is not evidence of USI's alleged anti-male bias.  John does not argue that USI had any control over the questions that Nutter decided to ask (or not ask) during the hearing, nor does he argue that USI had any control over

Nutter's decision to impose a three-semester suspension. This evidence could, at most, support John's Title IX claim against Nutter, but that claim is dismissed for the reasons explained below (*see infra* (III)(C)(1)).  It does not support John's Title IX claim against USI.

The Court finds that John has failed to demonstrate a genuine issue of material fact as to whether gender bias was a motivating factor behind USI's actions in this case.  It is clear that John adamantly disagrees with USI's Title IX procedures and the outcome of the hearing.  However, universities have leeway in determining how to address misconduct that occurs on their campuses and courts should "refrain from second-guessing the disciplinary decisions made by school administrators."  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).  Accordingly, summary judgment is **granted** in favor of USI on John's Title IX claim.

**C.**     **GRS Defendants' Motion for Summary Judgment (Filing No. 317)**[6]

The GRS Defendants request dismissal of Counts I, II, and III of the Second Amended Complaint.  They argue that Count I should be dismissed because Title IX claims are and can only be alleged against USI (Filing No. 317-1 at 13).  They also argue that Count II fails to meet the standard for deliberate indifference under Section 1983.  *Id.* at 14.  Lastly, they argue that Count III must be dismissed because their conduct does not satisfy the elements of IIED.  *Id.* at 20.

**1.**     **Count I: Title IX**

To state a Title IX discrimination claim, a plaintiff must allege "(1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Doe v. Columbia Coll. Chi.*, 933 F.3d at 854.  John's Title IX

---

[6] The arguments advanced by John and the GRS Defendants are in part identical to those advanced by Doss, Devonshire, and John in the Motion to Dismiss briefing (*see* Filing No. 220; Filing No. 248; Filing No. 269; Filing No. 271, Filing No. 272).  The Court notes this similarity only to explain why its discussion in this Order is essentially verbatim to its discussion in the order on Doss and Devonshire's Motion to Dismiss (Filing No. 379 at 18–25).  The facts remain the same, as discovery did not highlight anything that would raise a genuine dispute of material fact.

claim is solely directed at USI and is not alleged against the GRS Defendants (*see* Filing No. 196 ¶¶ 398–413).  Accordingly, the GRS Defendants' Motion for Summary Judgment as to Count I is **granted**.

### 2.    Section 1983 Claim

Count II alleges a claim pursuant to 42 U.S.C. § 1983 against Nutter for deprivation of John's protected interests without procedural due process (Filing No. 196 ¶¶ 420–30).  The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  "To demonstrate a procedural due process violation of a [protected] right, the plaintiff must establish that there is (1) a cognizable [protected] interest; (2) deprivation of that [protected] interest; and (3) a denial of due process."  *Price v. Bd. of Educ. of City of Chi.*, 755 F.3d 605, 607 (7th Cir. 2014).  A procedural due process analysis therefore consists of two steps; first we must identify the protected property or liberty interest at stake; Second, if the plaintiff was deprived of one of those interests, we must determine what process was due under the circumstances. *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013).

The GRS Defendants argue that John fails to meet the standard for deliberate indifference with respect to Due Process and Equal Protection Claims (Filing No. 317-1 at 14).  The GRS Defendants also argue that they are entitled to judgment and dismissal as a matter of law because John has failed to plead sufficient facts to establish that he had a protected property or liberty interest.  *Id.* at 16–20.

### a.    Protected Property Interest

John recognizes that this Circuit has long held that there is not a stand-alone property interest in one's education but contends he has a protected property interest in his education by virtue of contract.  *See Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009);

*Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008).  In the context of higher education, "any property interest is a matter of contract between the student and the university."  *Doe v. Purdue*, 928 F.3d at 660.  Therefore, "a student [must] establish that an implied contract existed between himself and the university that entitled the student to a specific relief, such as the right to a continuing education or the right to not be suspended without good cause."  *Bissessur*, 581 F.3d at 601.

Contracts between universities and students may come from a variety of sources.  *Gociman v. Loyola Univ. Chi.*, 41 F.4th 873, 883 (7th Cir. 2022).  Such sources include catalogues, bulletins, circulars, and regulations of the institution.  *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992).  Such sources must point to an "identifiable contractual promise that the [university] failed to honor."  *Bissessur*, 581 F.3d at 602.  In *Charleston v. Board of Trustees of the University of Illinois at Chicago*, where the plaintiff alleged a protected property interest based on the Student Disciplinary Policy and University Statutes, the Seventh Circuit held that those allegations were insufficient to state a claim for a violation of the plaintiff's federally protected due process rights because there is no "federal constitutional right to a *state-mandated* process." 741 F.3d at 773 (emphasis added).

Conversely, in *Shannon v. Board of Trustees of the University of Illinois*, a basketball player sought a preliminary injunction after he was accused of sexual assault and the university suspended him from sports, arguing written and implied contracts entitled him to procedural safeguards.  Case No. 24-cv-2010, 2024 WL 218103, at *11 (C.D. Ill. Jan. 19, 2024).  The court found the basketball player had sufficiently alleged that the written and implied contracts entitled him to procedural safeguards because the Division of Intercollegiate Athletics policy explicitly stated that all sports suspensions would be done in compliance with all applicable University policies and procedures,

which when read sensibly, included the Office of Student Conflict Resolution policy which outlined the University's regulations for handling allegations of student sexual misconduct. *Id.*

Like the plaintiff in *Charleston*, John argues he had a legally protected entitlement to his continued education at the university through the existence of an implied contract with USI. (*See* Filing No. 342 at 51.)  However, it is not enough for a plaintiff to merely state that an implied contract existed. *Bissessur*, 581 F.3d at 603.  A plaintiff must be specific about the promises the university made to the student, and the promises the student made in return. *Id.* at 603–04.

John argues that the undisputed material facts demonstrate the existence of an implied contract with USI including the "exact promises [USI] made to [John] and, . . . the promises that [John] made in return." (Filing No. 333 at 53 (alterations in original) (quoting *Doe v. Purdue*, 928 F.3d at 660)).  He argues that USI promised him that he would not be sanctioned or suspended for a violation of the Policy without good cause and through a process that was fair, impartial, thorough, equitable and in accordance with the process, procedure, and rights outlined in the Policy and Regulations (Filing No. 342 at 52; *see* Filing No. 330-7).  John further argues USI's promises were expressly acknowledged by USI's statement, "we do have certain Federal regulations and other rules that we must follow.  These are meant to guide us as we provide due process to all parties and to not follow them could result in dire consequences, such as an overturned decision, for everyone involved." (Filing No. 332-24 at 1.)

In essence, John asserts that USI agreed to conduct a Title IX grievance in accordance with the Policy.  However, John fails to present facts identifying where in the Policy USI makes specific promises to him.  The Policy is a state-created university process, and, as the Seventh Circuit has held many times, a violation of state law is not a denial of due process. *See Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993); *Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828 (7th Cir. 2012);

*Grant v. Trs. of Ind. Univ.*, No. 1:13-cv-826, 2016 WL 1222344, at *10 (S.D. Ind. Mar. 28, 2016)

(granting summary judgment on procedural due process claim arguing "[plaintiff] was denied

federally protected due process rights because IUSB did not follow the procedures within the IU

Handbook" because "the Seventh Circuit had repeatedly held that a state-created process does not

confer federal due process rights").

John has failed to put forth any fact demonstrating that a property interest existed by virtue

of a contract with USI.  He also fails to submit any case law to support his position that he has a

protected property interest in a state-created process.  Although the Policy may comply with Title

IX requirements, it is unique to USI and provides a process for how USI specifically will handle

sexual harassment; all universities are not required to follow the Policy created by USI.  John's

alleged interest in USI's state-mandated process is not protected by the federal Constitution.  *See*

*Charleston*, 741 F.3d at 773 ("It may have been unfair for the university not to follow its own

procedures . . . but it was not unconstitutional.").

### b.    <u>Protected Liberty Interest</u>

John argues that he has shown that the GRS Defendants deprived him of a protected liberty

interest.  The meaning of "liberty" is broad and includes the liberty to follow a trade, profession,

or other calling.  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972).  To establish a

liberty interest John must satisfy the "stigma-plus-test," showing that the state inflicted reputational

harm accompanied by an alteration in legal status that deprived him of a right he previously held.

*See Doe v. Purdue*, 928 F.3d at 661 (citations omitted).

In *Doe v. Purdue*, the Seventh Circuit held the plaintiff adequately alleged deprivation of a

protected liberty interest in the freedom to pursue his occupation of choice when Purdue University

suspended him for an academic year after finding him guilty of a sexual offense.  928 F.3d at 663.

Doe was an active member of the Navy ROTC program, and, based on a finding of guilt, he was

expelled from the Navy ROTC program, his ROTC scholarship was terminated, and he was unable to pursue a career in the Navy. *Id.* at 661–63. The Seventh Circuit held that Purdue's decision to brand Doe as a sex offender inflicted reputational harm and the expulsion changed plaintiffs' legal status from "full-time student in good standing to one suspended for an academic year." *Id.* Because Doe had an obligation to authorize Purdue to disclose the proceedings to the Navy, Purdue, not Doe, was responsible for the publication of the reputational harm. *See id.* at 662–63; *see Dupuy v. Samuels*, 397 F.3d 493, 510 (7th Cir. 2005) (finding the publication requirement of the stigma-plus test was satisfied when the plaintiffs were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers because publication was compelled and certain).

However, in *Malhotra v. University of Illinois at Urbana-Champaign*, the Seventh Circuit held that "the loss of reputation is not itself a loss of liberty, even when the reputational loss causes a serious impairment of one's future employment." 77 F.4th 532, 538 (7th Cir. 2023). A state actor infringes on a liberty interest only "by 'cast[ing] doubt on an individual's . . . reputation' to such a degree that 'it becomes virtually impossible for the [individual] to find new employment in his chosen field.'" *Id.* In *Malhotra*, the plaintiff alleged that he had a liberty interest in pursuing his chosen career of becoming a healthcare consultant and that his disciplinary record would be disclosed to any graduate school or employer to which he applies. *Id.* The Seventh Circuit held that plaintiff's alleged deprivation was too speculative, as he had not alleged that he applied to any other school or that no jobs would take him. *Id.; see also Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997).

John argues that the GRS Defendants have deprived him of his protected liberty interest to pursue the occupation of his choice (Filing No. 342 at 54). The government infringes upon an

individual's liberty interest to pursue the occupation of their choice when statements made by a state actor impugn "the individual's good name, reputation, honor, or integrity" or impose a "stigma or other disability on the individual which forecloses other opportunities." *Roth*, 408 U.S. at 573. The Fourteenth Amendment protects only the individual's liberty to pursue a particular occupation, however, and not the individual's right to any one job. *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001). Thus, for the purposes of an occupational liberty claim, defendants' actions must prevent the plaintiff from pursuing opportunities in their *chosen* profession. *Id.* at 670.

John argues that his claims are distinguishable from *Malhotra* because he would be disclosing a suspension over alleged rape. (Filing No. 342 at 55). He argues that his chosen profession is law and that he is prohibited from pursuing that profession so long as the Title IX finding remains on his records (Filing No. 342 at 54; Filing No. 33-16 ¶ 11).

Although John argues that a Title IX finding definitively would prohibit him from becoming a lawyer, he has not presented facts to support such an argument. Like the plaintiff in *Malhotra*, John argues that his disciplinary record would have to be disclosed to any institution he applies to and similarly disclosed to the state bar to become a licensed attorney (Filing No. 342 at 54). However, John has not designated evidence that his suspension has prohibited his admission. He has not shown that he has applied to any undergraduate school--a prerequisite to applying to law school--and USI's suspension was only for three semesters, and he was eligible to return Spring 2023. He argues that even if he were "admitted to another university, and then law school, becoming a licensed attorney would no doubt involve a legal obligation to disclose the Title IX findings to the state bar" and "such compulsory disclosure in order to pursue a chosen calling cannot be considered self-reporting." (Filing No. 333 at 56). Regardless, John's assertions are unsupported as he has not designated any evidence to show that the suspension would make it

impossible for him to become a lawyer.  The Court concludes that there are no disputed material facts that demonstrate a protected property interest or protected liberty interest.

However, even if there was a reputational loss causing a serious impairment of John's future employment as a lawyer, he has not shown a deprivation of his protected interests without procedural due process. Instead, the designated evidence shows that John was afforded all process which was due under the circumstances.  Accordingly, the GRS Defendants' Motion for Summary Judgment as to Count II is **granted**.

### 3.    Count III: IIED Claim

Count III alleges that the GRS Defendants engaged in extreme and outrageous conduct that intentionally or recklessly caused severe emotional damage to John (Filing No. 196 ¶ 441).  In particular, John alleges that GRS "is liable for the acts of Nutter relating to the matters alleged [within the Second Amended Complaint] which were committed within the course and scope of her employment with [GRS]."  *Id.* ¶ 435. John argues that the GRS Defendants intentionally disregarded their duties, Policy, and Regulations to intentionally and recklessly cause him harm. (Filing No. 333 at 61). The GRS Defendants respond that John cannot establish a *prima facie* claim that their conduct rose to the level of IIED.

To establish a claim for IIED, a plaintiff must plead that a defendant: "(1) engaged in extreme and outrageous conduct, (2) which intentionally or recklessly, (3) caused, (4) severe emotional distress to another." *Rihm v. Hancock Cnty. Libr.*, 954 F. Supp. 2d 840, 858 (S.D. Ind. 2013).  Indiana courts apply a rigorous standard to establish extreme or outrageous conduct. *Westminster Presbyterian Church of Muncie v. Yonghong Cheng*, 992 N.E.2d 859, 870 (Ind. Ct. App. 2013).  IIED is found where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind.  *Harkins v. Westmeyer*, 116 N.E.3d 461, 472 (Ind. Ct. App. 2018).  "Liability has been found only where the conduct has been so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

Seventh Circuit precedent has not addressed whether the mishandling of a Title IX investigation gives rise to a claim for IIED.  In such an absence, the Court considers helpful the District Court for the District of Columbia's decision in *North v. Catholic University of America*, 310 F. Supp. 3d 89, 95 (D.D.C. 2018).  In that case, a student was found responsible for sexual assault after having a sexual encounter with a student who was incapable of giving consent due to intoxication.  *Id.* at 91.  The student alleged that university personnel investigating the allegations showed "a 'clear bias' against him, were 'openly hostile' to him, and acted with 'actual malice' in determining which witnesses could testify at the hearing."  *Id.* at 95.  The court held that such conduct, even if true, did not rise to the level of outrageous conduct required for an IIED claim. *Id.* at 95–96.

The same conclusion applies here.  John argues that Nutter's conduct was outrageous in three ways: (1) her failure to disclose her conflict of interest and bias; (2) her failure to make a determination on the non-consensual kissing allegation; and (3) her failure to allow John the opportunity to explain inconsistencies.  The GRS Defendants contend that John's arguments are meritless, as the undisputed facts show that Nutter asked questions of both John and Jane, and that Nutter's intention was to conduct a fair, thorough, and impartial hearing (*see* Filing No. 317-1 at 22; Filing No. 318-1 at 22:9–13).  GRS Defendants concede that this was a difficult case that came down to credibility and that Nutter and her co-panelists carefully and exhaustively weighed the evidence before reaching a decision. (Filing No. 318-1 at 18-23).  Moreover, Nutter and her colleagues took several weeks after the hearing to reach a decision and Nutter acknowledged during her deposition that they "wrestled" with the decision. *Id.*

John's claim that Nutter had a conflict of interest fails because the undisputed facts do not demonstrate that Nutter had a conflict of interest. Nutter seeking clarity on policy definitions prior to the hearing did not make her involved with setting USI policy. Even if Nutter failed to disclose her alleged conflict of interest, failed to make a determination of the non-consensual kissing allegation,[7] and failed to allow John the opportunity to explain inconsistencies that affected his credibility, these facts do not rise to the level of extreme and outrageous conduct that goes beyond all possible bounds of decency. *See Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 247 (D. Vt. 1994) ("A College's decision, when confronted with a female student's accusation of rape, to confront the male student with the charges, hold a hearing, and support the findings of the initial tribunal on appeal, even where various procedural errors are alleged, cannot form the basis of an IIED claim.").  Despite his repeated claims of anti-male bias, John offers no facts from which a reasonable jury could infer such a motive.

For these reasons, summary judgment on Count III is **granted** in the GRS Defendants' favor.

**D.**     **John's Cross-Motion for Summary Judgment (Filing No. 329)**

In John's Substituted Consolidated Summary Judgment Brief, he seeks judgment as a matter of law as to liability on Counts I, II, and III of his Second Amended Complaint (*see generally* Filing No. 342).  He argues the undisputed facts support that USI discriminated against him because of his male sex; and asserts that "Nutter's defiance of her Title IX training and expertise and the Regulations and Policy in order to favor Jane throughout the Hearing and afterward, in addition to her undisclosed conflicts of interest, served to deny John his due process

---

[7] The Seventh Circuit previously held that Defendants failing to render a determination of responsibility on the non-consensual kissing allegation was an error under Title IX regulations, but it was not "convincing evidence of bias against men in general or John in particular." *Doe*, 43 F.4th at 797.

rights and ensure a finding that he was responsible for sexual assault." (Filing No. 333 at 58). The Court has addressed the merits of each count in its discussion above, and determined the Defendants are entitled to judgment as a matter of law, thus John is not entitled summary judgment on any of the counts.

Before concluding, the Court will address two final issues raised in John's reply brief. First, John argues that USI has conceded his arguments by failing to respond because their opposition brief contains no argument (*see* Filing No. 373 at 1). John reminds the Court that it mandated four briefs on summary judgment (Filing No. 223 at 3) but, notwithstanding this direction, USI filed a separate reply brief and opposition brief. John's Substituted Consolidated Summary Judgment Brief (Filing No. 342) presents the same arguments in response to USI's Summary Judgment Motion and in support of his Cross-Motion for Summary Judgment. USI devoted twenty-three pages to addressing John's arguments in its reply (*see* Filing No. 362), which the Court considered in ruling on its Motion for Summary Judgment. To say USI failed to respond to John's arguments would be disingenuous. Moreover, because the Court has already concluded that USI is entitled to summary judgment in its favor, any argument (or lack thereof) in USI's Opposition Brief is immaterial to the Court's ruling on John's Cross-Motion.

Second, embedded within John's reply brief is a Motion to Strike USI's "incorporation by reference." (*See* Filing No. 373 at 1.) John asks the Court to strike USI's incorporation by reference because it incorporates "over **80 pages** of argument and facts **without specificity**" and is an "improper 'self-help increase in the length' of [the] brief." *See id.* (emphasis in original). John's Motion to Strike does not comply with Local Rule 7-1(a). Local Rule 7-1(a) requires that motions must be filed separately, and a motion "must not be contained within a brief, response, or

reply to a previously filed motion, unless ordered by the court." Therefore, the Court will not

consider John's embedded motion.

For the reasons discussed above (*see supra* III(B)–(C)), John is not entitled to summary

judgment in his favor on Count I, Count II, or Count III. Accordingly, John's Cross-Motion for

Summary Judgment is **denied**.

## IV.     CONCLUSION

For the reasons discussed above, USI's Motion for Summary Judgment (Filing No. 314) is

**GRANTED**.   The GRS Defendants' Motion for Summary Judgment (Filing No. 317) is

**GRANTED**.  John's Cross Motion for Summary Judgment as to Liability on his Second Amended

Complaint as to all Defendants (Filing No. 329) is **DENIED**, and John's Motion to Strike

arguments raised in USI's reply brief (Filing No. 372) is **DENIED as moot**.

This Order resolves all claims in this action. Final Judgment will issue in a separate filing.[8]

**SO ORDERED.**

Date:  9/24/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Keith W. Vonderahe
ZIEMER STAYMAN WEITZEL & SHOULDERS
kvonderahe@zsws.com

Matthew Stephen Koressel
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
mkoressel@zsws.com

Robert L. Burkart
ZIEMER STAYMAN WEITZEL & SHOULDERS
rburkart@zsws.com

---

[8] The Court recognizes that John's interlocutory Appeal to the Seventh Circuit Court of Appeals as to the Court's Order
denying pseudonymity (Filing No. 441) remains pending. However, judicial economy supports bringing this case to
final judgment.

Kirstie Klutzke
STUART & BRANIGIN LLP
kek@stuartlaw.com

William P. Kealey
STUART & BRANIGIN LLP
wpk@stuartlaw.com

Aj Bokeno
WILSON ELSER
aj.bokeno@wilsonelser.com

Edward M. O'Brien
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
edward.obrien@wilsonelser.com